SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

EVA MALLEK

Plaintiff,

-against-

ALLSTATE, ALLSTATE AGENT AND REPRESENTATIVE FOR ALLSTATE KEVIN SCHAEFER, JOHN DOE, JANE DOE AS ALL OTHER CONSULTANTS REPRESENTING ALLSTATE

Defendants

Index No. 9134/17

**SUMMONS & COMPLAINT**

**TRIAL BY JURY**

**YOU ARE SUMMONED** to appear in this action by serving your answer to the complaint to **EVA MALLEK** within the time limit stated below.

Queens is designated as the county where this action will be tried due to the underlying action being venued in that county.

This summons is served by delivery to you personally within New York State, and as such you must answer the complaint within TWENTY (20) days after its delivery.

**IF YOU FAIL TO ANSWER THE COMPLAINT** within the time stated, judgment will be entered against you for the relief demanded in the **COMPLAINT**.

Eva Mallek, pro se
68-61 Yellowstone Blvd.
Forest Hills, NY 11375
(917)226-0802
eva.mallek@outlook.com
emm228@NYU.EDU

Dated: **SEPTEMBER 8, 2017**
New York, New York

Nicole Carbonare
Notary Public, State of New York
No. 01CA6174402
Commission Expires Sept. 17, 2019

**TO THE SUPREME COURT OF THE STATE OF NEW YORK**

The complaint of the plaintiff, EVA MALLEK, respectfully shows and alleges as follows:

## THEFT BY ALLSTATE, REPRESENTATIVES AND COUNSEL VIA BREACH OF CONTRACT MECHANISM

1. **THEFT - Allstate refuses to honor Homeowner Insured's Claim No. 0384184776**:

Mrs. Mallek, plaintiff and age 62, brings this action to recover the losses suffered by herself and her family due to Allstate capriciously declining to honor plaintiff's homeowner's insurance policy No. 000043794222 after a fire destroyed the structure and contents of her home at 88-20 207th St., Queens Village, NY 11427 on or about September 14, 2015. The homeowner's policy has a value of $358,000, and Additional Living Expenses up to 12 months, and Family Liability Protection $300,000 for temporary living expenses. **EXHIBIT 1.**

## FACTS

2. **MECHANISM 1– ALLSTATE Tampered with the evidence by altering Eva Mallek's sworn statement so engaging in obstruction of justice for the purposes of theft.** Eva Mallek's sworn statement was significantly altered/manipulated to fit Allstate's intents and purposes of undermining the truth. See **EXHIBIT 4.**

3. **MECHANISM 2- Allstate NEVER provided Eva Mallek the full text of the policy**.

This is a premediated fraudulent act by Allstate that places the insured at a strategic disadvantage by keeping the full text that explains the conditions/restrictions of the policy from the insured's knowledge. This is evidence of fraud and Allstate's ill intent against the insured. The modus operandi of this illicit act entails the yearly mailing of selected pages that represents the policy is being renewed in exchange for a yearly/monthly payment but Allstate avoids

enclosing the full 20-page policy document to the mailing. The size of the font does not comply with standards of Federal and State policy. Strategically, Allstate is found to reveal the full text of the policy at the time of a claim pointing to the insured, as in this case, a labored reason for refusing a claim. See **EXHIBIT 1** for yearly mailings received by insured on the policy. Only upon request by Eva Mallek and after the claim placed with ALLSTATE for the loss of the structure of the home, the full text of the policy was made available to Eva Mallek by Allstate's Counsel. This premeditated and willful illicit act is criminal under wire fraud State and Federal regulations. Both Allstate and Counsel are at fault in this criminal conspiracy and racketeering act.

***NOTE: The above paragraph impeaches in its entirety items #1 through #6 of Allstate refusal letter dated June 13, 2016 signed by Edward Lynch, tel. 866-724-2612 ext. 3570482 and letter dated September 14, 2016 signed by Rebecque Taphorn, tel. 800-366-9775 ext. 4404717. Eva Mallek perceived that the yearly mailing sent by Allstate included the entirety of the policy and was not aware of the 20-page long document and the conditions it contained some of which are listed under items 1 through 6 in Allstate's letter and are not applicable to the reasons for refusal and these are without merit. For a copy of Allstate's refusal letters see*** **EXHIBIT 3.**

4. **MECHANISM 3. Allstate consistently and capriciously rebuffed demand for payment on claim No. 0384184776 creating considerable delays on progress on the claim**: Mrs. Mallek created a claim by phone on or about September 14, 2015. Eva Mallek followed up by presenting several written demands for payment and via sworn statements ***on the loss of the structure only*** without success **EXHIBIT 2**. Mrs. Mallek has not made a claim on the **contents of the home** and informed Allstate accordingly in writing and during her sworn statement. See **EXHIBIT 4** at Allstate's Counsel's office on January 7, 2016. Plaintiff had

difficulties sorting out purchase receipts on the contents of the home dated 1997 to-date for obvious reasons.

*NOTE: The above paragraph further impeaches Items #3, #5 and #6 of Allstate refusal letter dated June 13, 2016 signed by Edward Lynch, tel. 866-724-2612 ext. 3570482 and letter dated September 14, 2016 signed by Rebecque Taphorn, tel. 800-366-9775 ext. 4404717. For a copy of Allstate's refusal letters see* EXHIBIT 3.

## REASONABLE EFFORTS BY PLAINTIFF TO SETTLE THE CLAIM

5. **Eva Mallek placed a formal complaint on Allstate's misconduct to the State of New York Attorney General under Case No. 2016-1272762**: This office referred Eva Mallek to the New York State Department of Financial Services-Financial Frauds and Consumer Protection Division.

6. **Eva Mallek placed a formal complaint with the NYS Regulatory Agency under Case No. CSB-2016-1134292 regarding Allstate's misconduct**: Allstate refused to settle the claim.

7. **Eva Mallek complained to the Departmental Disciplinary Committee Docket No. 2016.1150 against Allstate's Counsel**: Allstate refused to settle the claim.

## BACKGROUND INFORMATION

8. **Occupancy Status-The home was held by the family since 1977**: Mrs. Mallek's parents as well as Mrs. Mallek, prior to her marriage, occupied the property since 1977. From inception Mrs. Mallek has held title to the house with both her parents and currently holds full title. Both her parents are deceased.

9. **Occupancy Status-At the time of the Loss. Allstate held in its files the correct occupancy status of the home that verified Mrs. Mallek residence was in Forest Hills**: See **EXHIBIT 1** and **EXHIBIT 5** for mailing address and for change in occupancy status and title. Mrs. Mallek duly reported to Allstate agent Anna Truszkowski the change in occupancy status on the home effective March 20, 2007. After her mother's passing Mrs. Mallek's father transferred title to Eva Mallek's name. Mrs. Mallek retained the same policy number and her father continued living in the house. Mrs. Mallek resides with her husband in a pre-war one-bedroom apartment in Forest Hills, Queens. At least since reporting the change in occupancy status, Allstate directs all correspondence to Mrs. Mallek accordingly at the Forest Hills address. It is clear that Allstate was aware Mrs. Mallek's official domicile is in Forest Hills.

*NOTE: The above paragraph further refutes Items #1 and #2 of Allstate refusal letter dated June 13, 2016 signed by Edward Lynch, tel. 866-724-2612 ext. 3570482 and letter dated September 14, 2016 signed by Rebecque Taphorn, tel. 800-366-9775 ext. 4404717. For a copy of Allstate's refusal letters see* **EXHIBIT 3.**

10. **There was no reasonable/believable motivation for Eva Mallek to conceal her living address from Allstate**: Occupancy Status-Mrs. Mallek's records are consistent regarding her residence location. All of Mrs. Mallek's official and personal records are consistent in that for the past at least 10 years she reports her domicile as being in Forest Hills, Queens to the following agencies: IRS, NYS records, school and voter registration, credit cards, museum memberships, and employment records, among others. There is no reasonable/believable motivation for Eva Mallek to conceal her living address from Allstate.

11.   **The occupant of the home was Mrs. Mallek's father and a solid member of her household as a dependent:** Mrs. Mallek reported her father as her dependent for tax purposes. IRS and NYS tax records also show that Mrs. Mallek reports her father as her dependent. Her father, Mario Gonzalez, never paid rent to Mrs. Mallek. Her father was a member of Mrs. Mallek's household.

## BREACH OF CONTRACT

12.   On or about March 2015 the Plaintiff and Defendant continued a written contract, a copy of which is attached hereto, made a part hereof, and is marked as **EXHIBIT 1** (hereinafter referred to as the Contract).

13.   Pursuant to the Contract, the Plaintiff had agreed to cover for losses of the Plaintiff's home's structure, contents and living expenses at 88-20 207th Street, Queens Village, NY 11427. Plaintiff's elderly father, her dependent, resided at the home along with his wife. Plaintiff/Insured's address is 68-61 Yellowstone Blvd., Forest Hills, NY 11375 and had been dutifully reported to Allstate.

14.   Allstate was fully aware of Plaintiff's living arrangements and the evidence is that all correspondence from Allstate has always been addressed to the Forest Hills address. Plaintiff never attempted to deceive Defendant in that regard. Additional evidence is that all records generated by Plaintiff including tax filings and recent mortgage applications are consistent.

15.   On or about September 14, 2015 Plaintiff submitted to Allstate a claim for the loss of the structure due to fire through Allstate's website. Allstate generated claim no. 0000437941222.

**The following acts by Allstate are self-evident of willful bad faith:**

16. Allstate's staff repeatedly denied that Plaintiff had at all times been cooperative regarding the house inspection process and also denied the fact that keys to the house had been left in their care resulting in considerable delays on the inspection of the house. The house was at last inspected.

17. Allstate has denied Eva Mallek access to reports evaluating the assessment on the loss and potential claim value of the structure of the home.

18. Repeatedly the Plaintiff requested payment for temporary living expenses for dependent and elderly father, 87 years old and his wife. Allstate has repeatedly denied these requests. The elderly father resided at a shelter/hotel provided by the Red Cross until his passing in 2016.

19. Eva Mallek was called to a deposition on January 7th, 2016. When visiting the attorney's office to follow-up on the claim and collect payment, Eva Mallek was received with hostility. No one at the attorney's office wanted to speak with Eva Mallek and she was subsequently threatened by Counsel's staff with expulsion from the premises at the hands of Building Security.

20. For expediency purposes, Plaintiff has presented to Allstate the claim on the value of the structure only which would allow collecting on the value of its loss as well as on collecting coverage for living expenses incurred by the Plaintiff's father while still alive.

21. Circumstantial evidence suggests that Allstate is keen on treating both processes (claims on the structure and claim on the contents of a home) simultaneously to delay the claim and fabricate accusations of fraud by simply using the mechanism that accuses insureds of

overpricing the value of the contents in the home. The accusation of fraud against Eva Mallek constitutes defamation of her character.

22.     To-date, Plaintiff has met all reasonable conditions regarding the claim on the structure of the property at 88-20 207th Street, Queens Village, NY 11427 and deserves her claim to be honored by Allstate. Allstate and its agents have proven to be unworthy of trust and Plaintiff has avoided signing any additional legal documentation under Allstate's demands and duress.

23.     By reason of the facts and circumstances stated above, defendant has breached the contract.

## CLAIMS

### COUNT I

24.     The Defendant's breach of Contract and bad faith hereinabove has caused Plaintiff to suffer $358,000 represented in the loss of the home's structure and additional expenses due to fines by the State on debris left on the property, notwithstanding real estate, and utility bills that are outstanding from the Water service, and other accumulated debts regarding this matter.

### COUNT II

25.     The conduct of Defendant complained of hereinabove constitutes gross negligence, disregard for the law by tampering with the evidence, arrogance and reckless neglect for the laws protecting the elderly resulting in elderly abuse for which the Defendant should be punished and deterred from similar conduct in the future. The conduct of the Defendant complained of herein was: criminal, intentionally malicious, and egregious showing contempt for the rule of law.

**COUNT IV**

26. The Defendant, by repeatedly misrepresenting the facts, has defamed the Plaintiff's character.

**COUNT V**

27. While consistently and in good faith the Plaintiff wished to settle by incorporating third parties into the discussion Allstate, the Defendant, refused to settle by making false and outlandish accusations against the plaintiff defaming her character and good name.

## DEMAND FOR RELIEF

28. The Plaintiff wishes to demand full relief for the loss of the structure of her home and any other disbursements caused and debts accumulated related to the property by this tragic incident plus interest since September 14, 2015.

29. The Plaintiff wishes to demand relief for the pain and suffering caused by the Plaintiff's misconduct.

30. The Plaintiff continues to receive insurance invoices from Allstate by the same amount as if the home is still fully intact and there has been no decrease in the home's market value. The Plaintiff demands reimbursement for the overpaid sums plus interest since September 14, 2015.

31. The Plaintiff believes she has been overcharged for the policy for the past several years. No feedback from Allstate was ever received on this complaint . Plaintiff demands an audit on the account to disclose the reasons for substantial premium increases in recent years that might disclose additional theft mechanisms by Allstate and its agents.

32. The Plaintiff wishes to demand such additional sums that would serve as a harsh deterrent to Defendant and stand as precedent in future cases in defense of the elderly, and working families in our community against corporate theft and abuse.

33. Tax payers should not have to bear the debts of corporations such as Allstate. Therefore, Allstate should be held accountable for Plaintiff's loss as per the policy held since 1977 and renewed yearly since then instead of the IRS and the State of New York on behalf of the tax payers in our community.

34. Most importantly, the child of an immigrant working family whose parents were a seamstress and a construction worker and whose aim of self-reliance allowed them to leave their modestly accumulated savings in the form of a house to their offspring, should not be exposed to white-collar crime and theft perpetrated by a corporation to satisfy its own greed and left without the protection of our institutions and the rule of law. Allstate by its own act in this particular case represents the hands of corporate greed that with impunity has seemingly become accustomed to victimizing our community.

35. The plaintiff demands in addition to the above, any other relief the Court finds to be just and proper.

Dated: September 8, 2017

Eva Mallek, pro se
Plaintiff

68-61 Yellowstone Blvd.
Forest Hills, NY 11375
enm228@nyu.edu

**VERIFICATION**

Eva Mallek, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have prepared the foregoing complaint. All statements are true to my knowledge based on evidence, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Eva Mallek, pro se
Plaintiff

Sworn to before me this 8th day of September 2017

Nicole Carbonara
Notary Public, State of New York
No. 01CA6174402
Commission Expires Sept. 17, 2019

EXHIBIT 1

*Kevin Schaefer*
*49 Nassau St #2*
*New York NY 10038*

**Your Quick Insurance Check**

- ✓ Verify the information listed in the Policy Declarations.
- ✓ Please call if you have any questions.
- ✓ Now you can pay your premium before your bill is issued - visit allstate.com or call 1-800-Allstate®.

Eva N Mallek
6861 Yellowstone Blvd
Forest Hills NY 11375-9403

**A new policy period is about to begin. Here are your renewal materials.**

I'm pleased to once again offer you the opportunity to continue your Allstate Insurance Company Standard Homeowners policy for another year. We appreciate your business and want to remind you that you're backed by an experienced Allstate team that's ready to help you protect your family and your financial security.

**Your policy documents are inside.**
You'll find listed on the enclosed Policy Declarations your coverages, limits, deductibles, premiums, and any discounts you have. As you read these materials, it would be a good idea to consider whether anything needs updating. I'd be happy to help you make sure that your insurance keeps up with any changes in your life.

*(over)*

**Renewing your policy is easy.**
Here's what will happen and what you'll need to do before the beginning of your next policy period.

- Please carefully check your Policy Declarations to make sure it accurately reflects your information and the choices you've made. Get in touch with me right away if there's anything you'd like to change.
- Unless a mortgage company or lienholder pays your insurance premium for you, keep an eye out for your bill, which will include information on payment options.
- If you're paying your premium using the Allstate Easy Pay Plan, you will not receive a bill. Instead, we'll send you a statement detailing your withdrawal schedule for the policy period.
- Carefully read all enclosed materials and store these documents with your other important papers. Keep in mind that the policy documents included may change each time you receive a renewal offer—please read them to make sure you know about any important information or changes related to your insurance.

**We're here to help you.**
Feel free to call me at (212) 267-7601. Or take advantage of the online services at *allstate.com,* where you can view your policy information and even make a payment by registering at the Allstate Customer Care Center. And for 24-hour-a-day, 7-day-a-week service and information, just call 1-800-ALLSTATE® (1-800-255-7828).

Remember, insurance is not only protection for today. It helps pave the way to a financially secure future.

I'm glad you're with us.

Kevin Schaefer

Kevin Schaefer
Your Allstate Agent

1601285300273 41033889

# Allstate Insurance Company

## RENEWAL

# Standard Homeowners Policy Declarations

## Summary

| NAMED INSURED(S) | YOUR ALLSTATE AGENT IS: | CONTACT YOUR AGENT AT: |
|---|---|---|
| Eva N Mallek<br>68-61 Yellowstone Blvd<br>Forest Hills NY 11375-9403 | Kevin Schaefer<br>49 Nassau St #2<br>New York NY 10038 | (212) 267-7601 |

| POLICY NUMBER | POLICY PERIOD | PREMIUM PERIOD |
|---|---|---|
| 0 43 794222 03/20 | Begins on Mar. 20, 2015<br>at 12:01 A.M. standard time,<br>with no fixed date of expiration | Mar. 20, 2015 to Mar. 20, 2016<br>at 12:01 A.M. standard time |

**LOCATION OF PROPERTY INSURED**
88-20 207 St, Queens Village, NY 11427-2236

**LEGAL DESCRIPTION**
88-20 207 ST QUEENS VILLAGE NY 11427

**MORTGAGEE(S)** (Listed in order of precedence)

- CITIMORTGAGE INC ITS SUCCESSORS &/OR ASSIGNS
  P O Box 7706 Springfield OH 45501-7706 *Loan # 1123362416011D*
- CITIBANK NA ISAOA/ATIMA
  P O Box 7807 Springfield OH 45501-7807 *Loan # NONE*

## *Total Premium for the Premium Period* *(Your bill will be mailed separately)*

| | |
|---|---|
| Premium for Property Insured | $1,188.00 |
| **TOTAL** | **$1,188.00** |

PROP *0100031150128530027311102*

Information as of January 28, 2015

# Allstate Insurance Company

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

## POLICY COVERAGES AND LIMITS OF LIABILITY

| COVERAGE AND APPLICABLE DEDUCTIBLES (See Policy for Applicable Terms, Conditions and Exclusions) | LIMITS OF LIABILITY | |
|---|---|---|
| Dwelling Protection - with Building Structure Reimbursement Extended Limits<br>• $1,000 Other Peril Deductible Applies<br>• Deductible for Severe Hurricanes Applies* | $358,000 | |
| Other Structures Protection<br>• $1,000 Other Peril Deductible Applies<br>• Deductible for Severe Hurricanes Applies* | $35,800 | |
| Personal Property Protection - Actual Cash Value<br>• $1,000 Other Peril Deductible Applies<br>• Deductible for Severe Hurricanes Applies* | $64,000 | |
| Additional Living Expense | Up To 12 Months | |
| Family Liability Protection | $300,000 | each occurrence |
| Guest Medical Protection | $500 | each person |
| Workers' Compensation and Employers' Liability Coverage for Residence Employees | Statutory/See Form | |

*** $17,900 ( 5% of your Dwelling Protection limit) is your Deductible for Severe Hurricanes, which applies to the total of all losses under the coverages indicated above.**

## DISCOUNTS

Your premium reflects the following discounts on applicable coverage(s):

Protective Device 5 %

## RATING INFORMATION

The dwelling is of Brick construction and is occupied by 1 family

# Allstate Insurance Company

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

## *Your Policy Documents*

Your Homeowners policy consists of this Policy Declarations and the documents listed below. Please keep these together.

- Standard Homeowners Policy form AP315
- NY Amendment of Policy Provisions form AP1948
- Declarations Supplement Pg (New York) form AU233-1
- New York PIA Amendatory End. form AP4577
- Deductible for Severe Hurricanes End. form AP585-1
- Off Premises Theft Excluded End. form AU9010-1
- New York Amendatory Endorsement form AP497-2
- Amendment of Policy Provisions form AP521
- Domestic Workers' Comp & Emp Liability AP1105-1
- New York Amendatory Endorsement form AP1727
- Bldg. Struct. Reimb. Ext. Limits End. form AP693
- Standard Homeowners Amendatory End.form AP1357-1

## *Important Payment and Coverage Information*

Coverage A - Dwelling Protection includes an approximate increase of $9,000 due to the Property Insurance Adjustment provision using the Marshall Swift Boeckh Publications Building Cost Index. Coverage C - Personal Property Protection adjusted accordingly.

IN WITNESS WHEREOF, **Allstate** has caused this policy to be signed by two of its officers at Northbrook, Illinois, and if required by state law, this policy shall not be binding unless countersigned on the Policy Declarations by an authorized agent of **Allstate.**

Thomas J. Wilson
President

Mary J. McGinn
Secretary

PROP *010003115012853002731103*

Information as of January 28, 2015

**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

## *Privacy Policy Statement*

Thank you for choosing Allstate. We value you, respect your privacy and work hard protect your personal information.

This statement is provided on behalf of Allstate Insurance Company and the affiliates ("Allstate") listed at the end of this notice. We would like to explain how we collect, use and share the information we obtain about you in the course of doing business.

**Our Privacy Assurance**

- We do not sell your personal or medical information to anyone.
- We do not share your information with non-affiliate companies that would use it to contact you about their own products and services, unless permitted pursuant to a joint marketing agreement.
- We require persons or organizations that represent or assist us in servicing your policy and claims to keep your information confidential.
- We require our employees to protect your personal information and keep it confidential.

As you can see, protecting your personal information is important to us. In addition to the practices described above, we use a variety of physical, technical and administrative security measures that help to safeguard your information. For Social Security Numbers (SSN), this includes restricting access to our employees, agents and others who use your SSN only as permitted by law: to comply with the law, to provide you with products and services, and to handle your claims. Also, our employees' and agents' access to and use of your SSN are limited by the law, our policies and standards, and our written agreements.

Our privacy practices continue to apply to your information even if you cease to be an Allstate customer.

**What Personal Information Do We Have and Where Do We Get It**

We gather personal information from you and from outside sources for business purposes. Some examples of the information we collect from you may include your name, phone number, home and e-mail addresses, driver's license number, social security number, marital status, family member information and healthcare information. Also, we maintain records that include, but are not limited to, policy coverages, premiums, and payment history. We also collect information from outside sources that may include, but is not limited to, your driving record, claims history, medical information and credit information.

In addition, Allstate and its business partners gather information through Internet activity, which may include, for example, your operating system, links you used to visit *allstate.com*, web pages you viewed while visiting our site or applications, Internet Protocol (IP) addresses, and cookies. We use cookies, analytics and other technologies to help:

- Evaluate our marketing campaigns
- Analyze how customers use our website and applications
- Develop new services
- Know how many visitors have seen or clicked on our ads

Also, our business partners assist us with monitoring information including, but not limited to, IP addresses, domain names and browser data, which can help us to better understand how visitors use *allstate.com*.

**How We Use and Share Your Personal Information**

In the course of normal business activities, we use and share your personal information. We may provide your information to persons or organizations within and outside of Allstate. This would be done as required or permitted by law. For example, we may do this to:

- Fulfill a transaction you requested or service your policy

PROP "010003115012853002731104"



# Allstate Insurance Company

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

- Market our products
- Handle your claim
- Prevent fraud
- Comply with requests from regulatory and law enforcement authorities
- Participate in insurance support organizations

The persons or organizations with whom we may share your personal information may include, among others:

- Your agent, broker or Allstate-affiliated companies
- Companies that perform services, such as marketing, credit card processing, and performing communication services on our behalf
- Business partners that assist us with tracking how visitors use *allstate.com.*
- Other financial institutions with whom we have a joint marketing agreement
- Other insurance companies that play a role in an insurance transaction with you
- Independent claims adjusters
- A business or businesses that conduct actuarial or research studies
- Those who request information pursuant to a subpoena or court order
- Repair shops and recommended claims vendors

**The Internet and Your Information Security**

We use cookies, analytics and other technologies to help us provide users with better service and a more customized web experience. Additionally, our business partners use tracking services, analytics and other technologies to monitor visits to *allstate.com.* The website may also use Web beacons (also called "clear GIFs" or "pixel tags") in conjunction with cookies. If you prefer, you can choose to not accept cookies by changing the settings on your web browser. Also, if you would like to learn about how we gather and protect your information over the Internet, please see our online privacy statement located at the bottom of the *allstate.com* homepage.

To learn more, the allstate.com Privacy Statement provides information relating to your use of the web site. This includes, for example, information regarding:

1) how we collect information such as IP address (the number assigned to your computer when you use the Internet), browser and platform types, domain names, access times, referral data, and your activity while using our site;
2) who should use our web site;
3) the security of information over the Internet; and
4) links and co-branded sites.

**How You Can Review and Correct Your Personal Information**

You can request to review your personal information contained in our records at any time. To do this, please send a letter to the address below requesting to see your information for the previous two years. If you believe that our information is incomplete or inaccurate, you can request that we correct it. Please note we may not be able to provide information relating to investigations, claims, litigation, and other matters. We will be happy to make corrections whenever possible.

Please send requests to:
Allstate Insurance Company Customer Privacy Inquiries
P.O. Box 40047
Roanoke, VA 24022-0047

**Your Preference for Sharing Personal Information**

We would like to share your personal information with one or more Allstate affiliates in order to make you aware of different products, services and offers they can provide. However, you can request that Allstate and its affiliate companies not share your personal information with our affiliates for marketing products and services.

## Allstate Insurance Company

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

To request that we not allow other Allstate affiliates to use your personal information to market their products and services, you can contact us by calling 1-800-856-2518 twenty-four hours a day, seven days a week. Please keep in mind that it may take up to four weeks to process your request. If you previously contacted us and asked us not to allow other Allstate affiliates to use your personal information, your previous choice still applies and you do not need to contact us again. If you would like to change your previous choice please call the number above at any time.

**We Appreciate Your Business**
Thank you for choosing Allstate. We understand your concerns about privacy and confidentiality, and we hope this notice has been helpful to you. We value our relationship with you and look forward to keeping you in Good Hands®.

If you have questions or would like more information, please don't hesitate to contact your Allstate agent or call the Allstate Customer Information Center at 1-800-Allstate.

We reserve the right to change our Privacy practices, procedures, and terms.

Allstate Insurance Company

**Allstate affiliates to which this notice applies:** Allstate County Mutual Insurance Company, Allstate Finance Company, Allstate Financial Services, LLC (LSA Securities in LA and PA), Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, Allstate Investment Management Company, Allstate Life Insurance Company, Allstate Life Insurance Company of New York, Allstate Motor Club, Inc., Allstate New Jersey Insurance Company, Allstate New Jersey Property and Casualty Insurance Company , Allstate Property and Casualty Insurance Company, Allstate Texas Lloyd's, Allstate Texas Lloyd's, Inc., Allstate Vehicle and Property Insurance Company, Deerbrook General Agency, Inc., Deerbrook Insurance Company, Lincoln Benefit Life Company, North Light Specialty Insurance Company, Northbrook Indemnity Company.

Please Note: Allstate affiliates American Heritage Life Insurance Company, Castle Key Insurance Company and Castle Key Indemnity Company participate in information sharing with the affiliates listed above, but have a separate privacy notice for their customers.

**For California residents:**
Pursuant to California law, we need to disclose to you that we would obtain your consent before sharing medical information for marketing purposes.

**For Montana residents:**
Pursuant to Montana law, you may also request a record of any disclosure of your medical information during the preceding three years. Please send requests to: Allstate Insurance Company Customer Privacy Inquiries, P.O. Box 40047, Roanoke, VA 24022-0047

**For Nevada Residents:**
Allstate is committed to serving you when and where you prefer as we help you protect what you have today and prepare you for the future. To that end, and as Nevada law requires, if you do not want to receive sales calls from Allstate, you have the option to be placed on our internal "do not call" list. (Please disregard this notice if you have already been added to Allstate's internal "do not call" list.) You may make this request in the following convenient ways:

- Contact your local Allstate agency
- Call 1-800-ALLSTATE and speak with a customer representative
- Visit allstate.com, click on Contact Us and send us an e-mail
- Write to us at Allstate Insurance Company, Attn: Customer Service, P.O. Box 40047, Roanoke, VA 24022-0047

PROP *01000311501285300273105*



In your discussion or correspondence with us, please be sure to provide us with your name, address and all telephone numbers you wish to include on our list. If you have questions about this notice, you may contact us at the address listed above or you may also contact the Nevada Attorney General's office at:

Office of the Nevada Attorney General
Bureau of Consumer Protection
555 E. Washington Avenue, Suite 3900
Las Vegas, NV 89101
Phone: (702) 486-3132
Email: BCPINFO@ag.state.nv.us

Please note that Allstate's "do not call" list is limited only to telephone solicitation calls. We may still contact you about your Allstate policy, billing issues, claims and other service matters.

**For Vermont residents:**
We won't share your personal information with Allstate companies for marketing purposes except as allowed by Vermont law.

(ed. 8/2012) **X66702-1v5**

**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

## *Information about Scheduled Personal Property Coverage*

### *Protection for your valuables*

Allstate offers Scheduled Personal Property (SPP) coverage to help protect your valuables.

These items can include jewelry (such as engagement and wedding rings), fine art and musical instruments. Sports equipment, such as golf clubs, can also be covered by SPP.

In addition, SPP can cover valuables stored outside of your home in a safe deposit box or bank. And if you work from home and use computer or audio-visual equipment for business purposes, SPP can cover these items as well.

### *Already have SPP?*

Even if you currently have SPP coverage, it's a good idea to review your coverage annually. It's possible that the value of your property has changed or that you have purchased new items that have not been added to your coverage.

### *Affordable coverage*

The cost of SPP coverage varies, but the value of your property is the best way to determine how much coverage you need — the rates are generally a small percentage of the total value of the items you're insuring. This could mean that your valuables are being protected for only a fraction of the cost.

To learn more about SPP coverage, or if you have any questions about your insurance policy in general, contact your Allstate representative, or visit us at *allstate.com*.

*Subject to availability and qualifications. Other terms, conditions and exclusions may apply.*

**X72485**

PROP *0100031150128530027311106*



**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

## *We've Increased Your Coverage Limits*

You may have noticed that we have increased your Dwelling Protection (Coverage A) limits and, as a result, your premium may be higher.

As you may know, your policy includes a feature called " Property Insurance Adjustment" (PIA). PIA reflects changes in construction costs in your area, including material and labor costs that may have occurred during the policy period. This information helps us estimate the amount of insurance coverage needed to cover the cost of rebuilding your home in the event of a covered total loss.

Your policy's PIA recently indicated an increase in construction costs in your market. Based on this information, we increased your Dwelling Protection limits to reflect the estimated replacement cost of your home.

Please consider whether the changes we made are sufficient. These estimates are based on what we believe are sound assumptions, but they are only estimates. It's possible that the new limits may not provide sufficient coverage in the event of a loss. For example, if you have done any remodeling to your home that is not reflected in our records, your home's value may be higher than our records indicate. In that case, you may want to increase your limits even more. On the other hand, it's possible that your new limits may provide a coverage amount that is greater than the cost of replacing your home. For example, if you originally insured your home based on a mortgage amount that exceeded your home's estimated replacement cost, you may want to call your Allstate representative to discuss the current value of your home and the possibility of lowering your limits.

If you have any questions about this change, or if you would like to update your information or discuss any other changes, please feel free to call your Allstate representative. Together, we can help you determine the coverage limits that are right for you.

**XM72**

**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

## *Important Information About Your Allstate Policy*

The enclosed Policy Declarations lists important information about your policy, such as your address, the location of the insured property, the coverages and coverage limits you've chosen, and mortgagee information, if applicable. Your Policy Declarations also lists any discounts and surcharges applied to your policy.

Because much of the information found on your Policy Declarations is used to help us determine your premium, please be sure to review your Policy Declarations carefully each time you receive one. You may want to add coverage, delete coverage or change your coverage limits — or you may want to update coverage on valuable personal items, such as jewelry or artwork.

Another thing to keep in mind is that you may now qualify for discounts that you previously were not eligible to receive. For instance, in many states, Allstate offers discounts for:

- policyholders who are 55 years of age or older and who are no longer working;
- homes that contain smoke detectors and other protective devices; and
- policyholders who insure both their homes and autos with Allstate.

Please contact your Allstate representative for additional information about discount qualifications, as well as other discounts that may be available.

***Making changes to your policy***

If you need to make a change to any of the information listed on your Policy Declarations, please notify your Allstate representative of the change as soon as possible. With a few exceptions, **any changes will be effective as of the date you notify us.**

If you have any questions about this notice, or if you need to update any of the information listed on the enclosed Policy Declarations, please contact your Allstate agent or our Customer Information Center at 1-800-ALLSTATE (1-800-255-7828).

**X67106**

PROP *010003115012853002731107*



**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

## *You May Qualify for Lower Rates with an Allstate Affiliate Company*

When you chose us for your property insurance, you chose our mix of price, service, and coverage over those of our competitors, and we thank you for the opportunity to serve you.

We want you to know that you may be able to save money on property insurance by switching to an affiliate Allstate company that uses a different rating plan. This rating plan was not available to you when you originally chose to insure with us.

### Additional Information About Our Affiliate Company

Our affiliate company uses a rating plan designed to compete with other insurance companies and win business in the marketplace with its mix of price, service, and coverage. The reason that Allstate has multiple companies is, in part, because introducing a new rating plan into the Allstate company that provides your current policy could potentially create price swings for you and/or other current customers—a situation we want to avoid as much as possible. By putting our new rating plan into our affiliated company, we were able to avoid these price swings for some of our current customers.

### Issues to Consider When Switching to an Allstate Affiliate Company

We don't know if you would save money by purchasing property insurance from our affiliate company. The rating plan our affiliate uses assigns rates, in part, based on current credit-based insurance scores, which we do not have for you.

We also want you to know that if you leave your current Allstate company and switch to our affiliate company, you will not be able to return to your current Allstate company as long as it continues its current policy of not accepting *new* customers. Our affiliate company, on the other hand, does accept new customers.

### Home Replacement Cost Estimating Tool Is Available

As you consider whether or not to switch to an Allstate affiliate company, keep in mind that there is a tool for estimating home replacement cost called Residential Component Technology ™ (RCT) that's available from Allstate Vehicle And Property Insurance Company. This tool is designed to help insurers estimate the minimum amount for which the company will insure a home.

If you request a quote from Allstate Vehicle And Property Insurance Company, RCT will be used. If you continue insuring your home with your current company, you can request that RCT be used to estimate the replacement cost of your home. An RCT estimate requires you to provide information about the interior and exterior characteristics of your home.

And remember that your insurance limits must be at least as high as the minimum amount determined by your insurer (although they can be higher), regardless of the estimating tool used. It solely is up to you to consider whether your policy's coverage limits are appropriate for your needs.

**The Choice Is Yours**

While we hope you're happy where you are, we encourage you to look into the rates and coverages offered by our affiliate company. You'll get great Allstate service from all of our affiliates, but each affiliate has its own mix of price and coverage, and you might save money with a different Allstate company. All you have to do is call your local Allstate agent to see if you qualify for insurance with our affiliated company, and then you can decide if a move is right for you.

Whatever you choose, we want to thank you again for looking to Allstate to protect what's important to you.

**X73084**

PROP "010003115012853002731108"

**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

## *Information about Allstate's use of credit reports*

In an effort to help more accurately predict the likelihood of insurance losses, Allstate considers certain information contained in credit reports. In connection with this insurance, we may have previously used a credit report(s) or information contained within credit report(s) to determine a credit-based insurance score, which helps predict the likelihood of insurance losses.

Please rest assured that no one at Allstate has personally reviewed your credit report. To protect your privacy, only certain information from your credit report that has proved relevant to assessing the potential for insurance losses was used in connection with this application for insurance. Typical items from a credit report that were considered include, but are not limited to, payment history, number of revolving accounts, number of new accounts, the presence of collection accounts, bankruptcies and foreclosures. The information used to develop the insurance score comes from Trans Union National Disclosure Center and is calculated using an automated system.

Please note that we may obtain or use credit information again provided, however, that upon renewal such information may only be used to reduce premiums.

Thank you for choosing Allstate. We truly appreciate the opportunity to serve your insurance needs. If you would like to contact us, please write to us at Allstate Insurance Company, 2775 Sanders Road, Northbrook, IL, 60090 or call 1-800-ALLSTATE. ®

**X67798 -1**

**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

This notice provides brief descriptions of some of the discounts Allstate offers to qualified policyholders. These discounts may be subject to additional qualifications. Any of the discounts currently applied to your policy are listed on the enclosed Policy Declarations. For more detailed information, please contact your Allstate agent.

**New/Renovated House Discount (for Homeowners policyholders only)**
You may be eligible to receive this discount if your home is 9 years old or less, or if your home has been renovated within the last 9 years.

**Fire Resistive Discount (for Homeowners policyholders only)**
You may be eligible to receive this discount if you insure a house constructed with fire-resistive or fire-proof materials.

**Protective Device Discount**
You may be eligible to receive this discount if your home is equipped with burglary and/or fire alarm systems.

**55 and Retired Discount**
You may be eligible to receive this discount if:

- you or your spouse is 55 years old or older,
- neither of you is gainfully employed full-time (or seeking such employment), and
- the insured property is your principal residence

**Multi-Line Discount**
You may be eligible to receive this discount on your premium for your principal residence if you or your spouse have an Allstate automobile policy.

**Windstorm Protective Device Discount**
You may be eligible for a discount if exterior wall and roof openings such as doors, windows, skylights, and vents are fully protected with storm shutters of any style and material that are designed and properly installed to withstand external pressure and storm surge, in accordance with the discount requirements. Please note that this discount is also subject to other qualifications.

**Deductible Options**
Several different deductibles are available with your policy so that you can be sure to find the ones that best meet your needs. Call your Allstate agent today if you have any questions about how choosing a different deductible may affect your policy and your premium.

**Additional Information**
Your Allstate agent can give you additional information about all the discounts and deductible options that Allstate has to offer.

**X67175**

PROP *010003115012853002731109*



# Important Notice

## *A Statement Regarding Flood Insurance*

**Please Note: This policy does NOT cover losses from flood, mudslide, or mudflow.**

Most homeowners, renters, condominium owners, and manufactured/mobile home insurance policies do not provide coverage for flooding. However, coverage may be available for purchase through the Federal Government's National Flood Insurance Program (NFIP) or through some private insurance companies.

You can obtain information about the NFIP by contacting your Allstate representative, by going on the internet to WWW.FLOODSMART.GOV, or by calling 1-800-427-4661. Here are some important facts you should know:

- Flood insurance policies are available for qualifying homes located in a community that is a participant in the NFIP.
- Some lenders, as a condition of your mortgage, will require that you purchase flood insurance. You should confirm with your mortgage lender or the NFIP if you are *required* to purchase flood insurance. Even if you are not required to purchase flood insurance as a condition of your mortgage, you should consider purchasing it as part of the overall protection for your home. This decision is completely yours to make.
- You do not have to be located in a special flood hazard area or be close to a body of water to be exposed to flooding. The risk of flood is present for most homes as floods can be caused by storms, melting snow, heavy rains, dam failures, or other causes. This is why you should consider flood insurance even though it is not required by your lender, or if you do not live in a special flood hazard area or near a body of water.
- You must complete a separate application in order to purchase flood insurance; it is not part of your homeowners insurance application.
- Flood insurance policies have two types of coverage: *structural coverage* for your home and the items that are permanently attached and *contents coverage* for your personal property within the home. Structure and contents coverages are purchased separately and carry separate deductibles.
- Generally, there is a 30 day waiting period for a new flood insurance policy to become effective. However, there is no waiting period if the flood policy is purchased in conjunction with a mortgage loan.

The handling of federal flood claims is strictly regulated by the Federal Government, which requires that flood claims be adjusted and paid on a different basis than your homeowners, renters, condominium owners, or mobile home insurance claims. In addition, federal flood insurance claims are paid with federal funds.

**Allstate Insurance Company**

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

## *Choose a third party to receive your insurance materials.*

If you are called to active military duty or if you are over the age of 65, you may designate an adult third party to receive bills and other notices related to your insurance coverage.

**If you would like to designate a third party...**
Please contact your Allstate representative for a Third Party Designation form, or send us a written letter of designation. The letter should include your name, the third party's name, your signature, and the third party's signature. You can send the letter and/or Third Party Designation form by certified mail return receipt requested to Allstate at:

Allstate Insurance Company
National Support Center
P.O. Box 40025
Roanoke, VA 24022-9802

**If you are called to active military duty...**
You have the option of suspending your insurance coverage without any penalties. If you are considering this option, please be aware that all applicable conditions for suspension of coverage must be complied with, such as the surrender of registration and license plates to the Department of Motor Vehicles.

If you need more information about third party designations or suspending your insurance coverage, be sure to contact your Allstate representative.

**X4238-2**



## Allstate Insurance Company

Policy Number: **0 43 794222 03/20** Your Agent: **Kevin Schaefer (212) 267-7601**
For Premium Period Beginning: **Mar. 20, 2015**

# Important Notice

### *Your policy is subject to a Deductible for Severe Hurricanes.*

This notice provides general information about the circumstances under which a Deductible for Severe Hurricanes applies to your Allstate property insurance policy. For detailed information about this deductible and your insurance coverage, please read this notice, your Policy Declarations, policy, the Deductible for Severe Hurricanes endorsement, and any other applicable endorsements. If there is any conflict between the policy and this notice, the provisions of the policy shall prevail.

The Deductible for Severe Hurricanes is the amount you agree to pay for a covered loss due to a " windstorm," which is defined by your policy as " wind, wind gusts, hail, rain, tornadoes, or cyclones caused by or resulting from a hurricane." The deductible applies to a windstorm loss during the following time period:

- beginning 24 hours before the National Weather Service estimates that a wind speed exceeding 100 mph occurs in any part of the State of New York, and
- ending 12 hours after the last time the National Weather Service downgrades the hurricane to a tropical storm.

(For the definitions of " windstorm," " hurricane," and " tropical storm," please read your Deductible for Severe Hurricanes Endorsement.)

The Deductible for Severe Hurricanes is calculated as a percentage of your Dwelling Protection coverage limit. This percentage and the actual dollar amount of your deductible is shown on the enclosed Policy Declarations. It applies to the total of all losses covered under Dwelling Protection, Other Structures Protection, and/or Personal Property Protection coverages in your policy.

We will pay for a covered windstorm loss only when the amount of that loss exceeds your Deductible for Severe Hurricanes. We will then pay only the amount that exceeds your deductible. The following two examples illustrate your out-of-pocket expense with regard to this deductible:

- If your Deductible for Severe Hurricanes is $5,000, and you have a covered loss caused by a windstorm which totals $30,000, you would pay $5,000, and Allstate would pay $25,000 for your claim.
- If your Deductible for Severe Hurricanes is $5,000, and you have a covered loss caused by a windstorm which totals $4,000, you would pay the total amount of your loss, which is $4,000.

Please note that your Other Peril Deductible, shown on your enclosed Policy Declarations, will apply to all other covered losses not caused by a windstorm, unless your policy specifies otherwise for optional coverages. However, if two or more deductibles apply to the same loss, the largest deductible will be applied, except when the deductible for optional Water Back-Up coverage applies to the loss. The Deductible for Severe Hurricanes will not apply to losses covered under Water Back-Up coverage. The amount you pay toward your deductible for Water Back-Up coverage will not reduce the amount you must pay toward your Deductible for Severe Hurricanes.

Because your Deductible for Severe Hurricanes is a percentage of your Dwelling Protection coverage, your deductible amount may increase annually as a result of Property Insurance Adjustments, which automatically increase your Dwelling Protection coverage limit for increases in building costs. Your deductible may also increase if you change your Dwelling Protection coverage limit.

**You can help reduce the amount of damage to your property during a windstorm**. Here are just a few precautions for you to consider:

- Install storm shutters for all exterior openings such as windows, skylights and glass doors to help prevent breakage. Shutters should be capable of withstanding hurricane force winds and wind-blown debris.
- Hire a professional to evaluate and strengthen entry and garage doors to withstand high winds and flooding.
- Make sure composition roof shingles are firmly attached to the roof sheathing, and, if necessary, reinforce them with additional nails or screws to more firmly secure them.
- When you replace your shingles, install a water-resistant membrane of tar-paper of hot-mopped underlayment under the new shingles.

We hope that this notice helps you understand your Deductible for Severe Hurricanes. If you have any questions about the information provided here, please call your Allstate agent.

**X6598-1**

PROP *01000311501285300273111*

EXHIBIT 2

Eva Mallek

6861 Yellowstone Blvd., Apt. 417 • Forest Hills, NY 11375 • E-Mail: enm228@nyu.edu

VIA EMAIL, pmiletic@skarzynski.com; tcellilli@skarzynski.com
CERTIFIED MAIL 7015 1520 0002 3786 0054

March 10, 2016

Thomas H. Cellilli, III, Esq.
Paul V. Miletic, Esq.
Skarzynski Black LLC
One Battery Park Plaza, 32nd Floor
New York, NY 10004

VIA EMAIL
Mr. Ed Lynch
Allstate Insurance Company
49 Nassau St Fl 2
New York, NY 10038

# FINAL NOTICE ON DEMAND FOR PAYMENT

Re: *Mallek v. Allstate Insurance Company*
Insured: Eva Mallek
Policy No.: 000043794222
Claim Nos.: 0386671622, 0384184776

Dear Sirs:

This is a last NOTICE TO COLLECT A DEBT incurred by ALLSTATE on the payment of the claim of reference for full value of the policy and covering the total loss due to fire of the (1)STRUCTURE of the home insured under the policy of reference. The process of review and investigation on the loss of the structure of the home was finalized by Allstate on January 7th, 2016, on which date Eva Mallek was deposed by counsel. All requirements for making claim (1) were met by the insured as of that date.

Additionally, this is a last NOTICE TO COLLECT A DEBT incurred by ALLSTATE on the payment of the claim of reference and covering (2)TEMPORARY LIVING EXPENSES AND/OR RELOCATION for insured's dependent, her 87 year old father. Her father is married and his wife, although not a dependent, is covered under this claim. The process of review and investigation on the loss of the structure of the home was finalized by Allstate on January 7th, 2016, on which date Eva Mallek was deposed by counsel. All requirements for making claim (2) were met by insured as of that date.

The new deadline to submit full and final payment for the above is March 14th, 2016, 2:00pm. No lesser amount than full policy value will be accepted. On Monday, March 14th, 2016 Eva Mallek will submit proof to Allstate that her father was her dependent during 2015 in exchange for full payment at the offices of Allstate's counsel as indicated above, 2:00pm EST.

Eva Mallek reserves the right to make additional claims for the loss of (3)THE CONTENTS OF THE HOME at a future time within the terms of the law. This last claim pertains to the loss of Eva Mallek's and her family's personal items.

TAKE FURTHER NOTICE that failure to submit payment for debts (1) and (2) as directed above, will cause Eva Mallek to submit a complaint against Allstate to the SUPREME COURT in QUEENS COUNTY seeking multiple remedies.

TAKE FURTHER NOTICE, that the transcript of the above-mentioned deposition is presently being reviewed and any alterations found in the text when compared to the actual testimony by Eva Mallek, such as material omissions, will be evidence of continued bad faith, tampering with material evidence, obstruction of justice, added to negligence in not following proper internal and industry standard procedure, failure to meet fiduciary responsibility, and aiding and abetting with the intent to commit a crime, particularly, wire fraud. Notwithstanding the additional charges against Allstate for its continued elder abuse on denying coverage for living expenses to the elderly occupants who became homeless six months ago as well as breach of contract, among others. At this time Allstate has sufficient material to respond to Eva Mallek's repeated claims for losses (1) and (2). And that includes Allstate's own version of the transcript.

Very truly yours,

AMINE OULD IBBAT
Notary Public, State of New York
No. 01OU6121096
Qualified in Westchester County
Commission Expires January 10, 20 17

Enclosure: Demand For Payment Notice dated January 4th, 2016.
cc: New York State Department of Finance Services, New York State Attorney General's Office with the Bureau of Consumer Frauds and Protection.

EXHIBIT 3



Allstate
You're in good hands.

Claims Metro East SIU New York
PO BOX 660328
DALLAS TX 752660328

EVA N MALLEK
6861 YELLOWSTONE BLVD
FOREST HILLS NY 113759403

June 13, 2016

INSURED: EVA MALLEK
DATE OF LOSS: September 14, 2015
CLAIM NUMBER: 0384184776 SEL
POLICY NUMBER: 000043794222
REPORT DATE: September 15, 2015
TYPE OF POLICY: Homeowners

PHONE NUMBER: 866-724-2612
FAX NUMBER: 855-219-7494
OFFICE HOURS: Mon - Fri 8:00 am - 4:30 pm

## Re: Your Claim Status

Dear EVA N MALLEK,

With respect to the claim being submitted for fire related damage to the real property owned by EVA MALLEK located at 88-20 207 ST Queens NY with a date of loss listed as September 14, 2015 with this date being approximated and intended to include any and all property and ALE expenses the ALLSTATE INSURANCE COMPANY hereby disclaims and denies any and all liability it has to you and others in conjunction with its policy numbered 000043794222 and issued to EVA MALLEK .

This disclaimer is made because As you know, Allstate has been investigating your claim. For the reasons stated below, we hereby deny the claim and any and all liability for that loss. The claim is being denied for the following reasons:

1. You did not reside, intend to reside, or otherwise maintain a physical presence at the insured premises at the time of the fire as required by the Policy terms as set forth in the contract of insurance.

2. You did not advise Allstate of changes in your use and/or occupancy of the insured premises as required by the Policy terms as set forth in the contract of insurance.

3. You have failed to assist and cooperate with Allstate's investigation of the claim as you have willfully failed to submit to Allstate a signed Sworn Statement in Proof of Loss as required by the Policy terms as set forth in the contract of insurance.

4. You have failed to assist and cooperate with Allstate's investigation of the claim as you have willfully failed to sign a transcript of your January 7, 2016 examination under oath as required by the Policy terms as set forth in the contract of insurance.

5. You have failed to assist and cooperate with Allstate in verifying your claim in violation of the Policy terms as set forth in the contract of insurance by willfully providing false information in claims documents submitted in connection with the claim.

6. You have committed "concealment and fraud" by making false statements in claims documents, including sworn statements, proofs of loss, and/or recorded statements. These false statements include:

a. False and/or inconsistent representations concerning your use and/or occupancy of the insured premises;

b. False and/or inconsistent representations concerning the ownership of contents located at the Property that you contend were damaged or destroyed as a result of the fire; and

c. You have failed to provide documentation substantiating your ownership of contents located at the Property that you contend were damaged or destroyed as a result of the fire.

The Policy provides in pertinent part as follows:

* * *

Definitions Used In This Policy

* * *

7. Residence Premises – means the dwelling, other structures and land located at the address stated on the Policy Declarations.

* * *

Insuring Agreement
Reliance on the information you have given us, Allstate agrees to provide the coverages indicated on the Policy declarations. In return, you must pay the premium when due and comply with the Policy terms and conditions, and inform of in any change in title, use or occupancy of the residence premises.

Subject to the terms of this Policy, the Policy Declarations shows the location of the residence premises, applicable coverages, limits of liability and premiums.

* * *

3. What You Must Do After a Loss
In the event of a loss to any property that may be covered by this policy, you must:

* * *

c) separate damaged from undamaged personal property. Give us a detailed list of the damaged, destroyed or stolen property, showing the quantity, cost, actual cash value and the amount of loss claimed.
d) give us all accounting records, bills, invoices and other vouchers, or certified copies, which we may reasonably request to examine and permit us to make copies.
e) produce receipts for any increased costs to maintain your standard of living while you reside elsewhere, and records supporting any claim for loss of rental income.
f) as often as we reasonably require:
1) show us the damaged property.
2) at our request submit to examinations under oath, separately and apart from any other person

defined as you or insured person and sign a transcript of the same.
3) produce representatives, employees, members of the insured's household or others to the extent it is within the insured person's power to do so[.]
g) Within 60 days after the loss, give us a signed, sworn proof of the loss. The statement must include the following information:
1) The date, time, location and cause of loss;
2) The interest insured persons and others have in the property, including any encumbrances;
3) The actual cash value and amount of loss for each item damaged, destroyed or stolen;
4) Any other insurance that may cover the loss;
5) Any changes in title, use, occupancy or possession of the property that have occurred during the policy period;
6) At our request, specifications of any damaged building structure or other structure;
7) Evidence supporting any claim under the Credit Card or Check Forgery protection. State the cause and the amount of loss.

* * *

The Policy contains a New York Endorsement which provides in pertinent part as follows:

POLICY ENDORSEMENT
The following endorsement changes your policy. Please read this document carefully and keep it with your policy.

New York Amendatory Endorsement

Deluxe Homeowners Policy, Deluxe Plus Homeowners Policy, Standard Homeowners Policy, Deluxe Select Value Policy, Standard Select Value Homeowners Policy - AP497-2

1. In the General Provisions section, the following changes are made:

* * *

B. The Concealment or Fraud provision is replaced by the following:

Concealment or Fraud
Allstate has the right to cancel or non-renew your policy if it was obtained by fraud, material misrepresentation, or concealment of material facts, or if you intentionally conceal any material fact or circumstance before or after a loss. Furthermore, Allstate does not cover you or any other person insured under the policy who has concealed or misrepresented any material fact or circumstance, before or after a loss.

* * *

The Policy also contains the following Endorsement which provides in pertinent part as follows:

POLICY ENDORSEMENT
The following endorsement changes your policy. Please read this document carefully and keep it with your policy.

DECLARATIONS SUPPLEMENT PAGE (NEW YORK) - AU233-l

This form contains the provisions of the Standard Fire Policy. Whenever the terms and provisions of Section I can be construed to perform a liberalization of the provisions found in the Standard Fire Policy, the terms and provisions of Section I shall apply.

* * *

You have clearly failed to fulfill your obligations as set forth in the Policy above. For the reasons stated above, please be advised that Allstate is disclaiming coverage for Claim No. 0384184776. Allstate will take no further action at this time in regard to the claim you have submitted.

The reasons for disclaiming coverage are intended to include any other information that would constitute a policy violation, including information not now known, but which could have been discovered had you complied with your duties after a loss as set forth in your insurance contract. The reasons set forth above for disclaiming coverage are not intended to, and do not waive or estop Allstate from asserting additional defenses under the Policy at any time in the future.

Please be aware that your Policy contains a suit limitation which states:

* * *

12. Suit Against Us
No suit or action may be brought against us unless there has been full compliance with all policy terms. Any suit or action must be brought within two years after the inception of loss or damage.

* * *

However the two year period is extended by the number of days between the date the proof of loss is submitted and the date the claim is submitted in whole or in part.

The ALLSTATE INSURANCE COMPANY will take no further action with respect to any claim which you may have against it or with respect to any claim or suit against you, which has arisen or which may arise out of this occurrence, and hereby withdraws from the matter entirely.

Should you wish to take this matter up with the New York State Department of Financial Services, you may file with the Department either on its website at http://www.dfs.ny.gov/consumer/fileacomplaint.htm or you may write to or visit the Consumer Assistance Unit, Financial Frauds and Consumer Protection Division, New York State Department of Financial Services, at: One State Street, New York, NY 10004; One Commerce Plaza, Albany NY 12257; 163B Mineola Boulevard, Mineola, NY 11501; or Walter J. Mahoney Office Building, 65 Court Street, Buffalo, NY 14202.

## We're Here to Help You

Please call me at the number below and refer to our claim number should you wish to discuss any aspect of this case, including this letter.

Sincerely,

*Edward Lynch*

Edward Lynch
866-724-2612 Ext. 3570482
Allstate Insurance Company

EXHIBIT 4

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| PAGE | LINE | READS NOW | TEXT OMISSIONS AND ALTERATIONS | REASON |
|---|---|---|---|---|
| 5 | 18-23 | Allstate has my current living address, 68-61 Yellowstone Boulevard, and is aware, because I'm married, is aware that my father, my dependent, lives at my home at 88-20 207th Street. | Allstate has my current living address, 68-61 Yellowstone Boulevard, and is aware, because I'm married, is aware that my father, my dependent, lives at my home at 88-20 207th STREET, QUEENS VILLAGE, NY 11427. | *Omissions* |
| 6-7-8-9 | (9)8-25 (7)2-25 (8)2-25 (9)2-12 | A. It's not what I do believe. They send my bills to 68-61 Yellowstone Boulevard at the apartment in Queens Village. That tells me that they are aware, and that tells me that in their operations in looking out for the best interest of the client in insuring that the client has the appropriate policy. There is a process of risk management where each policy on a yearly basis is reviewed to insure consistency and that they are protecting their clients.<br><br>On the other side, it is also relevant that Allstate exists because of a profit motive, and it is in their best interest to review those policies on a yearly basis and to see where they can make more money by selling me additional things that I don't have insurance for; such as, I received I believe, in the past I think you have been insured in the case of your death you need something else. That means that Allstate is telling me, I reviewed your policy, risk management operations, back office, but they haven't come back to me saying we have gone through this process and we see two addresses here. "What's the story"? I want to make sure that you're insured properly."<br><br>So that makes me believe that they were aware of those two addresses, and that was fine with the policy. I never got a copy of the full policy. So I thought, like, when you go to the cleaners and you leave your clothes, and then come back, you know, two months later the cleaners says, "I'm sorry. I don't know why you're coming here. I don't have your clothes." "Where have you been?" You have that trust that you left your clothes with the cleaners that you are given a ticket that you're supposed to have that service. You need your clothes back.<br><br>We are a society based on original Christian tradition. We're Protestants. That's how this country was based, on trust and your word, and all I received on a yearly basis are two, three pages of something that says I'm insured, nothing else. I never seen the 20-plus page policy that gives the conditions and so on and so forth.<br><br>They catch you by surprise and they say, "I'm sorry. You're not insured. Let's look at this loophole; so I can get away with it." That's not right. That's not the American people. That's not how they should act.<br><br>Q. I think my original question was: How long have you lived at 68-61 Yellowstone Boulevard?<br><br>A. My answer is that Allstate has that answer. It's in the documents.<br><br>Q. What I'm asking you now— | A. It's not what I do believe. They send my bills to 68-61 Yellowstone Boulevard, ALTHOUGH THE PROPERTY IS IN QUEENS VILLAGE. That tells me that they are aware, and that tells me that in their operations in looking out for the best interest of the client in ENSURING that the client has the appropriate policy, there is a process of risk management where each policy on a yearly basis is reviewed to ENSURE consistency and that they are protecting their clients.<br><br>On the other side, it is also relevant that Allstate exists because of a profit motive, and it is in their best interest to review those policies on a yearly basis and to see where they can make more money by selling me additional things that PERHAPS I don't have insurance for; such as, I received, I believe in the past "I think you HAVEN'T been insured in the case of your death, you need something else." That means that Allstate is telling me "I reviewed your policy, risk management operations, back office." But they haven't come back to me saying "we have gone through this process and we see two addresses here. What's the story? I want to make sure that you're insured properly."<br><br>So that makes me believe that they were aware of those two addresses, and that was fine with the policy. 2) I never got a copy of the full policy. So I thought, like, when you go to the cleaners and you leave your clothes, and then come back, you know, two months later the cleaners says, "I'm sorry, I don't know why you're coming here FOR. I don't have your clothes." "Where have you been?" You have that trust that you left your clothes with the cleaners that you are given a ticket that you're supposed to have that service. You need your clothes back.<br><br>We are a society based on the JUDEO-Christian tradition. We're Protestants. That's how this country was based –on trust and your word. And all I receive on a yearly basis are two/three pages of something THAT says that I'm insured. Nothing else. I'VE never seen the 20-plus pages of the policy that gives conditions and so on and so forth.<br><br>They [ALLSTATE] catch you by surprise and they say, "I'm sorry. NOW you're not insured BECAUSE OF THIS OR THAT. Let's look at this loophole HERE; so I can get away with it." That's not right. THAT'S NOT OUR TRADITION. That's not the American people. That's not how they should act.<br><br>Q. I think my original question was: How long have you lived at 68-61 Yellowstone Boulevard?<br><br>A. My answer is that Allstate has that answer. It's in the documents.<br><br>Q. I'm asking you now— I DON'T KNOW | *Omissions. Misspellings. Counsel omitted senior citizen's statement that asserts her complaint against Allstate for attempting to deny her of her insurance funds for no legitimate reason.*<br><br>*Counsel also omitted the senior citizen's assertion that it is Allstate's responsibility to ensure the issuance of a proper policy that is in accordance to the client's needs and her disclosures made to Allstate's agent* Anna Truszkowski *regarding her occupancy status.* |

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | 13 | Go under Westlaw and look at the case. The case will tell you the details | JUST DO THE INVESTIGATION. Go into Westlaw and look at the case. The case will tell you the details. | ***Omissions*** |
| | 18 | Let's do this. Let me give you | I APPRECIATE IT. Let's do this. Let me give you | ***Omissions*** |
| 12 | 10 | fire located at 88-20 207th Street in Queens | Fire AT A STRUCTURE located at 88-20 207th Street in Queens | ***Omissions*** |
| | 21 | complained about something being effected | complained about something being AFFECTED | ***Misspelling*** |
| 13 | 7-18 | They asked me to take the statement from you and give them legal advice concerning the claim that you are making. My intent here is to try to gather all the facts regarding the claim so I can adequately give them advice as to how they should try to resolve it. I'm not here trying to trick, mislead or deceive you. I'm not here to get you to say something or stop you from saying something. I'm just sort of a fact gatherer today. Do you understand what my role is here today? | They asked me to take the statement from you and give them legal advice concerning the claim that you are making. My intent here TODAY is to try to gather all the facts regarding the claim so THAT I can adequately give them advice ON how they should try to resolve it. I'm not here trying to trick, mislead or deceive you. I'm not here to get you [illegible] or stop you from saying something. I'm just sort of THE fact gatherer today. Do you understand what my role [illegible] is here today? | ***Omissions! Counsel misrepresented the highlighted statement by repeatedly coercing the senior citizen to make misstatements on the value of the home's contents lost in the fire.*** |
| 13-14 | (13)25 (14)2-7 | A. Absolutely. I am a very straightforward person, and I always worked for the financial service industry, very straight forward, and many times I hear my background checks are perfect, and I have to say I have, in the past 20 years, I have a perfect attendance record. | A. Absolutely. I am a very straightforward person, and I've always worked in the financial services industry. Very straight forward. And I many times CLEARED background checks. ARE perfect. And I have to say I have FOR THE past 20 years, I have a perfect attendance record. | ***Omissions and altered text. The altered text changes the meaning of the statement regarding the senior citizen's impeccable credentials.*** |
| 14-15 | (14)20-25 (15)2 | Q. And you certainly have the right to do that. In the event that you do, do that I will explain to you why I believe the information is relevant. I will simply ask you whether, after giving you that <u>information</u>, you still seek to assert your fourth amendment right. | Q. And you certainly have the right to do that. In the event that you do do that, I will explain to you why I believe the information is relevant. I will simply ask you whether, after giving you that EXPLANATION you still seek to assert your fourth amendment right. | ***Altered text that changes the meaning of the senior citizen's statement. Note Counsel's word switch:*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| 16-17 | (16)24-25 (17)2-7 | information is in the files. That's what I will do, because there's no point in me repeating myself. The information is in the file. Just like I indicated that they knew all along of my living situation. My father lives in my home. I am at 68-61. I recorded that. I did not try to deceive them by keeping my address at 88-20. | information is in the files. That's what I will do, because there's no point in MY repeating myself. The information is in the FILES. Just like I indicated that all along of my living situation. My father lives in my home [88-20]. I am at 68-61. I that. I did not try to deceive them by keeping my address at 88-20. | *Altered text! Note Counsel's word switch: RECORDED VS. REPORTED* *The word switch changed the meaning of the senior citizen's statement. She never RECORDED anything but duly REPORTED occupancy status to the Allstate agent Anna Traszkowski.* |
| | 8-17 | My entire life, everybody knows that I live at 68-61 Yellowstone Boulevard, and Allstate has known all along, and they have never, apparently, exercised my fiduciary responsibility to take care of this for me by informing me there might be something strange or we have those two addresses because we're worried that might not be covered by the policy that you have. I trusted that I had the right policy. | AND EVERYTHING, my entire life, everybody knows that I live at 68-61 Yellowstone Boulevard, and Allstate has known all along, and they have never, apparently, exercised my fiduciary responsibility TAKING care of THAT for me by informing me there might be something strange HERE. because we're I trusted that I had the right policy. | ***Omissions!! The omissions obscure the truth expressed by the senior citizen on highlighting Allstate's demonstrated lack of fiduciary responsibility.*** |
| 17-18 | (17)20-25 (18)2-3 | A. Well, Allstate is a large company. You're bounced around, you're bounced around. Sometimes I used to have one agent and then another agent and another and another agent. I don't know how they work. That's why I requested all those documents because I have no idea how they work. I don't know. They're like anonymous. | A. Well, Allstate is a large company. You're bounced around, you're bounced around. Sometimes I used to have one agent and THEN another AGENT and THEN another agent. I don't know how they work. That's why I requested all those documents [REFERS TO THE ATTACHED LETTER ADDRESSED TO COUNSEL DATED JANUARY 4, 2016, PARAGRAPH TITLED "INVESTIGATION C – ALLSTATE OPERATIONS] because I have no idea how they work. I don't know. They're like anonymous. | ***Omissions*** |
| 23 | 7-10 | I Understand that you have to do a job. It's your job to do that. It's your duty, but it has its limits. | I understand that you have to do a job. THEY'VE RETAINED YOU TO DO A JOB. It's your job to do this. | ***Omissions*** |
| | 15 | And you're willing to proceed without legal counsel? | And you're willing to proceed WITH THIS STATEMENT TODAY without legal counsel PRESENT. IS THAT CORRECT? | *Omissions. Counsel ADDED* |

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | | | *senior SAW the 20+ pages of the policy only after her claim submission on the loss of the structure of her home.*<br><br>*Further, the restrictions on the policy cannot be enforced as the senior citizen never received, prior to the event and submission of the claim for the loss on the structure of the home, the 20+ page policy. As such her consent on the restrictions of such document was involuntary, tainted and flawed due to lack of information. Allstate in this wrongdoing established a superior bargaining position over the senior citizen's position due to her misinformation.* |

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**<u>Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016</u>**

| | | | | |
|---|---|---|---|---|
| 27 | 16-22 | A. The statement about it is, if we can discuss or continue our conversation today based on this, not on that. That I don't know about. Except for the figures, because it's an old policy. It's an old statement. So everything else should be based on this policy, not on the other one. | A. The statement about it is, if we can discuss or continue our conversation today based on this [EXHIBIT B], not on that [EXHIBIT A]. That I don't know about. Except for the figures, because it's an old policy, it's an old statement, so everything else should be based on this policy [EXHIBIT B], not on the other one [EXHIBIT A]. | ***Omissions*** |
| 28 | 9-12 | A. Well, when it says policy documents I always assume it's this, because I was never mailed the 20-plus pages that you have in your hands. Again, we go back... | A. Well, when it says policy documents I always assume it's this , [EXHIBIT B], because I was never mailed the 20-plus pages that you have in your hands [EXHIBIT A],. Again, we go back... | ***Omissions*** |
| 30 | 3-16 | A. But based on the fact that I trust Allstate and its agents to provide me the service, to provide me full documentation. I'm not reading, what is AP315. I'm thinking it's contained in this document, in this nine page document, because I'm not foreseeing that I'm going to have a fire or foreseeing that Allstate is going to shrink from paying my policy based on intentionally not sending me the full policy or oversight in not going through the risk management process and bring to my attention the fact that I might not have a full copy of the policy or I might not understand it. | A. IT SAYS THAT, But based on the fact that I trust Allstate and its agents to provide me the service, to provide me full documentation. I'm not reading, what is AP315. I'm thinking it's contained in this document [EXHIBIT B], in this nine page document, because I'm not foreseeing that I'm going to have a fire or foreseeing that Allstate is going to shrink from paying my policy based on intentionally not sending me the full policy AN INTENTIONALLY... or oversight in not going through the risk management process and bring to my attention the fact that I might not have a full copy of the policy or I might not understand it. | ***Omissions. Counsel omitted the statement that Allstate might have intentionally issued the wrong policy to the senior citizen.*** |
| 31 | 11-19 | A. All that insures me is that Allstate is playing tricks with its clients and it committed wire fraud by not submitting with this—if you're going to the point of saying your policy documents consist of this and that, why isn't that policy enclosed along with this? Why? If it is so important? I want to know why? Can you answer me that question. | A. All that ASSURES me is that Allstate is playing tricks with its clients and IS COMMITTING wire fraud by not submitting with this [EXHIBIT B]—if you're going to the point of saying your policy documents consist of this [EXHIBIT B) and that [EXHIBIT A], why isn't that policy [EXHIBIT A] enclosed along with this [EXHIBIT B]? Why? If it is so important? I want to know why? Can you answer me that question? | ***Omissions. Misspellings.*** |
| 31-32 | (31)25 (32)2-7 | A. I want on every client – the people of the United States when dealing with Allstate – and when Allstate sends this "your policy consists of," to attach all the documents, all the policy, and not hide it intentionally. That's committing wire fraud. | A. I want AND every client – the people of the United States when dealing with Allstate – and when Allstate sends this [EXHIBIT B] "your policy consists of," to attach all the documents, all the policy [EXHIBITS A AND B], and not hide it [EXHIBIT A] intentionally. That's committing wire fraud. | ***Omissions*** |
| 32 | 10-16 | A. Because it was not included in with this document. I thought all of these numbers that are listed here were here and it turns out now that I'm missing that 2- page document. Why am I missing that 20 page document and it's not included with this? | A. Because it was not included in with this document [EXHIBIT B]. I thought all of these numbers that YOU listed here were here [EXHIBIT B] and it turns out now that I'm missing that 20-page document [EXHIBIT A] | ***Omissions!*** |
| | 17-20 | Q. We can agree that Exhibit B indicates that your homeowners policy consists of policy declarations and the standard homeowners form AP315, correct? | Q. We can agree that Exhibit B indicates that your homeowners policy consists of policy declarations and the standard homeowners POLICY form AP315; correct? | ***Omissions*** |
| 32-33 | (32)21-25 (33)2-3 | A. We can agree – let me read this to you. Your policy documents, "Your homeowners policy consists of these policy declarations and the documents listed below. Please, keep this together." What am I going to keep together if the policy itself in not here? | | ***Omissions. Counsel omits the statement pointing to Allstate's wrongdoing by not mailing the 20+ page policy to the senior citizen every year.*** |
| 33 | 20-24 | Q. During the course of our dealings you asked for me to provide you with a certified copy of the insurance policy, is that correct? | Q. During the course of our dealings you asked for me to provide you with a certified copy of the insurance policy; is that correct? | ***Omissions. Counsel omits the*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | A. It is irrelevant. How is it relevant as to answer the question as to why I have not received the entire package. | A. It is irrelevant. How is it relevant as to answer the question as to why I have not received the entire package [EXHIBIT A]? | |
| 37 | 18-23 | A. Because I'm – I just said I have – I'm just finishing my schooling, my basic schooling, and I have disclosed that information; so there is absolutely no way for me to be cognizant of legal things like insurance. | A. | ***Omissions. The omissions obscure the fact that the senior citizen has no knowledge on the insurance business.*** |
| 38 | 7-10 | A. Where does it say here that you should trust my word or that I should trust yours, because we're basing this on this, what I got, not on that. | A. Where does it say here [EXHIBIT B] that you should trust my word or that I should trust yours, because we're basing this on this [EXHIBIT B], what I got, not on that [EXHIBIT A]. | ***Omissions*** |
| | 14-19 | A. Mister, I am telling you that I an in no position to make any type of judgment because I don't hold an executive position in a financial institution, never held, never came across any legal paperwork for my job or anything related to insurance, for... | A. MR. CELLILLI, I am telling you that I am in no position to make any type of judgment because I don't hold an executive position in a financial institution, never held, never came across any legal paperwork for my job or anything related to insurance, for... | ***Omissions in a failed attempt to portray the senior citizen as lacking in social graces.*** |
| | 23-25 | I'm totally clueless. I'm just doing my best here to defend myself based on this that I received, the nine page... | I'm totally clueless. I'm just doing my best here to defend myself based on this [EXHIBIT B] that I receive, the nine page... | ***Omissions*** |
| 39 | 2-12 | ...and now Allstate comes up this 24 page document that I never received and in this document that I just read it says, "Please, keep this together." With this long list and the 24-plus page policy. The most important thing is not attached to this; so I'm reviewing the nine pages back and forth and every year when I get it, I go here and I go there. I said, "Oka. Okay. This is the policy." This is, to me, the policy. | ...and now Allstate comes up THAT HAS A 24-page document that I never received and in this document that I just read [EXHIBIT B] it says, " | ***Omissions*** |
| | 13-23 | Q. Well, in fairness, I have read some of the letters. I have read all the letters that you have sent to Allstate, and to me personally and frankly, after reading the letters it seems to me that based upon some of the astute questions that you asked that you have some background about or familiarity with insurance or claims handling. You asked some pretty good questions during those letters and pretty pointed questions, and I tip my cap to you. | Q. Well, in fairness, I have read some of the letters. I have read all the letters that you have sent to Allstate, and to me personally and frankly, after reading the letters it seems to me that based upon some of the astute questions that you asked that you have some background or familiarity with insurance or claims handling. You asked some pretty good questions during those letters and pretty pointed questions, and I tip my cap to you. | ***Counsel added text on a failed attempt to expand the statement's meaning attributing to the senior citizen some knowledge on insurance the business.*** |
| 40 | 11-13 | A. Thank you for your compliment, by the way. It must be because of my $100,000 education from NYU. | A. | ***Omissions by Counsel on a failed attempt to obscure the fact that the senior citizen does not*** |

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| 44 | 15-16 | Q. Is exhibit C a true and accurate copy of the letter that you sent me? | Q. Is exhibit C a true accurate and GENUINE copy of the letter that you sent TO me ON NOVEMBER 14? | ***Omissions*** |
| 45 | 3-4 | Q. What agency did you send this letter to? | Q. What AGENCIES did you send this letter to? | ***Misspelling*** |
| 45-46 | (45)23-25 (46)2-5 | A. Exactly. Initially I had thought about it, but after releasing the note I said, maybe it's not a good thing to have a derogatory statement about a company in public records, and bringing local, state and federal, if in the end and after this exchange we come to a resolution. | A. YES. Exactly. Initially I had thought about it, but THEN after releasing the note I said, "WELL maybe I'LL . It's not a good thing to have a derogatory statement about a company in public records, and bringing local, state and federal, if in the end and after this exchange we come to a resolution. | ***Counsel's omissions in a failed attempt to obscure the fact that the senior citizen has integrity and showed patience at Allstate's vicious attacks against the senior citizen, i.e: Allstate wrongfully claimed that they had no access to the home for inspections due to lack of cooperation.*** |
| 48 | 15-19 | A. Well, let me see. It looks familiar. Although, I'm not going to say that this or that paragraph was excluded, in all fairness, and because I don't trust Allstate. It looks familiar. Although I can't confirm that everything that is in here is what I received. | A. Well, let me see. It looks familiar. Although, I'm not going to say that "this or that paragraph was excluded, IT'S DIFFERENT FROM MINE." In all fairness, and because I don't trust Allstate, it looks familiar, although I can't confirm that everything that is in here is what I received. | ***Omissions*** |
| 50 | 11-19 | They investigated my home. They held my key for 12 days. For all intents and purposes, they probably still have a copy. They made a copy and are still going to my home everyday since October 12th when they returned a copy of it to me; so for that purpose, that part of the investigation on the loss of the structure, I consider that part be to complete. | They investigated my home. They held my key for 12 days. For all intents and purposes, they probably still have a copy. They made a copy and are still going to my home every day since October 12th when they returned a copy of it to me; so for that purpose, | ***Altered text!! Senior citizen is making a claim ONLY on the structure of the home!*** |
| 51 | 10-12 | Allstate making misstatements that I denied access to my home and I said perhaps, you know, employees are good and bad employees. | Allstate making misstatements that I HAD denied access to my home and I said perhaps, you know, employees are good and THERE ARE bad employees. THERE ARE GOOD AND BAD MEMORIES. | ***Omissions*** |
| | 21-24 | If I went to your home I would see a living room set, a cocktail table, a wall mirror. I'm appealing to Allstate's common sense. | If I went to your home I would see THAT YOU WOULD HAVE a living room set, a cocktail table, a wall mirror, SO ON AND SO FORTH. I'm appealing to Allstate's common sense. | ***Omissions*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | the place referred by Allstate. This is the same form. I said I never received this form. I'm going to make my claim in plain English. | A. Well, I completed my own form and I made my claim. That's all I have to say. I made my claim. I don't know what form THAT is. To me it's just like people that WERE calling me from all over the place referred by Allstate. This is the same form. I said I'VE never ____ this form. I'm going to make my claim in plain English. | *not submitted to Allstate.* *Switched words: RECEIVED VS. SEEN* *Counsel replaced the word "seen" with the word "received" which, if unnoticed, would have caused the senior citizen to make a misrepresentation of a material fact by wrongfully asserting that she had never received the document! Although the document had been delivered to the senior citizen after the claim for the loss of the structure of the home was submitted. The senior citizen never made the assertion that she never received the document. That was Counsel's fabrication.* |

BREAK

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | A. If you need a statement from my tax preparer stating that I will get that, but there's a lot of financial and personal information that's under my fourth amendment rights that's not relevant to this case. | A. TRUST ME, if you need a statement from my tax preparer stating that, I will get that, but there's a lot of financial and personal information that's under my fourth amendment rights that's not relevant to this case. | ***of unreasonable search and seizure by asking for copies of personal tax returns.*** |
| 66 | 9-14 | A. Forever. Since I have been working as an adult and they never were able to hold jobs because they have no education. They were doing menial jobs. Whatever they find something; washes dishes, construction work, whatever came along. | A. Forever. Since I have been working as an adult and they never were able to hold jobs because they have no education. They were doing menial jobs. WHENEVER they find something; WASHING dishes, construction work, whatever came along THAT'S WHAT THEY DID | ***Omissions. Grammar*** |
| 67-68 | (67)25 (68)2-3 | Q. You don't collect any rent from him or anything?<br>A. No. | Q. You don't collect any rent OR ANYTHING from him or anything?<br><br>A. No. | ***Omissions*** |
| 68 | 4-18 | Q. Other than allowing him to live in the home that's in your name, what other type of financial assistance did you give him in 2014?<br><br>A. Well, that's irrelevant to the case. I just went into my personal things because it was just to give you a glimpse of my family. This is irrelevant to this case, and I don't want to create any other more paperwork and not dwell on my families and personal life, because it has nothing to do with the value of my home, the loss of my structure and whether I have the right policy or whether Allstate sold me the right policy. | Q. Other than allowing him to live in the home that's in your name, what other type of financial assistance did you give him in 2014?<br><br>A. Well, that's irrelevant to the case. I just went into my personal things because it was just to give you a glimpse of my family this is irrelevant to this case, and I don't want to create any other more paper and not dwell on my and personal life, because it has nothing to do with the value of my home, the loss of my structure and whether I have the right policy or whether Allstate sold me the right policy. | ***Omissions. Counsel is violating senior citizen's Fourth Amendment Rights of unreasonable search and seizure by inquiring into personal details of father/daughter relationship.***<br><br>***It is also possible that lengthening the line of unnecessary questioning is positive for Counsel for billing purposes on his service to Allstate.*** |
| 68-69 | (68)19-25 (69)14 | Q. It has to do with whether or not you're father is, in fact, a dependent of yours.<br><br>A. You asked me several questions about whether he is my dependent. Trust me, when we get to court I will open up my whole entire drawer of documents if a judge deems it necessary to make things simple. At this point, it is not.<br><br>Q. Who is your tax preparer? | Q. It has to do with whether or not YOUR father is, in fact, a dependent of yours.<br><br>A. You asked me several questions about whether he is my dependent. Trust me, when we get to court I will open up my entire drawer of documents if a judge deems necessary<br><br>Q. Who WAS your tax preparer IN 2014? | ***Altered text. Omissions. Counsel is violating senior citizen's Fourth Amendment Rights of unreasonable search and seizure by inquiring into*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | A. Not within these four walls it's not. | Q. It IS not personal, it's public record.<br><br>A. BUT not within these four walls it's not. | |
| 72 | 9-21 | Q. Well, are you aware of the fact that under your policy with Allstate you have a duty to cooperate with it's investigation and provide them relevant information?<br><br>A. I have a duty to answer questions that are relevant to the value of my structure and to make sure that all my answers are relevant to that, and also to the fact that whether my policy is valid or not, because that's what is my understanding that Allstate has questioned and is trying to blame me instead of blaming themself. | Q. Well, are you aware of the fact that under your policy with Allstate you have a duty to cooperate with it's investigation and provide them relevant information?<br><br>A. I have a duty to answer questions that are relevant to the value of my structure and to make sure that all my answers are relevant to that, and also to the fact that whether my policy is valid or not, because that's what is my understanding that Allstate has questioned and is trying to blame me instead of blaming THEMSELVES. | ***Counsel threatening remarks to the senior citizen. Grammar.*** |
| 73 | 15-23 | They knew that Allstate was protecting our home and in exchange for that we needed to pay a yearly fee, and we did that dutifully based on the meager wages that my parents made, and didn't speak English and were very poor and we did that fully trusting Allstate, that it would pay the policy if ever we lost the home, as in this case, in the incident of a fire. | They knew that Allstate was protecting our home and in exchange for that we needed to pay a yearly fee. And we did that dutifully based on the meager wages that my parents made. didn't speak English and were very poor and we did that fully trusting Allstate, that it would pay the policy if ever we lost the home, as in this case, in the incident of a fire. | ***Altered text which if not detected would have resulted in a misstatement by the senior citizen. The senior citizen never uttered that statement asserting she did not speak English herself.*** |
| 74 | 6-8 | Q. You were the one that took the policy out originally?<br><br>A. No. The one in 1977, no. | Q. You were NOT the one that took the policy out originally?<br><br>A. No. The one in 1977? No. | ***Omission*** |
| | 18-25 | Q. The policy in question here, it indicates that the named insured is Eva M. Mallek with an address of 68-61 Yellowstone Boulevard, Forest Hills, New York; is that correct?<br><br>A. Yes, and it also says the insured location of property and it has 88-20 207th Street, although – yeah, the bill the | Q. The policy in question here, it indicates that the named insured is Eva N. Mallek with an address of 68-61 Yellowstone Boulevard, Forest Hills, New York; is that correct?<br><br>A. Yes, and it also says the insured'S location of property INSURED and it has 88-20 207th Street, although – yeah, the bill the | ***Omissions. Correction of senior citizen's name.*** |
| 75-76 | (75)4-25<br>(76)2-8 | Q. How did the insurance policy go from being in your parent's name to in your name?<br><br>A. You contact the agent. At the time it was a woman. I don't know her name. Perhaps – let me see. At the time it was a woman and I met the woman in her office and again, she gave me, I think, I explained to her what the change was and she said come in and bring in your mortgage papers, whatever paperwork you have to make the change in title, and I'm sure she asked me a lot of questions. Like the form in your Exhibit D.<br><br>I'm sure there was another form that this agent filled out with all the pertinent information as to you're insuring this home at 88-20. That's the insured home and you live in 68-61, and what's the | Q. How did the insurance policy go from being in your parent's name to in your name?<br><br>A. You contact the agent. At the time it was a woman. I don't know her name. Perhaps – let me see. KEVIN IS HERE [MRS. MALLEK SEARCHES FOR EXHIBIT B]. BUT at the time it was a woman and I met the woman in her office and again, she gave me ALL KINDS OF...I think I DON'T KNOW, I explained to her what...OF the change and she said come in and bring in your mortgage papers, whatever paperwork you have THAT MADE the change in title, and I'm sure she asked me a lot of questions. Like the form in your Exhibit D. | ***Omissions that obscures the meaning of the senior citizen's assertions, i.e: Allstate forms are intricate.***<br><br>***This line of questioning was*** |

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | Q. And was this the same woman with whom you actually met?<br><br>A. I have no idea, whoever answered the phone.<br><br>Q. The agency on the policy, Exhibit A, is located at 49 Nassau Street, #2. Is that where you initially—<br><br>A. Initially Allstate bounced me around from this agent to that agent because every time I spoke to somebody it was a different person. | Q. And was this the same woman with whom you actually met?<br><br>A. I have no idea, whoever answered the phone.<br><br>Q. The agency ITSELF on the policy, Exhibit A, is located at 49 Nassau Street, #2. Is that where you initially—<br><br>A. THAT WAS NOT IT. THAT WAS WHAT I SAID initially. Allstate bounced me around from this agent to that agent because every time I spoke WITH somebody it was a different person AND IN THIS INSTANCE. | |
| 80-82 | (80)10-25<br>(81)2-25<br>(82)2-25<br>(83)2-4 | When I put my claim in they were ignoring me, and I said I need to get hold of my agent, and I must have taken an old, this nine page, Exhibit B from my files and there was a different address, and I went to that location. I don't know where It is but I'm going to look it up now when I go home, or whether or not I threw that copy, I don't know.<br><br>This is a very traumatic situation. The entire home is gone. You don't have a home to go back to, so I don't know what I did with the copy. Perhaps I put it back, but it was funny because when I went into that office I look up and I didn't see Allstate; so what I did is I called the number that appears and I said, hello, and I said, I'm looking for Kevin Shaefer. Because I don't know where it was. On the West Side? I have no idea, and he said no, our office is at 49 Nassau Street, and I said, what happened here, you know there was no – I don't think I ever recall receiving via email or correspondence your agent has changed, otherwise I would remember.<br><br>I wanted to get in touch with somebody because Allstate was totally ignoring me, and when I was making phone calls it was going to voicemail, and it was a total disconnect. I ended up in the wrong office; so to tell you the truth, I don't know who that woman is or where she is. They bounced me to Kevin and Kevin ended up being at 49 Nassau Street.<br><br>Q. So when you first went to make the change and notify Allstate of the change and notify Allstate of the change in title, what agency location did you go to? And I'm not asking for the specific address because you told me you don't recall. Although, you mention you might be able to look at a document that might ______ your recollection. We'll leave a blank in the transcript for a precise address.<br><br>INSERT: ____________________<br><br>A. If I find it. | When I put my claim in they were ignoring me. And I said I need to get hold of my agent, and I must have taken an old; this nine page, Exhibit B from my files and there was a different address AND TO GET HOLD OF MY AGENT, and I went to that location. --I don't know where it is. But I'm going to look it up now when I go home, WHERE IT IS or whether or not I threw that copy, I don't know.<br><br>This is a very traumatic situation. The entire home is gone. You don't have a home to go back to; so I don't know what I did with the copy. Perhaps I put it back. But it was funny because when I went into that office -TO THAT BUILDING- I look up and I DON'T see Allstate, AND I DON'T SEE ANYTHING. So what I DO is I CALL the main number that appears. AND I said "Hello, I'm looking for Kevin Shaefer WHERE ARE YOU? BECAUSE I'M IN SO AND SO." I don't know where it was. On the West Side? I have no idea. And he said "No, our office is at 49 Nassau Street." And I said "What happened here?" You know, there was no – I don't think I ever recall receiving via email or correspondence "Your agent has changed." otherwise I would'VE REMEMBERED.<br><br>I ENDED UP... BECAUSE I wanted to get in touch with somebody because Allstate was totally ignoring me, and when I was making phone calls it was going to voicemail, and it was a total disconnect. I ended up in the wrong office. So to tell you the truth, I don't know who that woman is, where she is. They bounced me NOW to Kevin, and Kevin ended up being at 49 Nassau Street.<br><br>Q. So when you first went to make the change and notify Allstate of the change and notify Allstate of the change in title, what agency location did you go to? And I'm not asking for the specific address because you told me you don't recall. Although, you mention you might be able to look at a document that might REFRESH your recollection. We'll leave a blank in the transcript for a precise address.<br><br>INSERT: Anna Truszkowski, 355 Seventh Ave, New York, NY 10001<br><br>A. If I find it. | *Omission to obscure the veracity of the senior citizen's assertion that she had actually reported her home occupancy status to Anna Truszkowski. Allstate was aware of this material fact.*<br><br>*Punctuation.* |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**<u>Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016</u>**

| | | | | |
|---|---|---|---|---|
| | | | | ***"ASKED ME TO COMPLETE QUESTIONS" GIVES THE INCORRECT MEANING. THE SENIOR CITIZEN NEVER UTTERED SUCH WORDS.*** |
| 85 | 2-6 | ...was Allstate mailing you the declarations on a yearly basis or did all that change when you had this meeting in Manhattan somewhere near Broadway on the West Side? | ...was Allstate mailing you the declarations on a yearly basis or did all that change THAT NOW YOU STARTED GETTING THE POLICY INFORMATION when you had this meeting in Manhattan somewhere near Broadway on the West Side? | ***Omissions*** |
| 85-86-87 | (85)13-23<br>(86)2-25<br>(87)2-11 | ...My parent did not speak English. My parents did not have an education. I spoke for my parents. I helped them along. I did everything that I could, and when I got a full-time job with a good enough paycheck I payed for everything, as much as I could.<br><br>Q. Did this meeting with the Allstate agent happen before or after your father was remarried?<br><br>A. Before.<br><br>Q. How long before your father remarried?<br><br>A. I was around when the title was changed, and Allstate should have that file with the forms that this woman prepared.<br><br>Q. When did your father get remarried?<br><br>A. 2005-2006, I'm not sure exactly, but around that year.<br><br>Q. When you met with the agent and informed her of the change in the title, did you have any discussion with her about who would be residing in the home?<br><br>A. I am sure. I mean if Allstate and all the consultants that they have to minimize losses to the company they have to ask all the right questions, otherwise they would be negligent.<br><br>Q. I'm just asking, what is your recollection. Do you have a specific recollection?<br><br>A. I don't know. This happened in the last century. I mean, my mom died, you know, over 20 years ago. I don't know what kind of questions – if they asked me tomorrow what kind of questions you | ...My parentS did not speak English. My parents did not have an education. SO, I spoke for my parents. I helped them along. I did everything that I could, and when I got a full-time job with a good enough paycheck I PAID for everything, as much as I could.<br><br>Q. Did this meeting with the Allstate AGENCY happen before or after your father was remarried?<br><br>A. Before.<br><br>Q. How long before your father remarried?<br><br>A. I DON'T KNOW it was around when the title was changed, and Allstate should have that file with the forms that this woman prepared.<br><br>Q. When did your father get remarried?<br><br>A. 2005-2006, I'm not REALLY sure exactly, but IT WAS around that year.<br><br>Q. NOW when you met with the agent and informed her of the change in the title, did you have any discussionS with her about who would be residing in the home?<br><br>A. I am sure! I mean if Allstate and all the consultants that they have to the company they have to ask all the right questions– otherwise they would be negligent.<br><br>Q. I'm just asking, what is your recollection. Do you have a specific recollection?<br><br>A. I don't RECALL. I DON'T KNOW. This happened in the last century. I mean, my mom died, you know, over 20 years ago. I don't know what kind of questions – if they asked me tomorrow what kind of | ***Omissions. Altered text. Counsel's failed attempt at obscuring the strength of the senior citizen's accusatory assertion. Counsel deleted the statement: "Allstate is trying to see a way of declining my claim..."*** |

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | I'm sure I would have told her my father, my only dependent, lives at 88-20 most of the time, all of the time. All my stuff is there. I never moved out, and I'm married, and my address is 68-61. Therefore, send me all the bills to 68-61 because I'm married. I live there and, you know, for purposes of getting everything, you know mailed and that I had to see all the bills it's, for me, the best way to receive all my bills.<br><br>Q. And I'm just trying to find out, did you actually tell the agent that when you met with her<br><br>A. I don't know. You're trying to ask me to recall a conversation that I had ten years ago? I don't know what the conversation was about.<br><br>She told me to come in, bring everything, and we have to make all the changes, and I'm telling you that by procedure she had to do one of these forms that cover all the bases including, your at 88-20 207th Ms. Mallek? We have been sending you the bills to 68-61. What are you going to do? Are you moving back there, because if you haven't been living there and if your married, you know, you're not complying with your policy. Let me give you the policy that you need if you're still planning to do that since your title is being changed. Are you moving back to the property? I would have said, no, I live there. I also have this home and I'm married. Then we would have had that discussion. I only answered her questions. | I'm sure I would have told her my father, my only dependent, lives at 88-20 most of the time, all of the time. All my stuff is there, I never moved out. And I'm married, and my address is 68-61. Therefore, send me all the bills to 68-61 because I'm married. I live there. And, you know, for purposes of getting everything, you know mailed and that I had to see all the bills it's, for me, the best way to receive all my bills.<br><br>Q. And I'm just trying to find out, did you actually tell the agent that when you met with her<br><br>A. , I don't know. You're trying to ask me recall a conversation that YOU had ten years ago? I don't know what the conversation was about.<br><br>She told me to come in, bring everything, and we have to make all the changes, and I'm telling you that by procedure she had to do one of these forms that cover all the bases including: YOU ARE at 88-20 207th BUT Ms. Mallek, we have been sending you the bills to 68-61? What are you going to do? Are you moving back there [88-20]? Because if you haven't been living there [88-20] and if YOU ARE married, you know, you're not complying with your policy. Let me give you the policy that you need if you're still planning to do that since your title is being changed. Are you moving back to property [88-20]? I would have said, no, I live there [68-61]. I also have this home [68-61] and I'm married. Then we would have had that discussion. I only answered her questions. | ***into making misstatements on the facts of the case.*** |
| 92-93 | (92)12-25<br>(93)2-25<br>(94)2-17 | Q. Have you ever, during this period of time, claimed the Queens Village address as your primary residence on your tax returns?<br><br>A. No. I always said my father is my dependent and he lives at 88-20 and this is - – I am very straightforward. I'm honest. I don't want to cheat anybody. Whatever is owed to me I want paid, and whatever is owed to the taxman he's owed, and I would never think of deceiving anyone intentionally.<br><br>I know that oversights sometimes happen, but intentionally I would have never deceived anybody. It's not beneficial to me to lie on a policy when really it's prejudicial to me. If I had known that it would be prejudicial to me to have a different policy or have that written down by Allstate, now I'm going to.<br><br>If I have another agent I'm going to have to say, this is my last story and make sure that my policy corresponds to this because apparently the form as indicated similar to Exhibit D, the form that the agent filled out when I came in, when she made me come in with all the legal documents and I dutifully came in, did not ask the right questions or if it did somebody lost the form, or somebody.... | Q. Have you ever, during this period of time, DID YOU claim the Queens Village address as your primary residence on your tax returns?<br><br>A. No. I always said my father is my dependent and he lives at 88-20 and this is my 68-61...I am very straightforward. I'm honest. I don't want to cheat anybody. Whatever is owed to me I want paid, and whatever is owed to the taxman he's owed, and I would never think of deceiving anyone intentionally.<br><br>I know that oversights sometimes happen, but intentionally, I would have never deceived anybody. It's not beneficial to me to lie on a policy when really it's prejudicial to me. If I had known that it would be prejudicial to me to have a different policy ...or have that written down by Allstate, now I'm going to.<br><br>If I have another agent I'm going to have to say, "this is my last story and make sure that my policy corresponds to this" Because apparently the form as indicated similar to Exhibit D, the form that the agent filled out when I came in, when she made me come in with all the legal documents and I dutifully came in, did not ask the right questions or if it did somebody lost the form, or<br><br>Q. That's generally, what I'm trying to figure out. I'm trying to figure out what the scenarios are as to why this policy was issued and either it was issued because something was misrepresented by you – | *Omissions. Counsel's failed attempt at obscuring the integrity of the senior citizen's character. Counsel's failed attempt at concealing the fact that Allstate has all the information in its computer systems that support the senior citizen's assertions on her claim regarding occupancy status.* |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | A. From where?<br><br>Q. We were referring to this meeting that you had in Manhattan.<br><br>A. Oh, initially?<br><br>Q. Correct. Between that time and up until the time of the fire, had you ever talked to anybody at Allstate Insurance?<br><br>A. No, because I thought everything was fine, and just like last year I received from Kevin Shaefer that he was reviewing my file on a yearly basis and he was offering me more products, so I'm sure he was on it, seeing that my account was, you know, on point and there were no questions, and no one questioned me about the two addresses. Nobody said that this isn't valid and telling me you might risk not have a valid policy. We don't do this or you need to expand your policy or you need a new policy. Nobody has mentioned to me about addresses, the two addresses that I have in the policy, and I thought that due diligence, and I trusted fully Allstate. I do not now. | A. From where? I'M SORRY, CAN YOU REPEAT THAT?<br><br>Q. We were referring to this meeting that you had in Manhattan.<br><br>A. Oh, initially, WHEN THE CHANGE OF THE TITLE?<br><br>Q. Between that POINT IN time and up until the time of the fire, had you ever talked to anybody at Allstate Insurance?<br><br>A. No, because I thought everything was fine, and just like last year I received from Kevin Shaefer that he was reviewing my file on a yearly basis and he was offering me [illegible] products. So I'm sure he was on it [illegible] seeing that my account was, you know, on point [illegible] and there were no questions, and no one questioned me about the two addresses. Nobody said "this [illegible] Nobody has mentioned [illegible] that I have in the policy. And I thought that due diligence [illegible], and I trusted fully Allstate. I do not now. | *Allstate's failure in its duty to fiduciary responsibility toward its clients.*<br><br>*To achieve this Counsel manipulated: "addressing the two addresses" sentence and "due diligence was being done on my account."* |
| | | | BREAK | |
| 98-99 | (98)12-25 (99)2-9 | Q. Let's go back on the record. I have now marked Exhibit E, which is a two page document. Is that the deed whereby your father transferred the home from him to you?<br><br>A. Yes.<br><br>Q. Does that help refresh your recollection as to when that occurred?<br><br>A. It says June 13, 2002.<br><br>Q. And does that help refresh your recollection as to when this meeting may have occurred between yourself and the Allstate agent?<br><br>A. Soon thereafter, around that time. Yes. Perhaps. I'm not sure about my schedule at that time, but I'm sure that my intent was to keep the record straight with Allstate about the change. Allstate's schedule I don't know if it was the agent herself or an assistant. I don't recall, but it should be in the files as to when the change occurred. | Q. Let's go back on the record. I have now marked Exhibit E, which is a two page document. Is that the deed whereby your father transferred the home from him to you?<br><br>A. Yes. THIS LOOKS LIKE IT.<br><br>Q. Does that help refresh your recollection as to when that occurred?<br><br>A. WHEN? It says June 13, 2002.<br><br>Q. And does that help refresh your recollection as to when this meeting may have occurred between yourself and the Allstate AGENCY?<br><br>A. Soon thereafter, around that time. Yes. Perhaps. I'm not sure about my schedule at that time, but I'm sure that my intent was to keep the record straight with Allstate about the change. On that matter, Allstate's schedule I don't know if it was the agent herself WHO MET WITH ME or an assistant. I don't recall, but it should be in the files as to when the change occurred. | ***Omissions*** |
| 99-100 | (99)10-25 (100)2-22 | Q. How did you find out about the fire and what do you know about it?<br><br>A. I get out of the office. I was in the office. Yes. I keep my phone off when I work. I don't take messages. If you need me, for personal acquaintances, text me. That's how I know it's urgent. It | Q. How did you find out about the fire and what do you know about it?<br><br>A. I get out of the office. WAS IT IN THE OFFICE?... Yes. I keep my phone off when I work. I don't take messages. If you need me, for personal acquaintances, text me. That's how I know it's urgent. It has to | ***Omissions. Counsel's attempt to portray the senior citizen in a*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | He's okay. He's walking. I was happy, but he told me on the phone everything was lost and you should call the insurance company and have the house boarded up. You lost everything.<br><br>No, I did not go because my father was there and the most important thing to me was my father. | that he said. I said, "okay." My first problem was my father. MY FATHER IS okay, He's walking. HE'S OKAY, I was happy, but he told me on the phone "everything was lost, you should call YOUR insurance company and have the house boarded up BECAUSE You lost everything."<br><br>No. I did not go because my father was there and the most important thing to me was my father. | |
| 103-104 | (103)12-25 (104)2-10 | A. Yes. It was a struggle to meet with the adjusters from Allstate. The first time he missed the appointment, and I was not happy.<br><br>Q. Was that the Saturday meeting that you described in some of your letters?<br><br>A. Yes, but getting to that point was horrible because when I called the person that was calling me he said, I need to see your house and I said, I'm available only on weekends. I can't get off work. I can't say I'm taking the day off. I can't be taking days off, and I said I can meet you any time Saturday or Sunday, and what this gentleman told me initially was that we don't visit or do inspections on the weekends.<br><br>So I called and I said that's impossible. I'm sure there are people who work on the weekends, and maybe Allstate can get somebody else, and I called the lady who is no longer there and I said, this is what happened. | A. Yes. It was a struggle to meet with the adjusters from Allstate. The first time THAT I WENT THERE, he missed the appointment, and I was not happy.<br><br>Q. Was that the Saturday meeting that you described in some of your letters?<br><br>A. Yes, but getting to that point was horrible. Because when I called the person WHO was calling me he WAS SAYING, "I need to see your house" and I said, "I'm available only on weekends. I can't get off work. I can't say I'm taking the day off. IT'S A VERY COMPETITIVE BUSINESS, I can't be taking days off," SO I said "I can meet you any time Saturday or Sunday. TELL ME" And what this gentleman told me initially was "WELL, we don't visit or do inspections on the weekends."<br><br>So I called and I said that's impossible. THERE ARE PEOPLE WITHOUT JOBS, I'm sure there are people who ARE LOOKING FOR A JOB on the weekends, and maybe Allstate can get somebody else, and I called the lady who is no longer there and I said, this is what happened. | *Omissions to obscure the logical argument made by the senior citizen on Allstate's inability to provide service on weekends to intentionally create delays in the claim process.*<br><br>*Punctuation.* |
| 104-105 | (104)23-25 (105)2-5 | ...And she arranged for someone to come over the weekend, and when that weekend happened he missed the appointment, and I said okay, my first experience. Okay. It happens, but then we made another appointment and I was. | ...And THEN she arranged for someone to come over the weekend, and when that weekend happened he missed the appointment. And I said "okay, my first experience. Okay, IT happens. I DON'T WANT TO BLAME ANYONE." But then we made another appointment and I was... | *Omissions to to remove evidence of the senior citizen's patience and good nature with Allstate's delaying the claim process.* |
| 110-111 | (110)19-25 (111)16-23 | ...We know what it is, and the policy, as far as I'm concerned, is – I don't know 368- 358 or whatever it is covering the structure of the home, and I can tell you that multiple individuals have told me that all was lost, even the adjuster that came. You lost everything. The fire marshal, Mr. Wilson, I think it is, told me I lost everything, just board it up, and the Allstate fire specialist told me you lost everything. | ...We know what it is, and the policy, as far as I'm concerned, is – I don't know [$]368-[ $]358 or whatever it is covering the structure of the home, and I can tell you that multiple individuals have told me that "all was lost," even the adjuster WHO came TO SEE IT TOLD ME "You lost everything." The fire marshal, Mr. Wilson, I think it is, told me I "lost everything, just board it up," and the Allstate'S fire specialist told me "you lost everything." | *Omissions. Punctuation.* |
| 111 | 16-23 | I want my home back. I want to replace my home, my family home. I have a lot of memories of my mother. As much as my husband wants me to sell it. He says, why are you going to live there? To me it's my only home. I don't have a home to go to. I miss my mom so bad, and my father. I don't know how long I have. | I want my home back. I want to replace my home, my family home. I have a lot of memories of my mother. As much as my husband wants me to sell it. BECAUSE he says, "why are you going to live there?" BUT to me it's my only home. I don't have a home to go HOME to. AND TO ME IS LIKE MY mom IS STILL THERE, and my father. I don't know how long I have... [CRYING]. | *Omissions to obscure the senior citizen's emotional attachment to the home.* |
| 113-114-115 | (113)14-25 (114)2-25 | ...Because when you have animosity against somebody you immediately think that when the wife is killed who are you going to think about? The husband. The first suspect. That's where your mind goes. I said, how could it happen? And that's the – we all think that, everybody, we all do. | ...Because when you have animosity against somebody you immediately think LIKE when the wife is killed who are you going to think about? The husband. The first suspect, RIGHT? That's where your mind goes. I said, how could it happen? And that's the – we all think that, everybody, we all do. Who | *Altered text. Omissions. Evidence of Counsel's use of* |

*Text within brackets [] were added for clarification*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | A. Absolutely, and this is preliminary. I'm going through my statement that I got, but I think a lot – since my parents initially bought everything for cash, we didn't have credit cards at that time. My parents were very old school people that were making meager wages, and everything that they bought, they bought in cash. I don't think I ever seen a credit card in my father's name.<br><br>Q. Looking at this, how do you think it would be possible for someone at Allstate to determine the actual cash value or the replacement cost of any of the items that you have listed here?<br><br>A. This is preliminary. This is my list, but it doesn't have a value because I'm honest enough to know, and I want to be as honest as possible to put the dollar amount when I determined that, either through looking to my statements or recalling how much, you know, they paid for it or we paid for it, putting our cash together.<br><br>Q. That's my other question. How would I looking at this list determine – well, let me ask you this first, this list that you have given us, who owns the items that are listed here?<br><br>A. I do.<br><br>Q. And why do you say that?<br><br>A. Because it's my home. Everything that's in their is my home. I don't think this lady who is my father's wife, I don't think she purchased any major things. | A. Absolutely, and this is preliminary. I'm going through my statementS that I got, but I think a lot – since my parents AND I initially bought everything for cash, we didn't have credit cards at that time. My parents were very old school PLUS THEY WERE people that were making meager wages, and everything that they bought, they bought in cash. I don't think ... I DON'T THINK I'VE NEVER seen a credit card in my father's name.<br><br>Q. Looking at this, how do you think it would be possible for someone at Allstate to determine the actual cash value or the replacement cost of any of the items that you have listed here?<br><br>A. THE LIST SAYS PRELIMINARY. THAT MEANS this is my list, but it doesn't have a value because I'm honest enough to know, and I want to be as honest as possible to put the dollar amount when I DETERMINE that, either through looking to my statements or recalling how much, you know, they paid for it or we paid for it, putting our cash together.<br><br>Q. That's my other question. How would I looking at this list determine – well, let me ask you this first, this list that you have given us, who owns the items that are listed here?<br><br>A. I do.<br><br>Q. And why do you say that?<br><br>A. Because it's my home. Everything that's in THERE is my home. I don't think this lady who is my father's wife, I don't think she purchased any major things. | *property as of yet. Altered text.* |
| 122 | 18-25 | Q. Who paid for it?<br><br>A. We all did. We all gypped in.<br><br>Q. When did you buy it?<br><br>A. I don't recall.<br><br>Q. Where did you buy it?<br><br>A. I have no idea. It's many years ago. I have no idea.<br><br>Q. How many years ago? | Q. Who paid for it?<br><br>A. We all did. We all CHIPPED in.<br><br>Q. When did you buy it?<br><br>A. I don't recall.<br><br>Q. Where did you buy it?<br><br>A. I have no idea. It's VERY many years ago. I have no idea WHERE IT WAS PURCHASED.<br><br>Q. How many years ago? | ***Omissions. Altered text. Counsel's callous and failed line of questioning on trying to coerce the senior citizen into making misstatements on the value of items lost.*** |
| 123-124 | (123)19-25 | Q. How much did it cost? | Q. How much did it cost? | ***Omissions. Altered text. Counsel's callous and failed line of questioning*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

| | | | | |
|---|---|---|---|---|
| | | Q. In looking at this preliminary list that you have given me, and I have sent on to them, is there any way as we sit here as reasonable people, is there any way that Allstate can make a determination as to the precise cash value or the replacement cost of any of these items?<br><br>A. No. As I said, I indicated several times in the past, I am reviewing my credit card statements, and I just want to be courteous and provide you with an answer because you requested so insistently and I just want to reply to your request and I did the best that I could, and it's obvious that I did not include the amounts because I am very honest and I want to be honest, and that's my integrity. That's my name, and when I have that information or an estimate I will submit that information, but for now as of today I want to end the investigation of – after the additional reviews or inspection, the part on the loss of the structure. This is minor.<br><br>Allstate wants to look at every <u>two</u> in the box to avoid paying me that. It's fine. Okay? I'm not saying that it's the right thing. Sooner or later we depend on a supreme being, and sooner or later things catch up with you, and that's fine.<br><br>I'm just asking for the courtesy, and the patience that I had, to allow me to complete that form, and when I do to be reasonable in the replacement of those things and, of course, I'm not asking that you know, the replacement be for quality A, you know, purchased in some Italian boutique.<br><br>It is a modest home, so a place where I can go and have the same thing, be able to go into my bedroom and sleep, go to the living room and have a living room set and a place to sit down or a place to have dinner or a place to cook, but for now if we are doing this for now for that part, we can meet again to revisit this section, because it's unfinished, and we all agree to that; so questioning as to when I did it, when I purchased this, when I purchased that, we're basing those questions on something that is unfinished. It's pointless. | Q. In looking at this preliminary list that you have given me, and I have sent on to them, is there any way LOOKING AT THIS LIST as we sit here as reasonable people, is there any way that Allstate can make a determination as to the precise cash value or the replacement cost of any of these items?<br><br>A. No. As I said, I indicated several times in the past, I am reviewing my credit card statements, and WITH THAT [EXHIBIT C] <u>I just WANTED to be courteous and provide you with an answer because you requested THE LIST [EXHIBIT C] so insistently</u> and I just WANTED to reply to your request and I did the best that I could. And it's obvious that I did not include the amounts because I am very honest and I want to be honest, and that's my integrity. IT'S my name. And [illegible]<br><br>Allstate wants to look at every [illegible] in the box to avoid paying me that. It's fine. Okay? I'm not saying that it's the right thing. Sooner or later we depend on a supreme being, and sooner or later things catch up with you, and IT'S fine.<br><br>BUT I'm just asking for the courtesy, and the patience that I had, to allow me to complete that form, and when I do to be reasonable in the replacement of those things and, of course, AS YOU JUST MENTIONED, I'm not asking that you know, the replacement be for quality A, you know, purchased in some Italian boutique OF FURNISHINGS.<br><br>It is a modest home; so a REPLACEMENT where I can go and have the same thing, be able to go into my bedroom and sleep, go to the living room and have a living room set and a place to sit down or a place to have dinner or a place to cook, THAT'S ALL I'M ASKING [illegible] So questioning [illegible] as to when I did it, when I purchased this, when I purchased that, we're basing those questions on something that is unfinished SO it's pointless. | ***Counsel changes the meaning of the senior citizen's statement when switching words:***<br><br>***TWO VS. TOOL***<br><br>***The above word switching deflect the fact that the senior citizen is aware she is one more of Allstate's robbery victims.*** |
| 131-132 | (131)6-25<br>(132)2-25 | Q. Can you tell me about this Apple printer?<br><br>A. Yes. When I attended Pratt we were using the best in technology – of course, at the time. So I purchased a set through the school, and I don't know whether I did it through Pratt, through a special account, or whether I did it myself. I don't recall if I used to go to a website, and I did purchase the Apple printer and the Apple mainframe. Unbelievable.<br><br>They were huge. I have the screen still, and there was a printer that matched the screen, so I kept the screen at home. I have it right now, because I eventually wanted to transfer the screen over | Q. Can you tell me about this Apple printer?<br><br>A. Yes! When I attended Pratt we were using the best in technology –APPLE, of course, at the time. So I purchased a set through the school, and I don't know whether I did it through Pratt, through a special account THEY HAD FOR STUDENTS or whether I did it myself. I recall THAT I used to go to a website, and I did purchase the Apple printer and the Apple mainframe. Unbelievable, they were huge! I have the screen still, and there was THE printer that matched the screen; so I kept the screen at home [68-61]. I have it right now, because eventually I wanted to EITHER transfer the screen over there [88-20] OR transfer the printer to there [68-61], but it didn't work over in my apartment because my apartment is a | ***Omissions. Counsel continues in the failed effort to coerce misstatements from the senior citizen on the value of items lost.*** |

*Text within brackets [] were added for clarification.*

**THE FOLLOWING DOCUMENT PROVES IT IS A MATERIAL FACT THAT ALLSTATE TAMPERS AND CONCEALS EVIDENCE IN THE PROCESSING OF HOMEOWNERS CLAIMS COMITTING OBSTRUCTION OF JUSTICE WITH THE PREMEDITATED INTENT TO EXECUTE FRAUD AGAINST SENIOR CITIZENS**

**Edits to Transcript of the Examination Under Oath of Eva Mallek –Claimant- Taken on January 7, 2016**

Based on the veracity of the body of evidence that supports the merits of my claim, I expect IMMEDIATE payment by Allstate for:

- the full value of my policy, plus interest at 25% calculated from January 2016,
- compensation for my mental agony and distress as well as that of my family's,
- compensation for my father's relocation to a rental apartment when and if appropriate (my father's address currently alters between the hospital and nursing home due to health conditions which have worsened due to stress regarding the loss of our home and refusal by Allstate to pay for its loss),
- compensation for repeatedly defaming my character with malicious intent,
- compensation for my personal time invested unnecessarily in the research of the insurance business to become acquainted with industry law and practices,
- compensation for my personal time invested unnecessarily on due diligence to have Allstate and Counsel investigated by multiple agencies on malpractice,
- compensation for my personal time invested unnecessarily on corresponding with Allstate and Counsel to-date on asserting my contractual business rights,
- compensation for demonstrated bad faith in delaying home inspections and subsequent investigation on the loss of the structure of the home,
- compensation for delaying payment,
- compensation for Allstate's malicious breach of a business contract,
- compensation for concealing material documentary evidence with malicious intent, and
- appropriate reimbursement of the 2016 Policy charges paid to Allstate. The current monthly charges do not reflect the decreased property value of my home in its present condition.

Eva Mallek

Subscribed and sworn to before me this 1st day of September, 2016

Notary Public

Gjon Balaj
Notary Public, State of New York
No. 01BA6341838
Qualified in Westchester County
Commission Expires May 16, 2020

*Text within brackets [] were added for clarification.*

- - - - - - - - - - - - - - - - - x

EVA MALLEK,

Claimant,

- against -

ALLSTATE INSURANCE COMPANY,

Respondent.

CLAIMANT Eva Mallek

CLAIM NO: 0000437941222

- - - - - - - - - - - - - - - - - x

One Battery Plaza
New York, New York 10004

January 7, 2016
10:35 a.m.

EXAMINATION UNDER OATH of EVA MALLEK, the Claimant herein, taken by the Respondent herein, pursuant to the terms and conditions of policy, held at the above mentioned time and place, before ANNMARIE OAKLEY, a Notary Public of the State of New York.

A P P E A R A N C E S :

SKARZYNSKI BLACK, LLC
Attorneys for Respondent
One Battery Park Plaza
New York, New York 10004

BY: THOMAS H. CELLILLI, III, ESQ.

homeowners policy that indicates that you were a resident of that property, and I understand that that's not the case.

A. That's incorrect.

Q. What's incorrect about it?

A. Allstate has always been aware that I lived at 68-61 Yellowstone Boulevard.

Q. What Allstate is aware of and what they may or may not be aware of is not my question. My question pertained to the fact that the policy that you do have with Allstate indicates that the insured person is a resident of the household and that's not the case as I understand it.

A. That's not true because I told Allstate about the circumstances of my living arrangements. Allstate has my current living address, 68-61 Yellowstone Boulevard, and is aware, because I'm married, is aware that my father, my dependent, lives at my home at 88-20 207th Street.

Q. We're going to spend some time talking about what you believe Allstate,

whether it be the agent or the claims office know or doesn't know, and the basis by which you claim they knew or didn't know at some point during the course of the statement, and I understand that you believe that they know that.

A. It's not what I do believe. They send my bills to 68-61 Yellowstone Boulevard at the apartment in Queens Village. That tells me that they are aware, and that tells me that in their operations in looking out for the best interest of the client in insuring that the client has the appropriate policy. There is a process of risk management where each policy on a yearly basis is reviewed to insure consistency and that they are protecting their clients.

On the other side, it is also relevant that Allstate exists because of a profit motive, and it is in their best interest to review those policies on a yearly basis and to see where they can make more money by selling me additional things that I don't have insurance for; such as, I

how salespeople are supposed to act and follow through.

Q. It's really just a simple question, and I don't understand why we're debating it.

A. Because they know I get my bill at 68-61 Yellowstone Boulevard. Although the address is my home, my insured home is 88-20. I never moved out of that home. My entire world was there. I never moved out of my home. I have that home for my father, and up until, I would say, 10 years ago I was supposed to be moving totally there, but for legal reasons and family situations that also have nothing to do with this. Totally outside of my control, and if you want to check Westlaw --

Q. Why did you bring up Westlaw?

A. Because that's another way of doing this investigation, of confirming what I'm telling you is true. Although --

Q. I don't mean to interrupt you. I missed the point of the Westlaw point.

A. The Westlaw point was that

Allstate is claiming you should have lived in the home a hundred percent of the time because we weren't aware that you lived at 68-61. Although, they send me a bill over there.

I was supposed to move into -- my father is over 80 years old. He likes his independence and I'm married, and that was the total issue for me not living there, totally there, because I'm married, you know, you can't live in a home -- but that was the ultimate result of that, because of the Westlaw case I was impeded from moving into that home a hundred percent of the time.

It wasn't that I didn't want to. It wasn't anything else, but it was out of my control, but that is totally irrelevant because operations, risk management, and everybody, and the agent, they should have known if I was at risk of not being compliant. They should have told me, just like they told me not too long ago, you don't have insurance for when you die so

E. MALLEK

right now, but it's on the website.

Q. On the Allstate website?

A. Under my account, yes.

Q. As you know, my name is Tom Cellilli, I'm outside counsel to Allstate. They asked me to take the statement from you and give them legal advice concerning the claim that you are making. My intent here is to try to gather all the facts regarding the claim so I can adequately give them advice as to how they should try to resolve it. I'm not here trying to trick, mislead or deceive you. I'm not here to get you to say something or stop you from saying something. I'm just sort of a fact gatherer today. Do you understand what my role is here today?

A. Absolutely. I do.

Q. In making that promise to you upfront, I hope that you will make that same promise to me, that you will not try to trick, mislead, or deceive me in any fashion either. Is that agreed?

A. Absolutely. I am a very

E. MALLEK

straightforward person, and I always worked for the financial service industry, very straight forward, and many times I hear my background checks are perfect, and I have to say I have, in the past 20 years, I have a perfect attendance record.

Q. Excellent. The way the process works, and you probably can tell by now, its a question and answer process.

A. I also would like to make a point that I am aware of my fourth amendment rights, and certain things are personal and that I believe will not affect the process in trying to determine whether I have a valid policy or not or what is the value of the structure that was lost. My personal information, sometimes it's irrelevant; so I'm going to assert that right.

Q. And you certainly have the right to do that. In the event that you do, do that I will explain to you why I believe the information is relevant. I will simply ask you whether, after giving you that information, you still seek to assert your

repeating myself. The information is in the file. Just like I indicated that they knew all along of my living situation. My father lives in my home. I am at 68-61. I recorded that. I did not try to deceive them by keeping my address at 88-20.

My entire life, everybody knows that I live at 68-61 Yellowstone Boulevard, and Allstate has known all along, and they have never, apparently, exercised my fiduciary responsibility to take care of this for me by informing me there might be something strange or we have those two addresses because we're worried that might not be covered by the policy that you have. I trusted that I had the right policy.

Q. Your dealings with Allstate before the claim, this was with the agent?

A. Well, Allstate is a large company. You're bounced around, you're bounced around. Sometimes I used to have one agent and another and another agent. I don't know how they work. That's why I requested all those documents because I have no idea how

they work. I don't know. They're like anonymous.

Q. Let me go back through the rest of my instructions, and I want to talk specifically at some point about conversations that you would have had with the agent when you did take out this policy, but let's set that aside for a second. Let me just get through the rest of the instructions.

As I mentioned, this is a question and answer process. I will ask questions, hopefully you can answer the question that I ask you. If at any point in time you don't understand a question that I ask you, tell me and I will rephrase it. If I ask you a question and you answer I will assume that you understood the question. Is that understood and agreed?

A. That's understood, and also on your comment that if I don't answer a question that might be grounds to refuse the claim, then that's not the end of it. You know that it is not for Allstate to make its

over at the courthouse?

A. Absolutely. And how may I get a copy of what's being said here?

Q. Once this is all done you will get a copy to review and to read and sign; so you will be able to get that afterwards. It will take some time to put it together after today, but you will be furnished with a copy of that to review to insure sure that it's accurate, and if there's any changes that you feel need to be made, that the court reporter may have inaccurately transcribed, you have a right to write that out on what's known as an errata sheet, and then we're going to ask that you sign it as your sworn testimony, but you will get every opportunity to review it. Okay?

A. Okay. Thank you.

Q. Are you having any physical problems today that would affect your ability to understand my questions or accurately respond to them?

A. Absolutely not.

Q. Any liquid medication or other

substances that you're taking that would affect your ability to understand my questions or accurately respond to them?

A. Absolutely not.

Q. They sound like funny questions, but I can assure you I have used them all in later cases where I have had people that said the day you asked those questions I was having this problem or that problem, and I said, well, do you remember when I asked you the question? They sound funny but there's a reason for them.

In the letter that I sent you to kind of introduce myself to you and get the process started, I indicated that you had a right to retain counsel, at your cost, and have counsel appear with you at the statement under oath. Are you represented by counsel?

A. I am not represented by counsel because I don't have much to say relevant to this case. Allstate knows everything that there is to know about the case. I have two addresses. My father is my dependent and

two or three page document, that it was the entire policy, and that was all that it required from me to know of the policy, which now I understand it was only a bill to pay the policy, but it was not saying this is your coverage.

So I don't accept any of the conditions to pay the policy, because it's totally -- I never seen that policy. How can I agree, after the fact, to be restrained by what's in the policy, but it's not fair to me that I never agreed to it.

Q. Obviously, your position is noted for the record, and that's all I will say about that.

A. The only thing that is valid about the policy is the coverage that I'm owed for the 358 or whatever it is that I received on the statement that I thought was a policy. The only thing that I know that should be there is the amount of coverage, the amounts that appear exactly on the bill that I'm covered for in case of a fire or whatever else that's there, and that the loss is the

loss and I lost it; so that's the only thing that's valid about that policy. All the other conditions, that you have to do this in 60 days, that you have to live there, that you have to live there a hundred percent of the time, and I live there 99 percent of the time; all of that, I never seen it. No one ever reviewed it with me. I didn't know that all those conditions existed. That to me is wire fraud.

(Insurance Policy was marked as Exhibit A for identification.)

THE WITNESS: I just went to my file today at home and to me Exhibit B, this is Exhibit B, is the policy. That is not the current, but that is something that I picked up from the file in a rush. This is Exhibit B.

Q. May we take that and mark it for identification?

A. This is not the current policy, this is the one I took from my files, and that to me was my policy.

(Nine page document was marked as

Q. It says right here, "your policy documents," in bold.

A. Okay.

Q. And underneath that it says "Your homeowners policy consists of the policy declarations and the documents listed below."

A. The policy documents and declaration, I trusted that everything has been mailed to me at some point. I don't think it's ever been mailed to me.

Q. We can agree, on Exhibit B, page 3, there's a section called "your policy documents." Correct?

A. It says, "your policy documents."

Q. So we can agree on that.

A. Yes. Correct.

Q. And we can agree that I read correctly the first sentence that says, "your homeowners policy consists of this policy declarations and the documents listed below." Correct?

A. Okay.

Q. Just let me know, did I read it

correctly, and does it say that? Yes or no?

A. But based on the fact that I trust Allstate and its agents to provide me the service, to provide me full documentation. I'm not reading, what is AP315. I'm thinking it's contained in this document, in this nine page document, because I'm not foreseeing that I'm going to have a fire or foreseeing that Allstate is going to shrink from paying my policy based on intentionally not sending me the full policy or oversight in not going through the risk management process and bring to my attention the fact that I might not have a full copy of the policy or I might not understand it.

When this is mailed to me I'm thinking that I'm covered for any loss that might occur in my home I'm not looking -- I'm not an attorney.

Q. When you received Exhibit B, did you read the section marked "your policy documents"?

A. No, because I'm not an attorney. I did not know that I needed to have an

going to keep together if the policy itself in not here? The policy consists standard homeowners policy form AP315. They're all here. New York policy provisions AP1948, declaration supplement page New York form AU233-1, New York PIA mandatory form AP4577, deductible for severe hurricanes N4AP-585-1, off premises theft excluded form AU9010-1, New York mandatory endorsement form AP497-2, amendment of policy provisions form AP521, domestic workers comp and liability AP1105-1, New York mandatory endorsement form AP1727, building structure reimbursement limits form N4AP693, standard homeowners mandatory N4AP1357-1. I do not have the 20-plus page document. "Please, keep this together." I do not have that with this.

Q. During the course of our dealings you asked for me to provide you with a certified copy of the insurance policy; is that correct?

A. It is correct.

Q. Let me hand you what has been

marked as Exhibit A, and take a moment to review Exhibit A, and let me know if that's a true and accurate copy of the certified policy that I provided you.

A. At this time I do not trust in Allstate. I don't know if it's the same copy that I got at home. I don't have my copy with me; so because of my lack of confidence and trust, I don't know if this is the copy that I got, but this is the first time, when you sent it to me, that was the first time I saw it. I never got it with this. This and this all of the other listed documents that I received should have been placed together and sent to me every year, and they should have said, "Please, have an attorney review it and let me know if there's anything that you do not understand." That's what fiduciary responsibility means.

Q. You mentioned that you worked most of your life in the financial services area?

A. That is irrelevant to this. It is irrelevant to this. The only thing I said

Q. What is your current occupation?

A. That's totally irrelevant.

Q. You're refusing to answer the question?

A. Yes, because of my fourth amendment right.

Q. You understand why -- I have explained why it is relevant.

A. I am clueless. I work in the financial services industry and I am not an official high level executive. I'm clueless about this world. I'm learning bit-by-bit and now I'm learning more about insurance.

Q. How would I be able to test the voracity of your statement if I don't know what it is that you actually do?

A. Because I'm -- I just said I have -- I'm just finishing my schooling, my basic schooling, and I have disclosed that information; so there is absolutely no way for me to be cognizant of legal things like insurance.

Q. I mean, it's one thing to say it, but how could I ever do my job --

A. Trust my word. If it we go to court I will disclose that.

Q. The policy doesn't say I have to trust your word. The policy says that I have an obligation.

A. Where does it say here that you should trust my word or that I should trust yours, because we're basing this on this, what I got, not on that.

Q. How am I to test the voracity of what you're telling me if you don't give me the background information that --

A. Mister, I am telling you that I an in no position to make any type of judgment because I don't hold an executive position in a financial institution, never held, never came across any legal paperwork for my job or anything related to insurance, for that matter; so I'm as totally clueless as the next person in this room or hopefully it's not another attorney's office or I'm clueless. I'm totally clueless. I'm just doing my best here to defend myself based on this, that I received, the nine page

E. MALLEK

I love studying at NYU. They have the best professors ever. Although I have big debt, but it's all been worth it, and as I said, you paid me a great compliment and that's because of the $100,000 education that I have.

Q. Well, I'm just a reverse of you. I was a history major and a literature minor, and one of the things that got me into wanting to practice law was always getting to learn about something new, and I clerked for a law firm in New Jersey when I was in school, and I remember being involved in a case where it was a product liability case and a woman had been injured when her stove tipped over on top of her and she had opened up the oven and placed something heavy on the oven and the stove tipped over with some hot water and some things boiling on the stove, and I saw the manufacturer had done years and years of tipping tests, and I thought, wow it was very fascinating to me.

So you and I obviously think alike

E. MALLEK

in that regard, but give me an idea of how it is that you went about getting some of this detailed information if insurance is not your background, and how did you go about finding that out? Did you speak with a lawyer?

A. I did not speak with a lawyer. I think I have to say, I work with the best people in the industry, very smart people, challenging, absolutely dedicated to what they do, and by looking at documents, not documents but letters, and the way they write and the way they say things or questions that sometimes that they do ask me.

You don't have to be a specialist in anything to learn or to bring out issues from a situation if you have an analytical mind. And particularly in this case, where I'm being victimized. You're very motivated in a normal situation. You have to write a report and, you know, sometimes the issues that you write about are very -- I can't believe this happened. Can you imagine

A. Yes.

Q. What agency did you send this letter to?

A. Well, I do intend, at that point when I wrote the letter it was the initial exchange, and I, in good faith want to come to a good resolution on my claim, but it's just an advance notice that if you do not come up with a resolution in my favor that all those agencies will receive copies of my complaint, of course, after I submit my complaint in court, but I just wanted to warn you, warn Allstate, but also not release anything until -- you know, in good faith, because I do have good faith that we will come to a resolution given the facts that I have brought forth.

Q. The way I read it was that this letter showed that a carbon copy was sent to appropriate governmental agencies, local state and federal.

A. Exactly. Initially I had thought about it, but after releasing the note I said, maybe it's not a good thing to have a

derogatory statement about a company in public records, and bringing local, state and federal, if in the end and after this exchange we come to a resolution.

But I still have kept it because I eventually if we do not come to a resolution in my favor, that's what will happen, but for now nothing has been released to anyone, because as a good person and in good faith I want this to come to a resolution in my favor. If Allstate is going to act in good faith also, but in their protection not mine, in their protection, I haven't released anything to anyone.

Q. We can agree, that my reading, that this letter was actually copied to appropriate local, state and federal agencies; is that a fair reading of this letter?

A. It is a fair reading, but also in one of your letters, you indicated, you requested, which agencies had been contacted and release the name or something to that effect, and I said nothing. There is

the ones that say here, then those responses correspond, but I don't know if it's been modified. I just don't know what I have at home; so just take whatever is accurate from my letter that is here, we can cross reference from my letter. Whatever I cross referenced can be cross referenced to these but, you know, it's a clear response to your letter; so that's it.

Q. Now Exhibit D contains a document entitled "Sworn statement and proof of loss to Allstate Insurance Company." Is that correct?

A. Yes. I have made reference to this in my last letter.

Q. The form that's part of Exhibit D, you received that when you received the October 9, 2015 letter; correct?

A. Yes. Pertaining to this form and the claim, it's very convoluted how Allstate does this, but in my last letter I think I separated the projects; claim A is the structure; claim B is the contents of the structure, of the contents of the home; and

part C is my investigation or documentation that I am going to be receiving from Allstate regarding it's back office operations.

Now, what I specially claim, clearly, and that is complete is -- I don't know, 50 percent, at least complete with all the investigation, with reviews. For 12 days they held my keys. For 12 days they reviewed. They investigated my home. They held my key for 12 days. For all intents and purposes, they probably still have a copy. They made a copy and are still going to my home everyday since October 12th when they returned a copy of it to me; so for that purpose, that part of the investigation on the loss of the structure, I consider that part be to complete.

Q. My questions that I'm about to ask you are going to pertain solely to this form contained in Exhibit D, the two page document entitled, "Sworn statement and proof of loss." As we sit here today, have you completed and returned that form to

Allstate furnished you with this document, "Sworn statement and proof of loss." isn't it true that you, as we sit here today, have still not completed this form; correct?

A. I have completed my claim.

Q. That's not my question. My question is: As we sit here today, you have not completed the document entitled, "Sworn statement and proof of loss." Correct?

A. The purpose of that form is to obtain from the client the claim that the client is trying to claim. Whether it's done through a form or whether through a letter or whether it's done through cable, it's still the claim and Allstate does not have authority to -- particularly since I never got the 20 page policy that talks about the form; so to me anything goes because I don't have a policy to refer to.

Q. My question is very simple. You're not answering it.

A. I placed my claim. I placed my claim not through the form from Allstate but through my own form and my claims through

the letters.

Q. I understand what you're saying, but that's not an answer to my question. My question is simply this: I'm holding in front of you Exhibit D, and two page of Exhibit D is a form called, "Sworn statement and proof of loss to Allstate Insurance Company."

A. Yes.

Q. Did you complete that document?

A. What we're trying to say is, this is a robotic process. I do not have to state my claim through a form. I have to state my claim any way possible. Especially since I don't this thing that talks to me about a form. To me that form, Exhibit A, to me that form is a foreign form because I have never heard of such a form, and to me I have to submit my claim in any way possible.

Q. Let's go back to my original question and see if I can get an answer. Do you see this form here entitled, "Sworn statement and proof of loss." that's contained in Exhibit D?

simple question. You see the form, "Sworn statement and proof of loss." as part of Exhibit D; correct?

A. Yes.

Q. You did not complete this form; correct?

A. That form is foreign to me.

Q. Did you complete it?

A. I completed it but in my own way.

Q. So you did not complete the sworn statement and proof of loss that we gave you.

A. This is my sworn statement and proof of loss here. I did not complete the form. That was foreign to me.

Q. And when you say "here," you're referring to Exhibit C, "Preliminary list of items lost."?

A. Yes.

Q. We can agree that the preliminary list of items lost is different from the sworn statement and proof of loss that we were referring to; correct?

A. The intent is the same.

Q. They're two different forms; correct?

A. They're different forms but the intent is the same. I just wanted to state my claim and I said I lost all of these items which, is the same thing that the form is trying to do. What your form is trying to do is put all kinds of convoluted questions that I did not -- it's not user friendly, your form, and I thought it was very complicated.

Q. Did you ever call anybody at Allstate to ask how to complete it?

A. No.

Q. Did you ever call me and ask for assistance?

A. No, because I worked in industry, in corporate America, all of my life and I know a form is not the vehicle. It's the intent of the form. If you have an intent to file a claim, as in this instance, you can use any other method possible and the people at the other end are supposed to honor your claim in any way shape or form,

Q. What's your mother's name.
A. Isabel.
Q. Is it I-s-a-b-e-l-l-e?
A. There's no E at the end.
Q. One L or two L's?
A. One L.
Q. Did she go by Isabel Gonzalez?
A. Yes.
Q. Is your mom still living?
A. No. She passed away.
Q. When did she pass?
A. Last century.
Q. I understand that your father was living in the house at the time of the fire; correct?
A. He was.
Q. Was there anybody else other than your father living in the house at the time of the fire?
A. My father remarried and his wife was living there.
Q. What is her name?
A. Rosa Gonzalez, I'm guessing. I don't know what the legal documents are for







her name.
Q. So in 1977 the original deed on the house was in the name Mario Gonzalez, Isabel Gonzalez and Eva Gonzalez, I would assume.
A. Correct.
Q. Give me just historically how that changed throughout the course of time.
A. Well, my father -- again this is very personal. It's not relevant to this, but I will tell you. I was living in the home with my father after that --
Q. After your mom passed?
A. When my mom passed I was married, but most of the time -- I was thinking on the way from my home today, what percentage of the time did I live there. I would think that I was there all summer because I have a garden, and I put all the fruit trees. I have a cherry tree in the front of the house. I have another -- I can't recall the name of all the ornamental trees in the house. I like to garden and I wanted to be with my father all the time and my husband

suddenly for safety reasons -- as I said briefly in session one, the whole intent was for me to move into the house and take care of my father because he's getting weaker and weaker. He's not getting any better.

When he remarried I said, well, now they can take care of each other and alert me if there's any need for me to be around, and so on and so forth; so that was the point of taking care of my father, and he's my dependent.

Q. You mentioned that he is your dependent, and do you claim him as a dependent on your tax returns?

A. Yes.

Q. One of the things that I asked you to bring were copies of your income tax returns.

A. If you need a statement from my tax preparer stating that I will get that, but there's a lot of financial and personal information that's under my fourth amendment rights that's not relevant to the case.

Q. Who's your tax preparer?

A. Well, I will ask them. I don't have a name. I go to an agency that does it for me. It's not one particular name, but if we ever go to court, at all, that will go out in the open. I have no worries.

Q. How long have you been claiming your father as a dependent?

A. Forever. Since I have been working as an adult and they never were able to hold jobs because they have no education. They were doing menial jobs. Whatever they find something; washes dishes, construction work, whatever came along.

That's what they did, and my mom, you know, she was missing an eye, and she was a factory worker; so can you imagine, being a factory worker and sewing with one eye, not even to speak English, what kind of a life my parents had.

Q. So let me ask you, in 2014 in your tax return, did you claim your father as a dependent?

A. Yes.

Q. What about in 2013?

E. MALLEK

it necessary to make things simple. At this point, it is not.

Q. Who is your tax preparer?

A. It's an agency that I'm not willing to disclose at that point.

Q. Why not?

A. Because it irrelevant, and it's an invasion of my privacy, my fourth amendment rights.

Q. Your father being a dependent or not being a dependent is relevant to the case?

A. No. Who's my tax preparer.

Q. No, but whether or not your father is a dependent; correct?

A. Yes. Trust me on that, he is.

Q. I understand you're saying, "trust me" but I --

A. Just like in the case where I had given Allstate access to my home or not, I was telling the truth then and I'm telling the truth now.

Q. Can you send me a tax return with all the other information blacked out other

E. MALLEK

than the section that pertains to whom you claimed as a dependent in 2014?

A. Yes, of course.

Q. Would you agree to do that?

A. I agree to, yes. To black out all the other information, yes, of course.

Q. And then, obviously, we need the signature pages as well.

A. Of course.

Q. Thank you. When did the deed to the home switch to your name only?

A. That's also irrelevant in protection of my fourth amendment rights. It's currently in my name, as of 2015. That's the date of the effect of the policy. That's all that is relevant.

Q. It may have some bearing though on when the house was fully in your name and your interaction with Allstate as it pertained to the insurance on the home, and that's the reason why I'm asking. Plus, I think it's probably a matter of public record.

A. It is a matter of public record.

E. MALLEK

Q. How long has Allstate Insurance insured this house?

A. That I know of, for the longest time. As long as I have owned the house.

Q. Since 1977?

A. That I'm aware of. I could be wrong. I don't know, but we never made that change. It was something that, you know, a bill came, you know, this nine page document that came to the house and we needed to pay and we paid it, and I don't think my parents ever discussed if they should change the policy.

They knew that Allstate was protecting our home and in exchange for that we needed to pay a yearly fee, and we did that dutifully based on the meager wages that my parents made, and we didn't speak English and were very poor and we did that fully trusting Allstate, that it would pay the policy if ever we lost the home, as in this case, in the incident of a fire.

Q. So you believe you started having Allstate Insurance on the policy in 1977?

E. MALLEK

A. To the best of my knowledge, but my mom is not here; my father is not here. I can't consult with them. They were the elders making decisions for me.

Q. You were the one that took the policy out originally?

A. No. The one in 1977, no.

Q. That policy, would it have been taken out in the names of your parents then?

A. Of course, and I don't know who else. I don't know if you can add other parties that are not owners. I have no idea without having any parents present or whether the agent came and said sign here, sign there. I don't know what they sold to my parents. I have no idea.

Q. The policy in question here, it indicates that the named insured is Eva M. Mallek with an address of 68-61 Yellowstone Boulevard, Forest Hills, New York; is that correct?

A. Yes, and it also says the insured location of property and it has 88-20 207th Street, although -- yeah, the bill the

E. MALLEK

I only know it was a woman.

Q. Was there anybody else with you during this meeting?

A. No. I was the only one.

Q. What triggered you to go into the agent?

A. It was triggered by Allstate. They needed to do forms. It's the regulations, back office operations, risk management, and to do the forms properly for me to bring in documents to prove I was the sole owner and to review the policy. I guess to insure that I'm the rightful owner and to review that type of policy they were going to sell me.

Q. And I'm just trying to find out how all this came about and what prompted you to go into the Allstate office.

A. They asked me to come in, as you're asking me now. Come in, show me your id, show me the documents that show you are the owner, and when did this transfer occur, and they made copies of all my documents.

Q. How did they find out that the

E. MALLEK

ownership had changed?

A. I told them.

Q. So you initiated the first call?

A. Of course. I have a duty. The diligence. This is coverage. I said, I need to report that there was a change in the title. That was my first impression. I'm prompt in my duties and I said, I have to inform my insurance.

Q. How did you know that you had a duty --

A. Because the names on the title changed.

Q. Let me ask my question. How did you know you had a duty to report the change in title and ownership to Allstate Insurance Company before meeting with the agent?

A. Because I am an honest person and I like to keep my legal concerns straight, because when there's a change to a title you have to change, you know, your insurance or I didn't know whether my father should have remained on the insurance. I wasn't sure. I knew there was insurance when my mother

E. MALLEK

number that appears and I said, hello, and I said, I'm looking for Kevin Shaefer. Because I don't know where it was. On the West Side? I have no idea, and he said no, our office is at 49 Nassau Street, and I said, what happened here, you know there was no -- I don't think I ever recall receiving via email or correspondence your agent has changed, otherwise I would remember.

I wanted to get in touch with somebody because Allstate was totally ignoring me, and when I was making phone calls it was going to voicemail, and it was a total disconnect. I ended up in the wrong office; so to tell you the truth, I don't know who that woman is or where she is. They bounced me to Kevin and Kevin ended up being at 49 Nassau Street.

Q. So when you first went to make the change and notify Allstate of the change in title, what agency location did you go to? And I'm not asking for the specific address because you told me you don't recall. Although, you mention you might be able to

E. MALLEK

look at a document that might reflect your recollection. We'll leave a blank in the transcript for a precise address.

INSERT____________________

A. If I find it.

Q. Just give me a general idea because I may be able to locate it based upon a general location.

A. That's true. Allstate should know because they have all my files; so it should be in the database.

Q. Do you recall what area of New York it was in? Queens? Brooklyn?

A. No. No, in the city. I know it was a tiny building, a tiny rundown building, and I had to walk up a long set of stairs, and it was a room with several desks spread about and they had me sit down with the woman, and I'm sure she went through the process of asking me questions and filling out the forms.

Q. Do you recall, generally? Downtown? Midtown? East Side? West Side?

A. Probably on the West Side,

Allstate office, was Allstate mailing you the declarations on a yearly basis or did all that change when you had this meeting in Manhattan somewhere near Broadway on the West Side?

A. I was on this account too; so I always received statements from day one, I suppose when I was at home, and then yes, I have always been, since my recollection, since beyond 2015.

I have always been responsible for my parents. My parent did not speak English. My parents did not have an education. I spoke for my parents. I helped them along. I did everything that I could, and when I got a full-time job with a good enough paycheck I payed for everything, as much as I could.

Q. Did this meeting with the Allstate agent happen before or after your father was remarried?

A. Before.

Q. How long before your father remarried?

A. It was around when the title was changed, and Allstate should have that file with the forms that this woman prepared.

Q. When did your father get remarried?

A. 2005- 2006, I'm not sure exactly, but around that year.

Q. When you met with the agent and informed her of the change in the title, did you have any discussion with her about who would be residing in the home?

A. I am sure. I mean if Allstate and all the consultants that they have to minimize losses to the company, they have to ask all the right questions, otherwise they would be negligent.

Q. I'm just asking, what is your recollection. Do you have a specific recollection?

A. I don't know. This happened in the last century. I mean, my mom died, you know, over 20 years ago. I don't know what kind of questions -- if they asked me tomorrow what kind of questions you asked me

a conversation with this person, with this agent in Manhattan, where you informed her that your father would be living in the home and the property was just deeded to you and that you lived somewhere else?

A. Okay. I don't recall that's the way the information was exchanged, but I'm sure due diligence calls for that, as to why do you have 88-20 and why do you have 68-61, what is the relationship there, and speaking with an agent that is really trying to sell the right policy. I would have been asked. Had I been asked, I'm totally sure that I would have told him or her about that.

Q. And I'm just trying to figure out, when you met with that agent during that particular period of time, did you tell them that you were living at 68-61 Yellowstone Boulevard and that you would not be living at the Queens Village address?

A. Again, living is relative, because I always lived in my father's home. I have all my stuff there. I have all of my personal items there, and I spent 80 to 70

percent of my time with my father. He's elderly. He needs attention; so at that time he wasn't married. So I was most of the time there; so if she asked me why, I don't know exactly because the conversation -- I think due diligence of the agent calls for inquiring as to why, if I'm giving you two addresses to find out what it is that is happening so that I can insure this woman and her father, her dependent, and her family has the proper policy.

I'm sure I would have told her my father, my only dependent, lives at 88-20 most of the time, all of the time. All my stuff is there. I never moved out, and I'm married, and my address is 68-61. Therefore, send me all the bills to 68-61 because I'm married. I live there and, you know, for purposes of getting everything, you know, mailed and that I had to see all the bills it's, for me, the best way to receive all my bills.

Q. And I'm just trying to find out, did you actually tell the agent that when

to lie on a policy when really it's prejudicial to me. If I had known that it would be prejudicial to me to have a different policy or have that written down by Allstate, now I'm going to.

If I have another agent I'm going to have to say, this is my last story and make sure that my policy corresponds to this because apparently the form as indicated similar to Exhibit D, the form that the agent filled out when I came in, when she made me come in with all the legal documents and I dutifully came in, did not ask the right questions or if it did somebody lost the form.

Q. That's, generally, what I'm trying to figure out. I'm trying to figure out what the scenarios are as to why this policy was issued and either it was issued because something was misrepresented by you --

A. Never.

Q. -- or there was an error and omission on the part of the agent at Allstate, and I may be able to pursue a

claim against the Allstate agent who made the error or omission.

A. I'm going to help you. I work in corporate America all my life, and I know that back office operations sometimes, because of the volume of work that they do, it is very possible that mistakes are being made on a huge scale. I'm just one of them. If we get this form, the form that's equivalent in Exhibit D, if we get the form that the agent did, and I'm sure that risk management asked all the right questions, including in the case of the two mail addresses. What is the story? And according to that this is the policy that she needs to get.

Q. You keep referring to the sworn statement and proof of loss marked in Exhibit D, and I can assure you that what the agent was completing at the time has nothing to do with the sworn statement of loss.

A. No. You misunderstand my statement --

the Allstate agency, up until the time of the fire had you ever spoken to anybody personally at Allstate Insurance Company about the insurance for the Queens Village property?

A. From where?

Q. We were referring to this meeting that you had in Manhattan.

A. Oh, initially?

Q. Correct. Between that time and up until the time of the fire, had you ever talked to anybody at Allstate Insurance?

A. No, because I thought everything was fine, and just like last year I received from Kevin Shaefer that he was reviewing my file on a yearly basis and he was offering me more products; so I'm sure he was on it, seeing that my account was, you know, on point and there were no questions, and no one questioned me about the two addresses. Nobody said that this isn't valid and telling me you might risk not have a valid policy. We don't do this or you need to expand your policy or you need a new policy.

Nobody has mentioned to me about addresses, the two addresses that I have in the policy, and I thought that due diligence, and I trusted fully Allstate. I do not now.

Q. Why don't we take a short five minute break and I will change gears a little bit here.

(A short break was taken.)

(Two page document was marked as Exhibit E for identification.)

Q. Let's go back on the record. I have now marked Exhibit E, which is a two page document. Is that the deed whereby your father transferred the home from him to you?

A. Yes.

Q. Does that help refresh your recollection as to when that occurred?

A. It says June 13, 2002.

Q. And does that help refresh your recollection as to when this meeting may have occurred between yourself and the Allstate agent?

A. Soon thereafter, around that time.

it's your business. You're calling me for business. How did you get my information? He said, oh, there's a database. There's a database of all the buildings that go on fire, and I said, how do you have my name, my personal phone number? I don't know that in public record that you have my phone number. I mean, who can collect that information? It's a good business definitely, because I don't give out my personal number, except to my friends or acquaintances. I was so shocked and I said, not even Allstate is calling me -- I mean, not even the police is calling me. What's up with that?

Q. Well, those are public adjusters probably, and they follow the police radio and the fire department radio, and there's a very competitive business; so they try to locate where issues arise and get to the people first so they can sign them up to handle their claim, but that's my guess as to who was contacting you originally. How they get your phone number, I don't know.

Allstate wouldn't know about it until you first report the loss. Did you ever go to the house after being notified of the fire?

A. I called the fire marshal to try to find out more information about the fire. I called the fire marshal and I said, I need to know what's going on with my house, because he was there. And I said, I'm going to go straight there. I'm going to go over there. And I said, my father was taken to the hospital and all that stuff. He said, no. No, your father is coming here with his wife. I'm going to talk to him. Then I said, my father is okay? And I said since he's there there's no need for me to be there. My father is going to handle the whole situation.

If they tell you your whole home is lost, what are you going to do there? You're going to see a building and everything is lost, and I said, my father is okay? He's walking, he said. I'm going to meet your father after or something like that he said. I said, okay. My first

missed the appointment, and I said okay, my first experience. Okay. It happens, but then we made another appointment and I was so excited because we are moving along here, and then I went and when I showed up this very tall gentleman showed up, and I thought it was the fire inspector for Allstate, and he said I'm so-and-so and he said I'm the fire inspector and I'm here, and I know the Allstate adjuster is coming and so I thought since he was coming that I thought it would be a good time for me to come, and soon after that the adjuster showed up, and that's it. That's when I left the key with him.

Q. Was that the sequence of events of how that went, or was the Allstate adjuster and the fire inspector there before this Saturday meeting?

A. What do you mean? That meeting that took place October 3rd? I think that's when it happened. The first person who showed up was the fire inspector. The tall, very tall person, and then the adjuster

showed up. He was late, I think. I'm not really sure.

Q. Between the time that you were notified of the fire up until today, have you ever removed anything from the home?

A. I'm afraid to go into the house because they told me everything is lost. I was afraid that if I step into anything I'm going to end up in the basement; so I went up to the door and to the living room area. Everything is black. You can't see what you're stepping on. You need a flashlight or something, and you need to be very daring because you can't tell when you step whether or not you're going to go through the floor.

Q. So you have never been inside the home?

A. Beyond the living room. No. Never.

Q. What is in the living room area? Is there still contents in there?

A. No. I said, where did everything go? Where is the table because the dining area is just next to the living room, and I

Q. I don't know that anybody accessed the property during that 12 day period of time with the key. I don't believe that anybody has gone through and done measurements or done a cost estimate of the property at this particular point in time; so that's what needs to be done to determine what the replacement and actual cash value for replacement of the home is and then, in addition to that I think that they want to see what, if any, remnants of the contents are there as well as too, and then document that purposes of analyzing what information is still there, and I don't believe that, that was ever done. I think that the initial adjuster was to inspect the loss and hadn't done any of those things, and I don't know if he would have been capable of doing those things based on his qualifications.

That's why the last person tried to get into there during the Saturday meeting; so that's why they continued to ask to try to get in so they can try to make some assessment of the loss.

My understanding is that you haven't hired anybody to determine what the replacement cost or what the actual cash value of the property was at the time of the loss; is that fair to say?

A. Well, I received an estimate. Citibank always sends -- you know, you can do this, you can refinance and all that stuff; so at one point I called them for something. I don't know for what reason. They sent me, in fact, in duplicate because I got two mailings, the same thing. They are eager to do business with you. An estimate of properties around the area, including the 88-20.

So I have that some place. Hopefully, I did not lose it because it's a current market. We know what it is, and the policy, as far as I'm concerned, is -- I don't know 368- 358 or whatever it is covering the structure of the home, and I can tell you that multiple individuals have told me that all was lost, even the adjuster that came. You lost everything. The fire

E. MALLEK

burned the property down; is that right?

A. Not my father. I was suspicious, not my father. As I said, the problem of my not being able to be with my father was the wife. She hates me, and she is very jealous of me and wants forever to separate us, and in the interest of my father I want him to be happy, to be content, and I was suspicious. And I said, how did this happen? And I guess I was mistaken because the fire marshal told me, no, there's nothing that you have to worry about. It was not intentional. Because when you have animosity against somebody you immediately think that when the wife is killed who are you going to think about? The husband. The first suspect. That's where your mind goes. I said, how could it happen? And that's the -- we all think that, everybody, we all do. Who could it be that could do something like that? How could it happen? I couldn't believe it; so that's why it probably happened, in the heat of moment.

Q. I read something about the fact

E. MALLEK

that you were trying to evict your father from the house before the fire.

A. That's a technical issue. You're a lawyer. Had I wanted to evict my father, rationally, it would have happened in 2005. I did not want to, in any way, effect my father, but the attorneys told me, technically you have given your father license and your father has given her license; so you cannot remove this woman from your home unless you remove the person that gave her the license, which is your father.

So it took me many, many years, over a decade, to realize that that's the step that I have to do to recover my family and my home. They told me, if this woman is trying to take advantage of your father you have to take that step. Take that step and after that your father is going to -- you know, the woman is going to drop him like a hot potato because she doesn't have a home to live for free that you're paying for now because of your father, but it's a technical

E. MALLEK

insurance claims to see what people normally do claim and cross checked it, but I noticed after I sent it that I missed a few things that I own that perhaps -- like, website adviser, they give you -- you know, this is what the form would look like, and I said I'm saying, yes this is probably -- my intent of this is to compile a logical list, that if anyone walks into a home these are the normal things that one will find in a home which I had in my home. I had a living room set, absolutely. I have a beautiful dark wood cocktail table, solid wood, that I had for ages and I lost that. I always want to keep that. I said, oh, my God. That table was so beautiful, and I'm sure I missed a lot of things, and I said soon after I sent it I said, I missed to put that, but this is basically quickly a preliminary thing a common sense type of thing that anyone would say, no, that's not true, impossible that you had a living room set. That's impossible to deny.

Q. Well, what is a living room set?

E. MALLEK

A. A couch, a cocktail table, that I just mentioned, a couple of lamps, maybe a mirror art on the wall; that's a living room set.

Q. As we sit here today as two reasonable people, can you believe that what a living room would mean to one person may be different to another person.

A. Absolutely, and this is preliminary. I'm going through my statement that I got, but I think a lot -- since my parents initially bought everything for cash, we didn't have credit cards at that time. My parents were very old school people that were making meager wages, and everything that they bought, they bought in cash. I don't think I ever seen a credit card in my father's name.

Q. Looking at this, how do you think it would be possible for someone at Allstate to determine the actual cash value or the replacement cost of any of the items that you have listed here?

A. This is preliminary. This is my

father versus you?

A. My father's personally property, culturally, is his clothes and any other, you know, for his personal use kind of things. Everything else when he transferred title, although I was already on the title, one-third, because part of my mother's estate, that portion that was his when he transferred title, you know, culturally is left to the children.

Q. The living room set, you said that it may include certain things, and I'm going to ask you to be more specific.

A. It did include, not that it may include, it did include two sofas.

Q. Two sofas?

A. Yeah, one here and another one there, and a cocktail table, lamps and things on the wall.

Q. How many lamps?

A. It was probably two, because it was one that was curved like this, old fashioned, another one in the corner.

Q. And you say the cocktail table is

part of the living room set but you have them listed separately on the preliminary list of items lost.

A. It says living room set, cocktail tables. The living room set would be the sofas, and the cocktail table is separate, because when you go to the store and you buy a living room set they don't give you a cocktail table. Do they? No, they don't. You just say you want this living room set.

Q. Who bought the living room set?

A. We used to have one and we bought it all together, and I don't know what they did with that, but the second purchase was made by us. Mainly, my mother chose the living room set.

Q. Who paid for it?

A. We all did. We all gypped in.

Q. When did you buy it?

A. I don't recall.

Q. Where did you buy it?

A. I have no idea. It's many years ago. I have no idea.

Q. How many years ago?

E. MALLEK

table to dine, have a chair, have a china set. Whatever it is that I can have. I can have my home back. Now, I have nothing. Now, I have ashes.

Q. Well, I assume you have all the property you have in your other home and you can move all that property into the new home; right?

A. When you move things -- I don't know if you have ever moved. When you pay for the move it's like buying everything all over again. I moved more than once, and it's not that I want to be helping Allstate replace my stuff. I want Allstate -- I have a contract with Allstate, and if I lost something Allstate should replace it.

Q. I was just curious about your answer about how you needed stuff to move in there when you have a fully furnishes home right now; right?

A. You are misinterpreting things. When I go to one home or the other I want to go there and have a place to sit; so if I move my furniture when I go into my

E. MALLEK

apartment I don't have a place to sit. I don't understand the logic of the question. I'm confused.

Q. I don't understanded the logic of the answer, I guess, and that's why --

A. I want it to be the way it used to be when my house was standing. That if I want to go after work or after whatever to go to one home or the other that I have a bed to sleep.

Q. One of the items listed in the kitchen is a stove. Can you tell me about the stove.

A. What do you mean?

Q. Was it a gas stove, an electric stove, what was it?

A. It was a gas stove.

Q. Was it a multi-burner?

A. I don't know it was with the house.

Q. How old was it?

A. I don't know. It was purchased with the home.

Q. In 1977 it came with the home?

E. MALLEK

Allstate would have because I don't trust them. That's not what I would do.

Q. In looking at this preliminary list that you have given me, and I have sent on to them, is there any way as we sit here as reasonable people, is there any way that Allstate can make a determination as to the precise cash value or the replacement cost of any of these items?

A. No. As I said, I indicated several times in the past, I am reviewing my credit card statements, and I just want to be courteous and provide you with an answer because you requested so insistently and I want to reply to your request and I did the best that I could, and it's obvious that I did not include the amounts because I am very honest and I want to be honest, and that's my integrity. That's my name, and when I have that information or an estimate I will submit that information, but for now as of today I want to end the investigation of -- after the additional reviews or inspection, the part on the loss of the

E. MALLEK

structure. This is minor.

Allstate wants to look at every two in the box to avoid paying me that. It's fine. Okay? I'm not saying that it's the right thing. Sooner or later we depend on a supreme being, and sooner or later things catch up with you, and that's fine.

I'm just asking for the courtesy, and the patience that I had, to allow me to complete that form, and when I do to be reasonable in the replacement of those things and, of course, I'm not asking that, you know, the replacement be for quality A, you know, purchased in some Italian boutique.

It is a modest home; so a place where I can go and have the same thing, be able to go into my bedroom and sleep, go to the living room and have a living room set and a place to sit down or a place to have dinner or a place to cook, but for now if we are doing this now for that part, we can meet again to revisit this section, because it's unfinished, and we all agree to that;

we're done here today, and you will be meeting him at the house Thursday at 11:00. Is there a good location to meet?

A. The front of the house, and another thing, I suppose -- have they admitted that they have had the key for 12 days?

Q. I don't know the facts and circumstances of that.

A. Well, I do have the FedEx envelope that has the key.

Q. Then I guess there's no disputing that if that's what you believe.

A. I asked for affidavits, one way or the other. Why aren't they sending me the affidavits saying, no, I didn't have the key or you weren't there or we never inspected the home?

Q. I don't know that they're obliged to give you the affidavits.

A. Why not? I'm obliged to give you things.

Q. The policy indicates --

A. That is the inequality of the

policy that I never read; so we're not going by that policy. We're going by the nine page policy that doesn't indicate anything to that effect. In fact, they lie.

Q. You and I will disagree on the governing policy and with that, let's wrap the record up. Thank you.

A. Thank you.

(TIME NOTED: 2:05 p.m.)

____________________________

EVA MALLEK

Subscribed and sworn to before me this _____ day of _____________________, 2016.

____________________________

NOTARY PUBLIC

ERRATA SHEET

DATE OF DEPOSITION: JANUARY 7, 2016

NAME OF DEPONENT: EVA MALLEK

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

______________________________

EVA MALLEK

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____ DAY OF ______________________, 2016.

______________________________

NOTARY PUBLIC

0

**0000437941222** 1:8 12:7
**01/02/55** 3:24

1

**10** 9:13 116:5
**10,000** 132:11
**100,000** 40:12 41:6
**10004** 1:11 2:4
**10:35** 1:13
**11** 108:20
**11375** 3:12
**11:00** 133:3
**12** 50:9,10,12 108:23 109:3 133:7
**12th** 50:15
**13** 98:20
**14** 43:19 51:3
**14th** 44:8
**150** 63:22
**18th** 136:18
**1977** 51:18 60:11 62:3 73:6,25 74:8 84:24 126:25
**1990s** 132:14

2

**2** 44:22 79:19
**20** 8:8 14:6 28:11,14 32:13,14 33:17 53:18 86:23 123:2
**20,000** 55:21
**2002** 98:20
**2005** 64:14,16 86:7 114:6
**2006** 64:15,16 86:7
**2013** 66:25 67:13 88:14
**2014** 66:21 67:10,15 68:7 70:3
**2015** 43:20 44:25 47:20 48:3,9,14 49:19 67:2,3,4 70:15 85:11
**2016** 1:13 134:19 136:19 137:3,20
**207th** 5:22 12:10 74:24 91:12
**24** 39:2,6
**26** 135:8,9
**2:05** 134:10

3

**3** 27:24 28:21 29:14 135:4
**32nd** 11:25
**358** 25:19 110:21
**368** 110:21
**3rd** 105:22

4

**417** 3:12
**43** 135:10
**47** 135:11
**49** 27:8 79:19 81:6 81:19

5

**5** 135:17
**50** 50:8
**585-1** 33:8

6

**60** 26:5 51:18 115:13
**61** 3:22 111:25 115:5,12
**68** 63:4
**68-61** 3:11 5:8,19 6:9 8:18 9:8 10:5 17:5,9 74:20 75:21 87:21 88:2,4,6 89:10,19 90:17,18 91:13 96:4,11 115:24

7

**7** 1:13 137:3
**70** 89:25

8

**80** 10:8 64:25 89:25 96:10
**82** 135:17
**88-20** 5:22 9:10 12:10 17:7 74:24 75:20 89:10 90:14 91:12 92:17 96:3 110:16 115:20 132:6
**89** 63:25

9

**9** 44:25 48:3,9,14 49:19
**90** 64:25
**98** 135:12
**99** 26:7
**9th** 47:20

a

**a.m.** 1:13 108:21
**ability** 19:8 21:22 22:3
**able** 21:7 37:15 66:10 81:25 82:8 87:5 93:25 112:16 113:5 116:6 124:25 130:19
**absolutely** 13:19,25 20:22 21:3,24 22:5 36:2 37:21 42:11 117:13 118:10
**accept** 25:8
**access** 51:11 69:21 71:14
**accessed** 109:2
**account** 13:4 84:19 84:20 85:7 97:19 131:13
**accuracy** 20:16 48:11
**accurate** 19:15 20:18 21:11 34:4 44:15 48:2 49:5
**accurately** 19:9 21:23 22:4
**acquaintances** 99:15 101:13
**act** 8:16 9:2 46:12
**action** 136:13
**actual** 109:9 110:4 118:22 128:13,15
**add** 74:12
**addition** 108:23 109:11
**additional** 6:24 12:14 59:2 108:24 129:24
**address** 3:9 4:7 5:19 9:9 17:7 60:8,9 74:20 80:14 81:23 82:4 88:9,11 89:21 90:17 92:13 95:21
**addresses** 7:9,13 17:15 22:25 90:9 94:15 95:20 96:5 97:21 98:2,3
**adequately** 13:11
**adjuster** 105:11,14 105:18,25 107:20 108:8 109:17 110:24
**adjusters** 101:17 103:13
**admitted** 133:7
**adult** 66:10
**advance** 45:9
**advantage** 114:19
**advice** 13:8,12
**adviser** 117:6
**affect** 14:14 21:21 22:3
**affidavits** 133:15,17 133:21
**afraid** 106:7,9
**afternoon** 108:12
**agencies** 44:23 45:11,21 46:19,23 51:8

23:18 25:24 41:15 41:16 42:20 64:10 65:24 68:9,11 69:13 69:20 73:23 92:9 94:14 95:19
**cases** 22:8
**cash** 109:9 110:4 118:14,18,22 119:8 128:14,16 129:9
**catch** 8:11 130:8
**cc** 44:22
**cellilli** 2:5 3:5 13:6 19:17,20 27:3 43:13 135:4,13
**century** 3:18 61:13 86:22
**certain** 14:13 121:13
**certainly** 14:20 16:10
**certified** 24:17 33:22 34:4 47:24
**certify** 136:6,12
**chair** 125:2
**challenge** 40:17
**challenging** 42:11
**change** 23:19 73:9 73:13 75:12,14 78:7 78:16,21,22 79:4 81:21,21 83:16 85:4 86:10 87:21 95:14 95:15 98:7 99:5,9 137:5
**changed** 62:9 76:13 78:2,14 81:10 86:3 91:20
**changes** 21:11 91:9
**charge** 124:11
**cheat** 92:19
**check** 9:18 35:2,3 36:21
**checked** 36:20 117:3
**checking** 48:6 99:20
**checks** 14:5
**cherry** 62:21
**child** 124:8,11
**children** 121:11
**china** 124:5 125:2
**chose** 122:16
**christian** 8:3
**chrome** 123:14
**cioffe** 43:22
**circumstances** 5:17 133:10
**citibank** 110:8
**city** 82:15 116:8
**claim** 1:8 6:4 12:8 12:15 13:9,11 15:7 15:17,22,24 16:15 16:16 17:19 18:24 31:23 35:11 40:8 45:8 49:21,23,24 50:6 53:6,12,13,16 53:23,24 54:14,15 54:20 55:11 58:6,22 58:25 59:11,18,19 59:24 65:14 66:22 67:11 80:10 87:10 94:2 95:13 101:23 117:3 132:19
**claimant** 1:4,8,17
**claimed** 67:7 70:3 92:13
**claiming** 10:2 66:7
**claims** 4:3 6:2 15:12 39:20 40:8 53:25 117:2
**class** 128:6
**clean** 100:2
**cleaners** 7:16,18,22
**clear** 35:3 49:9 67:19
**clearly** 50:7 83:22
**clerked** 41:13
**client** 6:13,14 31:25 53:12,13 76:7 84:17
**clients** 6:18 31:12
**close** 71:21 116:8
**closed** 71:12
**clothes** 7:17,20,22 7:24 121:4
**clueless** 36:2 37:10 37:12 38:20,23,23 95:25
**cocktail** 51:22 117:14 118:2 121:19,25 122:5,7 122:10 123:5 124:21
**cognizant** 37:22
**collect** 67:25 101:9
**come** 7:7,17 15:11 43:4 45:7,10,17 46:5,7,11 47:8 75:12 77:20,21 79:9 79:12 83:17,24 84:15 87:16 91:7 93:13 104:24 105:13 116:8
**comes** 39:2 43:5
**comforts** 20:24
**coming** 7:19 11:3,4 55:24 102:13 105:11,12
**comment** 11:9 18:22
**committed** 31:13
**committing** 32:6
**common** 51:24 117:21
**community** 128:6
**comp** 33:12
**companies** 35:25 56:20 87:17 100:23
**company** 1:6 12:6 15:23 17:20 46:2 47:23 49:13 51:2 54:9 78:18 86:15 97:4 99:25 100:20 103:5 112:12
**competitive** 101:20
**compile** 117:9
**complained** 12:21
**complaint** 45:12,13
**complaints** 51:7
**complete** 50:7,8,19 54:11 55:17 57:6,9 57:11,15 58:14 59:7 59:14 84:3 130:11
**completed** 50:25 52:8 53:5,6,9 55:3 55:10,11 57:10 59:17
**completing** 94:21
**compliant** 10:23
**complicated** 58:12 92:5
**compliment** 40:11 41:5
**compliments** 40:25
**complying** 91:17
**computer** 72:3
**conceding** 51:13
**concern** 4:21
**concerned** 110:20 120:8
**concerning** 13:8
**concerns** 78:20
**conclude** 44:5
**conclusion** 47:9
**condition** 107:11
**conditions** 1:18 8:9 12:4 24:22,23 25:9 26:4,10
**conference** 20:24
**confidence** 34:10
**confirm** 48:6,20
**confirming** 9:21
**conflicts** 64:3
**confused** 126:4
**connect** 40:23
**consider** 50:18
**consist** 31:16 123:3
**consistency** 6:17
**consists** 29:6,21 31:8 32:4,19,23 33:3 47:18

**construction** 55:21 56:23 66:13 100:2 100:19
**consult** 23:21 74:4
**consultants** 86:14
**contact** 44:2,5 75:7
**contacted** 46:23
**contacting** 101:24
**contained** 24:23 30:7 50:22 52:10 54:25
**contains** 47:20 49:11
**content** 113:9
**contents** 12:13 24:16 49:24,25 51:17,20 52:18 106:22 109:12 128:12
**continue** 27:17 112:9
**continued** 109:23
**contract** 28:16,17 125:16
**contribute** 60:13
**control** 9:17 10:19
**controls** 76:5
**conversation** 27:17 64:4 89:2 90:7 91:4 91:6
**conversations** 18:7
**convoluted** 49:21 58:9 59:5
**cook** 130:22
**cooperate** 72:11
**cooperation** 15:8,24
**copied** 46:17
**copies** 45:11 65:18 77:24
**copy** 7:15 21:4,6,9 24:17 30:15 33:22 34:4,8,9,11 36:23 44:16,17,20,20,24 45:20 48:3,6,8 50:14,14,16 80:17 80:22
**corner** 121:24
**corporate** 58:19 94:5
**correct** 12:17 23:17 28:15,23 29:15,18 29:23 32:20 33:23 33:24 44:18 48:9,24 49:14,19 52:4,5 53:5,10 57:4,7,24 58:3 59:9 61:16 62:7 67:5 69:16 74:22 76:8 88:3 96:15,16 97:11
**correctly** 12:16 29:20 30:2 44:25
**correspond** 49:3
**correspondence** 81:9
**corresponds** 93:9
**cost** 22:17 109:6 110:4 118:23 123:19 129:9
**couch** 118:2
**couches** 123:5
**counsel** 13:6 22:17 22:18,20,21 23:12 23:14,16,21,22
**count** 124:17
**countries** 120:21
**country** 8:4 120:20
**couple** 19:7 118:3
**course** 6:5 33:20 45:12 60:13,20 62:9 63:7 70:4,7,10 74:11 76:15 78:5 124:16 130:13 131:10
**court** 19:3,4 21:12 38:3 45:13 47:10 66:5 68:24 132:23
**courteous** 129:14
**courtesy** 130:9
**courthouse** 21:2
**cover** 23:3 27:7 91:11
**coverage** 12:9,11 25:7,18,22 78:6 128:17,19
**covered** 17:16 25:24 30:18 31:5 92:9 95:16
**covering** 110:22
**create** 63:19 68:12 84:19
**creative** 63:17
**credit** 118:14,18 128:3 129:13
**criminal** 11:6
**cross** 49:6,7,8 117:3
**culturally** 121:4,10
**culture** 120:16,18
**curious** 115:17 125:18
**current** 5:19 26:17 26:22 36:13 37:2 110:19
**currently** 11:24 23:12 36:4 70:15 115:18
**curved** 121:23

**d**

**d** 47:13,15,17,18 48:2,23 49:11,17 50:22 52:11 54:6,7 54:25 57:4 59:9 75:16 76:17 83:25 84:2 93:11 94:11,20 95:9 135:2,11
**dad** 63:9,24 64:25
**damage** 12:12
**dangerous** 107:19
**daring** 106:14
**dark** 107:16 117:14
**database** 82:12 101:4,5
**databases** 76:5
**date** 3:23 64:17 70:16 76:11 137:3
**dated** 43:19 44:24
**day** 22:9 36:18 43:25 85:8 103:23 108:19 109:3 116:8 134:18 136:18 137:20
**daylight** 108:17
**days** 26:5 50:10,10 50:12 51:18 103:24 108:23 133:8
**deal** 63:23
**dealing** 32:2 87:15
**dealings** 17:18 33:20
**death** 7:3 92:9
**debating** 9:6
**debt** 41:4
**decade** 114:16
**deceive** 13:14,23 17:6
**deceived** 92:25
**deceiving** 92:22
**decides** 128:11
**decision** 16:8 112:17
**decisions** 19:2 74:5
**declaration** 29:10 33:6
**declarations** 29:7,22 31:9 32:19,24 85:3
**decline** 87:9
**decoration** 123:7
**dedicated** 42:11
**deductible** 33:8
**deed** 60:19,21,22 62:3 70:11 83:20 98:14 120:11,12
**deeded** 89:5
**deemed** 15:4
**deems** 68:25
**defend** 38:24
**definitely** 101:11
**delve** 40:18

**financial** 14:3 34:23 35:7,15 37:11 38:17 65:22 67:16 68:6
**find** 66:13 71:17 77:17,25 82:6 87:12 90:9,24 99:10 100:16 102:6 117:11
**finding** 42:6
**fine** 3:25 4:5 7:14 97:15 130:5,8
**finish** 19:23,25
**finishing** 37:19
**fire** 4:25 12:10,18 15:18 23:3 25:24 30:9 61:15,20 73:23 80:4,8 97:3,12 99:11,25 100:8,11 100:11,18 101:6,19 102:4,5,6,7 103:11 105:8,10,19,24 106:5 110:25 111:4 112:25 113:12 114:3 115:4
**firemen** 107:5
**firm** 41:13
**first** 3:2 15:11 19:10 29:20 34:12,13 36:17 43:11,23 47:25 78:4,8 81:20 83:4 100:15 101:22 102:3,25 103:13 105:3,23 113:18 116:22 119:12 120:20
**five** 98:6
**flashlight** 106:13
**floor** 11:25 106:16
**floors** 107:17
**fog** 84:4
**follow** 9:3 101:18
**following** 12:9
**follows** 3:4
**food** 127:12
**foreign** 54:18 55:14 57:8,16
**foreseeing** 30:9,10
**forest** 3:12 74:21
**forever** 66:9 113:7 123:15
**form** 32:20 33:4,6,7 33:9,10,11,14,15 49:17,20 50:21,25 52:20,20,21,24 53:5 53:11,14,19,24,25 54:7,14,17,17,18,18 54:19,23 55:3,6,6,7 55:8,12,14,15,18,18 57:2,6,8,16 58:7,8 58:11,20,21,25 59:8 59:14,17,20,23,23 75:16,17,24,24 83:24,25 93:10,11 93:16 94:10,10,11 95:8,10,13,14,24,24 117:7 130:11
**formally** 43:12
**forms** 52:14 55:17 58:2,4 59:4,4 67:7 76:15,16,17,24 77:9 77:11 82:22 86:4 91:10
**forth** 8:10 39:9 45:18 65:10 136:8
**forward** 4:13 14:4
**four** 43:15 47:18 71:13,25 135:10
**fourth** 4:10 14:12 15:2 16:5,21 36:11 37:6 65:23 69:9 70:14 71:10
**frame** 107:3,5
**frankly** 39:16
**fraud** 26:11 31:13 32:7
**free** 67:18 114:24
**friendly** 58:11
**friends** 101:12 116:9
**front** 27:25 54:6 62:21 133:5
**fruit** 62:20
**full** 7:15 11:11 24:5 30:5,12,15 85:17 104:22 111:12 127:16
**fully** 31:5 70:19 73:21 98:5 112:18 125:20
**funny** 22:6,12 80:23
**furnished** 21:9 53:2
**furnishes** 125:20
**furniture** 125:25
**further** 23:24 136:12
**future** 115:9

**g**

**garden** 62:20,24
**gardening** 112:2
**gas** 126:16,18
**gather** 13:10 16:16
**gatherer** 13:17
**gears** 98:7
**general** 82:7,9
**generally** 82:23 93:17
**gentleman** 104:2 105:7 108:7
**genuine** 48:3
**getting** 41:12 42:3 65:5,6 90:20 103:18
**give** 11:18 13:8,11 15:6,9,14,23 38:12 42:2 52:16 56:19 60:6 62:8 68:6,10 76:11 82:7 88:9,16 91:17 101:11 117:6 122:9 128:3 133:21 133:22
**given** 7:23 45:17 47:4 69:21 112:8 114:9,10 119:13 129:5 136:10
**gives** 8:9
**giving** 14:24 19:23 19:25 55:20 56:2 90:9
**glad** 20:13
**glass** 107:3,4 123:14
**glimpse** 68:10
**global** 51:19
**go** 7:16 11:13 18:4 24:11 28:12 38:2 39:9,10 42:5 52:7 54:21 61:8 63:3 64:20 66:3,5,5 71:18 72:3 75:4 77:6,19 80:16,21 81:22 96:21 98:12 101:5 102:3,10,10 103:7 106:7,16,24 107:2 111:21,25 116:13 122:8 125:23,24,25 126:9 126:10 128:8,17,22 130:18,19,19 131:14
**goal** 20:14
**god** 117:16
**goes** 53:19 113:18
**going** 4:17,19 5:24 14:19 16:10,18,21 21:16 24:20 30:9,10 30:13 31:3,14 33:2 36:21 46:12 47:12 48:16 50:3,14,21 59:24 77:16 79:7 80:16 81:14 84:25 87:4,5,7,15,16 88:15 91:14 93:6,7 94:4 96:3 102:8,9 102:10,14,17,20,21 102:23 104:21,23 106:10,16 111:20 113:17 114:21,22 115:8 116:10 118:11 121:13 127:19 134:2,3

**gonzalez** 3:20 60:25 61:8,24 62:4,5,5
**good** 3:13,14 39:21 45:7,8,15,16,25 46:10,10,12 47:6,8 47:8 51:12 85:18 101:10 105:13 123:15 133:4
**gotten** 84:11
**governing** 134:7
**governmental** 44:23 45:21
**gracious** 108:4
**great** 19:21 41:5 63:23
**grounds** 15:6,23 18:23
**guess** 60:2 77:14 79:12 101:23 107:23 108:10 113:11 126:6 133:13
**guessing** 61:24
**gypped** 122:19 124:4

**h**

**h** 2:5 135:6
**half** 132:5
**hand** 27:12 33:25 40:4 43:17 44:11 47:16 96:2 136:18
**handle** 101:23 102:17
**handled** 15:12
**handling** 39:21
**hands** 28:12
**happen** 46:8 85:21 87:8 92:24 96:17 113:11,19,22 115:9 116:5 127:24
**happened** 23:5 42:25 76:12 79:8 80:3 81:7 86:21 104:10,25 105:23 113:24 114:6 127:22
**happening** 90:10
**happens** 105:3
**happy** 64:5 103:3,15 113:9
**harder** 39:24
**hates** 113:6
**hear** 14:4
**heard** 54:19 55:15
**heart** 115:11
**heat** 113:24
**heavy** 41:19
**hecht** 108:7 132:25
**held** 1:19 35:6 38:17 50:10,12 51:17 84:23 108:24
**hello** 81:2
**help** 4:17,19 11:16 56:14 94:4 98:18,21 104:19
**helped** 85:16
**helpful** 11:22 20:10
**helping** 125:14
**hereinbefore** 136:8
**hereunto** 136:18
**hide** 32:6
**high** 37:12 60:12
**hills** 3:12 74:21
**hired** 110:3
**historically** 62:8
**history** 40:15,17,22 41:9 60:7
**hold** 38:16 66:11 80:11 100:25
**holding** 54:5 64:17
**holidays** 63:8
**home** 4:21,25 5:22 9:9,9,10,12,12 10:3 10:12,15 11:11 17:5 26:15 30:19 34:8 36:24 48:7,12 49:5 49:25 50:11,15 51:11,17,21,21 52:19 55:23 56:14 56:23 60:10,17,17 60:18 62:13,17 63:3 63:11,15 67:18 68:5 68:15 69:21 70:12 70:21 73:16,22 75:20,20 80:16,20 80:21 85:9 86:12 87:5 88:21,22 89:4 89:23 91:22 98:15 100:2,3 102:19 106:6,18 109:10 110:22 111:7,8,16 111:17,17,21,21,25 112:3,4,7,18,21 114:12,18,23 115:6 115:13,21,23 116:24 117:10,12 117:12 119:17,18 124:10,20,25 125:4 125:7,9,20,23 126:10,24,25 128:9 130:17 131:19 132:6 133:19
**homeowners** 5:2 29:6,21 31:7 32:18 32:20,23 33:4,16
**homes** 116:3
**honest** 78:19 92:18 119:3,4 129:19,19 132:5
**honor** 58:25
**hope** 13:21
**hopefully** 18:14 38:21 51:5 110:18
**horrible** 103:19
**hospital** 102:12
**hot** 41:20 114:23
**house** 15:18 23:2,2 61:15,19 62:4,22,24 63:7 64:7,18 65:4 67:20 70:19 73:3,5 73:11 80:8 87:24 99:25 100:8,12 102:4,8 103:6,11,21 106:7 107:9,11 114:3 115:18,19 126:8,21 133:3,5
**household** 5:14
**huge** 94:9 131:17
**hundred** 10:3,15 26:6 96:10
**hung** 100:5
**hurricanes** 33:8
**husband** 62:25 67:9 111:19 113:17

**i**

**ice** 127:11
**idea** 17:25 42:2 47:4 48:12 55:19 56:7 74:13,17 79:16 81:5 82:7 92:4 122:23,24
**ideal** 116:7
**identification** 26:13 26:21 27:2,4 43:16 47:15 79:11 98:11
**ignoring** 80:7,11 81:13
**iii** 2:5
**imagine** 42:25 66:17
**immediately** 113:15
**impeded** 10:14 11:10
**impedes** 111:14
**important** 31:18 39:7 103:8
**impossible** 104:6 117:23,24
**impression** 78:8
**inaccurately** 21:13
**incident** 73:23 111:11
**include** 120:14 121:13,15,16,16 129:18
**included** 32:10,15
**including** 91:11 94:14 110:16
**income** 65:18 120:4

103:4,6 106:8 107:7 110:24,25 111:3,4 117:15 122:4 124:15,17 125:16 127:21
lot 15:11,12 63:20 63:20 65:22 75:15 111:18 117:18 118:12
love 40:16 41:2
lover 63:17
lynch 43:21

m

m 74:19
machine 19:7
maiden 3:19
mail 47:24 94:14
mailed 28:11,14 29:11,12 30:17 90:21
mailing 85:2 88:10 95:21
mailings 110:13
main 4:21
mainframe 131:16
major 40:13,14 41:9 119:20,24
making 13:9,20 51:10 74:5 81:13 118:16 132:20
mallek 1:3,8,16 3:2 3:8,13,16 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1,3,8 13:1 14:1 15:1 16:1 17:1 18:1 19:1,18,20 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 27:6 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,19 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1,20 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,12 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1,15 136:7 137:3,18
man 104:11
management 6:16 7:6 8:25 10:20 30:13 76:4 77:11 94:13 95:23
mandatory 33:7,10 33:13,16
manhattan 85:5 87:20 89:3 96:25 97:9
manner 20:15
manufacturer 41:21
mario 60:25 62:4
mark 26:20 43:13 47:12
marked 26:12,25 27:5,24 28:21 30:22 34:2 43:15,18 47:14 47:17 48:23 94:19 98:10,13
market 110:19 123:21
marriage 64:8 136:14
married 3:17 5:21 10:9,11 62:15 63:24 75:23 88:24 90:4,17 90:19 91:16,23
marshal 102:5,7 111:2 112:25 113:12
mary 55:21
matched 131:18
matches 132:8
matter 4:15 38:20 70:23,25 71:11,20 136:16
meager 73:18 118:16
mean 9:23 11:12 35:23 37:24 43:3 86:13,22 101:9,14 105:21 118:8 126:15 127:9
means 7:4 34:21 35:4
measurements 109:6
medication 21:25
meet 102:24 103:12 103:24 130:24 133:4
meeting 76:10 77:4 78:18 85:4,20 88:9 96:24 97:8 98:22 103:16 105:20,21 109:23 133:3
memories 111:18
memory 83:2
menial 60:16 66:12
mention 71:8 81:25
mentioned 1:19 18:12 24:7 34:22 43:24 65:13 83:10 98:2 107:25 118:3 132:22
message 99:18
messages 99:14
met 75:10 76:21 79:15 83:10 86:9 87:19 89:17 91:2 119:22
method 58:23
midnight 108:16
midtown 63:4 82:24
militich 43:20
mind 23:20 42:20 113:18
mine 46:14 120:11
minimize 86:15
minor 41:10 130:2
minute 98:7
mirror 51:23 118:4 123:6 124:21
misinterpreting 125:22
mislead 13:13,23
misrepresented 93:21
missed 9:24 103:14 105:2 117:4,18,19
missing 32:13,14 52:19 66:16
misstatements 51:10
mistaken 113:11
mistakenly 96:13
mistakes 94:8
mister 38:14
misunderstand 94:24
modern 123:18
modest 128:5,8 130:17
modified 49:4
mom 61:10 62:14,15 66:15 74:3 86:22 111:22 123:25

moment 34:2 47:13 52:6 100:25 113:24
monday 104:21
money 6:24 11:4 112:15 124:12,13
month 108:6
months 7:18 100:24
morning 3:13,14 108:18
mortgage 75:13 88:16 92:8 112:10 112:12 115:19,20 115:22
mother 78:25 79:3 111:18 122:16
mother's 61:2 121:8
motivated 42:21
motive 6:21
move 10:7 65:4 96:3 115:6,13 125:8,10 125:12,19,25
moved 9:10,11 63:15 90:16 125:11 125:13
moving 9:14 10:14 11:10 91:14,20 105:5
multi 126:19
multiple 110:23

n

n 2:2 135:2,15,15
n4ap 33:8
n4ap1357-1 33:16
n4ap693 33:15
name 3:6,19 13:5 46:24 60:24 61:2,23 62:2,4,23 66:3,4 67:20,22,23 68:5 70:12,15,19 75:5,6 75:8 76:14,20,22 101:6 108:7 118:19 129:20 137:3
named 74:19
names 3:15 56:20 74:10 78:13
nassau 27:9 79:19 81:6,19
nature 19:14 40:9
near 85:5
necessary 63:19 69:2
need 7:4,24 19:8 20:12 21:12 23:3 56:14,15 65:9,20 70:8 78:7 80:8,11 91:18 96:12 97:24 97:25 99:14 100:15 102:7,16 103:20 106:13,14 108:23 108:24 112:15 115:13 116:23 124:12,12,12,13
needed 30:25 64:2 73:11,17 77:9 84:6 125:19
needs 16:3 19:16,17 90:3 94:17 109:8 128:11
negligent 86:17
neighbor 12:20
neighborhood 128:5
neighbors 12:19
never 7:14 8:8 9:10 9:11 11:21 12:22 17:11 24:15,22 25:10,13 26:8 28:11 28:17,17 34:13 36:17,18 38:17,18 39:3 53:18 54:19 55:10,15 59:23 60:13 63:15 66:10 73:8 90:16 92:21,24 93:22 106:17,20 112:20 127:24 133:18 134:2
new 1:11,11,21 2:4 2:4 3:3,12 12:2,2,11 33:5,6,7,10,13 41:12,13 44:4 74:21 76:2 82:13 97:25 124:18 125:8 136:6
nine 26:25 27:5 30:8 38:25 39:8 73:10 75:2 80:13 95:18 134:3 135:9
normal 42:22 51:21 117:11 127:8,10,13
normally 117:2
notary 1:20 3:3 134:21 136:5 137:22
note 45:24
noted 25:14 134:10
notice 45:9
noticed 117:3
notified 102:4 106:5
notify 81:21
november 43:19 44:7 51:3
number 12:6 20:10 55:20 56:2,11 81:2 99:23 101:7,9,12,25
numbers 32:12 56:20
nyu 40:13 41:2 43:8

o

o 135:15
oakley 1:20 136:4 136:22
oath 1:16 12:3 20:18 20:20 22:19
obligation 20:21 38:6 40:3 128:14
obliged 133:20,22
obtain 53:12
obvious 129:17
obviously 15:22 20:15 25:14 41:25 64:24 70:8 128:23
occupation 37:2
occupational 35:9
occur 30:19 77:23
occurred 98:19,23 99:9
october 44:24 47:20 48:3,9,14 49:19 50:15 105:22
offered 51:6
offering 92:8 97:17
office 6:2 7:7 11:24 38:22 43:21 50:4 52:13 75:10 76:3,25 77:10,19 80:24 81:6 81:16 85:2 94:6 99:12,13,20
official 37:12
oh 79:9 96:2 97:10 101:4 117:16
okay 8:23 21:18,19 29:4,24 39:10,10 79:9 89:7 102:15,23 102:25 103:2 105:2 105:3 108:12,22 127:19 130:5 132:15
old 3:21,22 10:8 27:20,20 80:12 112:2 115:5 118:15 121:23 126:22 132:9
omission 93:24 94:3
once 21:5 44:5 125:13 127:6 128:19 132:22
ones 49:2 96:21,22
open 66:6 68:24 72:5 100:13,13
opened 41:18 96:7
operation 76:4
operations 6:12 7:6 8:24,25 10:20 35:24 50:5 52:14 77:10 94:6
opportunity 21:18
opted 52:16

31:24 35:18 39:18 39:22,23 40:7 42:15 50:20 52:15 58:10 59:2 68:22 72:14 75:16 82:21 84:4,5 84:6 86:16,24,25 91:24 93:15 94:13 97:20 131:4 132:16
**quickly** 117:20

**r**

**r** 2:2 135:15 136:2
**radio** 101:18,19
**range** 128:8
**rate** 123:21
**rationally** 114:6
**read** 16:15 21:6 29:19,25 30:22 32:21 39:4,13,14 40:6,20 44:25 45:19 48:13 112:23 113:25 120:12 132:24 134:2
**reading** 30:6 39:16 46:16,19,21
**ready** 115:6
**real** 120:13
**realize** 114:16
**really** 9:4 89:12 93:2 100:12 106:3
**reason** 4:22,23 22:13 32:9 40:2 47:10 70:22 84:21 110:11 137:5
**reasonable** 47:7 118:7 124:19 129:7 130:12
**reasons** 9:15 64:19 64:21 65:2
**recall** 62:22 76:20 76:22 81:8,24 82:13 82:23 83:3,13 88:25 89:7 91:4 99:7 122:21 128:2,16 131:14
**recalling** 119:7
**receipts** 47:24 51:18
**receive** 45:11 48:8 90:23
**received** 7:2 8:5 12:19 24:17,24 25:19 30:21 34:15 36:16,17,18 38:25 39:3 48:7,10,12,21 49:18,18 59:23 85:8 92:7 97:15 110:7
**receiving** 50:3 81:8 95:17
**recollect** 88:5 115:7
**recollection** 82:3 85:10 86:19,20 98:19,22
**record** 3:7,10 11:23 14:7 19:9,15 24:3 25:15 27:4 43:19 47:18 70:24,25 71:8 71:11,24 72:8 95:6 98:12 99:4 101:8 134:8 136:10
**recorded** 17:6
**records** 46:3 71:14 72:25 112:23
**recover** 114:17
**refer** 20:6,9 53:20 64:10
**reference** 27:23 49:7,15
**referenced** 49:8,8
**referred** 59:22
**referring** 51:25 57:18,24 84:13 94:18 97:8 111:10
**refinance** 88:17 110:9
**refinanced** 88:13
**reflect** 11:23 24:4 82:2
**refresh** 98:18,21
**refrigerator** 127:4,7 127:8,13,17,25
**refuse** 15:3 18:23
**refusing** 36:9,12 37:4 71:4 72:22
**regard** 42:2 111:6
**regarding** 12:18 13:10 50:4
**regulations** 77:10 88:19
**reimbursement** 33:15
**related** 38:19 136:13
**relationship** 89:11
**relative** 89:22
**release** 45:15 46:24
**released** 46:9,15 47:5,11
**releasing** 45:24 51:7
**relevance** 16:7
**relevant** 3:25 4:23 6:20 14:23 15:5,22 16:11,20 22:22 35:10 36:9,15,19 37:9 52:15 62:11 64:4 65:24 67:2 69:12 70:17 72:12 72:15,17
**remain** 96:3
**remained** 78:24
**remarried** 61:21 64:6 65:7 85:22,25 86:6
**remarry** 64:13
**remember** 19:8 20:9 22:11 41:14 81:10 87:6
**remnants** 109:12
**remove** 114:11,12
**removed** 79:3 106:6 107:8
**rent** 67:25
**repairs** 100:3
**repeating** 17:2
**repetitive** 96:8
**rephrase** 18:17
**replace** 111:17 125:15,17 127:20 128:6,19,22
**replaced** 119:24 124:24 127:5
**replacement** 109:9 109:10 110:4 118:23 128:17,19 129:9 130:12,14
**reply** 129:16
**report** 42:23 47:2 78:7,16 102:3
**reporter** 19:4 21:13 132:23 136:5
**represented** 22:19 22:21 23:12,14
**request** 129:16
**requested** 17:24 46:23 129:15
**required** 25:4
**reservation** 24:6
**residence** 92:14
**resident** 53:14 88:17
**residing** 86:12
**resolution** 45:8,10 45:17 46:5,7,11
**resolve** 11:7 13:12
**respectable** 35:4
**respond** 21:23 22:4 71:9
**responded** 48:25
**respondent** 1:7,17 2:3
**responding** 39:25 71:7
**response** 48:23 49:9
**responses** 19:11,14 49:2
**responsibility** 17:12 34:21 76:6
**responsible** 85:12
**rest** 18:4,10

**restrained** 25:12
**restriction** 24:14
**result** 10:13
**retain** 22:17 23:22
**retained** 135:13
**retire** 112:5,15 115:14
**retirement** 115:23
**return** 66:22 67:5 69:24 99:18
**returned** 50:16,25
**returns** 65:15,19 92:15
**reverse** 41:8
**review** 6:22 21:6,10 21:18 31:2 34:3,18 77:13,15
**reviewed** 6:17 7:5 26:9 50:11
**reviewing** 39:8 95:23 97:16 129:12
**reviews** 50:9 96:17 129:24
**revisit** 130:24
**right** 8:14 13:2 14:19,20 15:2,19,20 16:6 17:17 21:14 22:17 29:2 36:5,11 37:7 55:5 68:16,17 71:14,18 86:16 87:8 89:13 93:15 94:13 100:13 107:12 111:14 113:2 125:9 125:21,21 130:6 131:20
**rightful** 77:14
**rights** 4:10 14:13 16:6,22 24:6 65:24 69:10 70:14
**risk** 6:15 7:6 8:25 10:20,22 30:13 76:4 77:10 94:12 95:23 97:23
**robotic** 54:13
**rodeo** 15:12
**role** 13:18 16:14
**room** 20:24 38:21 51:22 82:18 106:11 106:19,21,25 117:13,23,25 118:4 118:8 119:25 121:12 122:2,5,6,9 122:11,12,17 123:3 123:11 130:20,20
**rosa** 61:24
**rules** 19:2 20:25
**rundown** 82:16
**rush** 26:18 80:4

**s**

**s** 2:2 61:4 135:6,15 135:15 137:5
**sacrifice** 20:16
**sad** 63:10
**safe** 64:12,12,21 116:11
**safely** 115:7
**safest** 64:11
**safety** 64:19,21 65:2
**salespeople** 9:2
**saturday** 103:16,25 105:20 109:22
**saved** 60:12
**saw** 24:15 34:13 41:21 107:2
**saying** 7:8 12:20 13:15 15:13 19:18 19:19 24:19 25:6 31:15 40:3,19,24 54:3 69:18 72:5 95:7 100:7 117:8 130:5 133:17
**says** 7:18 8:7 28:5,7 28:9 29:2,5,16,20 38:5 39:4 44:22 48:10 74:23 75:3 98:20 111:19 122:5
**scale** 94:9
**scenarios** 93:19
**schedule** 99:3,6 104:10
**school** 41:14 60:12 60:14 118:15 131:11
**schooling** 37:19,20
**screen** 131:17,19,19 131:21 132:4,7
**se** 35:23
**seated** 19:4
**second** 18:9 112:8 122:15
**seconds** 71:20
**section** 28:4,22 29:14 30:22 70:2 130:24
**security** 120:5
**see** 4:17 6:23 7:9 28:4 31:23 40:21 48:15 51:22 54:22 54:23 57:2 75:9 80:25 83:24 90:21 96:5 102:21 103:20 106:12 107:14,18 108:15 109:12 117:2 124:8
**seeing** 97:19
**seek** 14:25 16:5
**seeking** 12:9
**seeks** 12:11
**seen** 8:8 20:7 25:10 26:9 28:18 44:12 84:10 118:18
**sell** 77:16 89:12 92:10 111:19
**selling** 6:24 112:21
**send** 6:9 10:5 45:3 69:24 90:18
**sending** 30:12 56:22 91:13 133:16
**sends** 32:3 110:8
**sense** 51:24 117:21
**sent** 22:14 34:12,16 39:15 43:12 44:16 45:20 47:19 48:4 51:19 110:12 117:4 117:19 129:5
**sentence** 29:20
**sentimental** 124:16
**separate** 113:7 122:7
**separated** 49:23
**separately** 122:3
**sequence** 105:17
**service** 7:24 8:24 14:3 30:5
**services** 34:23 35:7 35:16 37:11
**session** 65:3
**set** 15:18 18:9 51:22 52:15 82:17 117:13 117:24,25 118:5 119:25 121:12 122:2,5,6,9,11,12,17 123:11 125:3 130:20 131:10 136:8,18
**seven** 47:14 135:11
**severe** 33:8
**sewing** 66:18
**shaefer** 27:8,10 81:3 92:7 97:16
**shape** 58:25
**she'll** 132:24
**sheet** 21:15 137:2
**shocked** 101:13
**short** 59:25 98:6,9 111:24
**shorthand** 136:4
**shoulders** 19:12
**show** 77:21,22,22
**showed** 28:20 45:20 105:6,7,14,24 106:2
**showing** 55:9 59:15
**shrink** 30:10
**shrug** 19:12
**side** 6:19 63:18 81:5 82:24,24,25 85:6 107:6

**transcribed** 21:13
**transcript** 82:4 132:24
**transfer** 75:24 77:23 131:21,22
**transferred** 79:8 98:15 120:9,10,13 121:6,10
**transition** 60:2
**traumatic** 80:19
**tree** 62:21
**trees** 62:20,23
**trick** 13:13,23
**tricks** 31:12
**tried** 109:21
**triggered** 77:6,8
**true** 5:16 9:22 34:4 44:15 48:2 53:4 56:17 82:10 87:13 117:23 136:10
**trust** 7:21 8:4 28:13 30:3 34:6,10 35:5 36:24 38:2,5,8,8 48:18 68:23 69:17 69:18 87:10 96:22 129:2
**trusted** 17:17 29:10 87:18 96:15 98:5
**trusting** 73:21
**truth** 20:19,19,20 69:22,23 81:16 132:18,18
**try** 13:10,12,22 16:10 17:6 20:14 101:20 102:5 109:24,24
**trying** 11:16 13:13 14:15 15:14 16:2,16 31:21 40:21 43:6 53:13 54:12 56:6 58:8,8 59:12 72:20 77:17 83:3 87:9,12 88:5 89:12,16 90:24 91:3 93:17,18 104:10 114:2,19 120:24
**turn** 116:12
**turned** 100:16
**turns** 32:13
**tv** 20:7 119:25
**two** 7:9,13,18 8:6 17:14 22:24 25:2 28:16 44:8,9 47:21 50:22 52:2 54:6 58:2 61:6 64:16 90:9 92:10 94:14 95:20 96:5 97:21 98:3,10,13 100:24 110:13 116:2 118:6 121:16,17,22 123:5 130:4 135:12
**type** 38:15 68:6 77:15 88:21 117:21 127:7
**typed** 132:23
**types** 35:6 87:17

u

**ultimate** 10:13
**unaware** 35:12
**unbelievable** 107:6
**unbelieve** 131:16
**underneath** 29:5
**understand** 5:4,15 6:6 9:5 12:15 13:17 18:16 20:20,23 21:22 22:3 23:8,11 25:5 30:16 31:22 34:20 37:8 48:13 54:3 61:14 69:18 83:23 95:2,5,6,7 100:7,25 126:3 128:24
**understanded** 126:5
**understanding** 16:17 63:2 72:19 110:2
**understood** 18:19 18:20,21 20:2 23:24
**unfinished** 130:25 131:5
**united** 32:2
**unnecessary** 71:9
**unsophisticated** 35:14 40:5
**upfront** 13:21
**urge** 63:8
**urgent** 99:16,17
**use** 55:6 58:23 121:5
**user** 58:10
**usually** 84:12

v

**vacation** 104:16,19
**valid** 14:16 25:17 26:3 72:18 96:19 97:22,23
**valuable** 127:3
**value** 4:20 14:16 68:15 72:15 109:9 110:5 118:22 119:2 124:16,18 128:14 128:16 129:9
**varied** 87:3
**various** 31:9
**vehicle** 58:20
**verbal** 19:11,14
**verify** 36:23
**versus** 121:2
**vet** 40:3
**victimized** 42:21 43:3
**village** 6:10 12:11 60:4 89:21 92:13 97:5 100:9 116:10 132:6
**visit** 104:3
**voicemail** 81:14 99:21,23
**voicemails** 104:17
**volkswagen** 128:22
**volume** 94:7
**voracity** 37:16 38:11

w

**wages** 73:18 118:16
**wait** 104:23
**walk** 72:2 82:17 124:20,25
**walked** 107:7
**walking** 102:23 103:3
**walks** 117:10
**wall** 51:23 118:4 121:20 123:7,7 124:22
**walls** 71:13,25 72:2 107:16
**want** 7:10 9:17 10:17 16:9 18:5 20:16 23:21 31:18 31:25 43:10,25 44:6 44:20 45:7 46:11 47:8 60:3 64:20 68:12 72:4 92:19,20 95:5 109:11 111:8 111:13,16,16,24,25 112:2 113:8 114:7 115:14,25 116:4,13 117:15 119:3 122:11 124:3,3,24 125:14,15,23 126:7 126:9 128:6,9 129:13,16,19,23
**wanted** 45:13 55:22 58:5 62:24 63:11,12 64:5 81:11 92:10 114:5 124:2 131:21
**wanting** 41:11
**wants** 108:3 111:19 113:7 130:3
**warn** 45:14,14
**washes** 66:13
**waste** 16:12
**water** 41:20
**way** 9:20 14:8 37:21 40:12 42:13,14 45:19 54:15,20

55:19 57:10 58:25 62:17 71:16 83:2 84:9 89:8 90:22 114:7 120:21 126:7 129:6,7 133:15 136:15
**weak** 107:23
**weaker** 65:5,6
**website** 13:2,3 116:25 117:5 131:14
**week** 104:22 108:9
**weekend** 104:12,13 104:15,25,25
**weekends** 103:22 104:4,7
**welcome** 44:19
**went** 26:14 42:3 51:21 60:14 63:25 68:9 76:3 80:2,8,14 80:24 81:20 82:20 105:6,18 106:10 116:25
**west** 81:5 82:24,25 85:6
**westlaw** 9:18,19,24 9:25 10:14 11:9,10 11:13 64:10 111:10
**wide** 100:13
**wife** 61:21 102:14 113:6,16 119:19
**willing** 23:15 69:6
**willingness** 64:23
**wilson** 111:2
**window** 123:8
**windows** 107:15
**wire** 26:11 31:13 32:7
**wish** 51:14
**witness** 26:14 136:7 136:11,17
**witnesses** 87:16
**woman** 41:16 75:8 75:10,10 76:21 77:2 79:14 81:17 82:20 83:11 86:4 90:11 114:11,18,22
**wood** 117:14,14
**word** 8:5 35:5 38:2 38:5,8
**work** 17:24 18:2 37:10 39:24 42:9 55:23 59:3 63:20,20 66:14 94:4,7 99:14 99:19 100:3 103:22 104:7,13 116:4 126:9 131:23
**worked** 14:2 34:22 58:18
**worker** 66:17,18
**workers** 33:12
**working** 66:10 119:23 128:5
**works** 14:9 104:14 108:12 119:21,22 120:21
**world** 9:11 37:13 40:5 56:21 120:20 120:20
**worried** 17:15
**worries** 66:6
**worry** 113:13
**worse** 107:16
**worth** 41:4
**wow** 41:23
**wrap** 134:7
**write** 21:14 42:14,22 42:24
**writing** 40:16
**written** 93:5
**wrong** 72:6 73:8 81:15
**wrote** 45:6

x

**x** 1:2,9 135:2,6

y

**yeah** 74:25 88:7 121:18
**year** 34:17 39:9 43:23 67:17 86:8 92:7 97:15
**yearly** 6:16,23 8:6 73:17 85:3 96:17 97:17
**years** 3:22 9:13 10:8 14:6 41:22,22 76:12 84:18 86:23 91:5 112:2 114:15 115:5 116:5 122:23,25 123:2
**yellowstone** 3:11 4:7 5:8,19 6:9 8:18 9:8 17:9 74:20 87:22 89:19 96:4 115:24
**york** 1:11,11,21 2:4 2:4 3:3,12 12:2,2,11 33:5,6,7,10,13 74:21 82:14 136:6
**younger** 115:8

# EXHIBIT 5

Allstate. You're in good hands.

*Anna Truszkowski*
*355 Seventh Ave*
*New York NY 10001*

**Your Quick Insurance Check**

- ✓ Verify the information listed in the Policy Declarations.
- ✓ Please call if you have any questions.
- ✓ Now you can pay your premium before your bill is issued - visit allstate.com or call 1-800-Allstate®.

Eva N Mallek
68-61 Yellowstone Blvd
Forest Hills NY 11375-3313

**Confirming Your Policy Change**

We've sent along this mailing to verify the changes to your policy that you recently requested. The changes took effect on March 20, 2007. Please look over all the information in this mailing, and call us right away if you have any questions or if anything isn't exactly right.

The accompanying Amended Policy Declarations includes these changes:
Your name has been corrected.
An Occupant has been changed.
A policy coverage has been changed.
A policy coverage has been changed.

Your premium for this current period has been increased by a total of $190.00.

The coverages and limits you carry for your property, and the costs of those coverages, are listed in detail on the enclosed Amended Policy Declarations. You can see the specific changes to your policy by comparing this Amended Policy Declarations to the Policy Declarations previously mailed to you.

If you have any questions or concerns, please contact Anna Truszkowski at (212) 714-0650---or call the Allstate Customer Information Center at 1-800-ALLSTATE (1-800-255-7828).

Sincerely,

Edward M. Liddy

Edward M. Liddy
President, Allstate Insurance Company

PROP *51000310703025300300030I* 000000043794222 070 010 NY

MCD21-3 Information as of March 2, 2007 EP29